IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| CHRISTIAN EMPLOYERS ALLIANCE, | |
| *Plaintiff,* | |
| v. | CIVIL CASE NO. _____ |
| UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; CHARLOTTE A. BURROWS, in her official capacity as Chair of the United States Equal Employment Opportunity Commission; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; XAVIER BECERRA, in his official capacity as Secretary of the United States Department of Health and Human Services; OFFICE FOR CIVIL RIGHTS OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; LISA J. PINO, in her official capacity as Director of the Office for Civil Rights of the United States Department of Health and Human Services, | VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF |
| *Defendants.* | |

Plaintiff, Christian Employers Alliance (CEA), asserts for its Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof, allege the following:

## I.   INTRODUCTION AND NATURE OF THE ACTION

1.     This lawsuit challenges two federal regulatory mandates that exceed the government's statutory and constitutional authority. First, the Equal Employment Opportunity Commission (EEOC) has for many years now misinterpreted and improperly enforced discrimination based on sex in Title VII so as to force religious non-profit and for-profit employers to pay for and provide health plans or health insurance coverage to their employees that cover gender transition surgeries, procedures, counseling, and treatments in violation of the employers' religious

1

beliefs (the "EEOC Coverage Mandate").

2.     Second, the U.S. Department of Health and Human Services (HHS) issued a final rule in 2016, and recently expressed its present intent to enforce that rule, which interprets Section 1557 of the Affordable Care Act (ACA) and its implementing regulations so as to force religious healthcare providers to perform gender transition surgeries, procedures, counseling, and treatments in violation of their medical judgment and religious beliefs, and to compel and restrict based on viewpoint those providers' speech (the "HHS Gender Identity Mandate").

3.     The EEOC Coverage Mandate forces religious employers that provide health insurance to their employees to provide insurance coverage of elective gender transition services—and to pay for elective gender transition services in those health plans—even though doing so violates the religious beliefs of those employers.

4.     And the HHS Gender Identity Mandate forces religious healthcare providers to physically perform or facilitate those gender transition services even though doing so would violate healthcare providers' medical judgment and religious beliefs. That's not all. The HHS Gender Identity Mandate requires those religious healthcare providers to speak positively about these procedures even though they disagree with them and the Mandate prohibits them from offering their full and frank medical opinions, including warning patients of the dangers and risks of these experimental and irreversible procedures.

5.     The EEOC's interpretation of Title VII mandates that employers with 15 or more employees must provide employee health plans or health insurance coverage that cover gender transition surgeries and services, such as medical procedures to transition a biological male to a transgender female or to transition a biological female to a transgender male. The EEOC's interpretation of Title VII also requires coverage for other gender transition services such as supportive counseling/psychotherapy and cross-sex hormone therapy and treatment.

6.     HHS's interpretation and enforcement of Section 1557 requires healthcare providers that receive Federal financial assistance under 42 U.S.C. § 18116 to perform (and refer for) gender transition services, such as performing hysterectomies on healthy women, compels those providers to use preferred pronouns in medical charting, and prevents those providers from offering their medical opinion and advice on those same procedures, among other requirements.

7.     Many religious employers—including CEA and all its members—hold sincerely held religious beliefs that such gender transition surgeries and procedures are morally wrong. Providing these gender interventions contradicts their beliefs that God purposefully created humans as either a biological male or female and that a person's biological sex is immutable.

8.     Neither the EEOC nor HHS provide religious exemptions from these Mandates.

9.     If CEA members fail to comply with the EEOC Coverage Mandate or HHS Gender Identity Mandate, they face heavy fines, the prospect of expensive and burdensome litigation, possible criminal penalties, and penalties in attorney's fees and costs.

10.     On January 19, 2021, this Court held that the EEOC Coverage Mandate and HHS Gender Identity Mandate violated RFRA with respect to an association of religious non-profit and for-profit employers similar to CEA. This Court permanently enjoined the EEOC and HHS from interpreting or enforcing Title VII or Section 1557 in a manner that would require those plaintiffs to perform gender transition procedures or provide health plans or health insurance coverage to their employees for gender transition procedures. *See Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1153-1154 (D.N.D. 2021), *judgment entered sub nom. Religious Sisters of Mercy v. Cochran*, No. 3:16-CV-00386, 2021 WL 1574628 (D.N.D. Feb. 19, 2021).

11.    That permanent injunction applies only to the particular plaintiffs in that case, which included the Catholic Benefits Association (a nonprofit corporation made up of Catholic employers, similar to CEA), its present and future members, and three of its named members, plus the Religious Sisters of Mercy, Sacred Heart Mercy Health Care Center, SMP Health System, and the University of Mary (collectively, the "*Religious Sisters* plaintiffs"). *Id.* at *27.

12.    The defendants in *Religious Sisters of Mercy*—the EEOC, EEOC Chair Charlotte A. Burrows, HHS, and Secretary Becerra—appealed the permanent injunction ruling to the United States Court of Appeals for the Eighth Circuit on April 20, 2021, arguing the case was not justiciable.

13.    On behalf of its members, CEA seeks a similar declaratory judgment and permanent injunction against the EEOC Coverage Mandate and HHS Gender Identity Mandate as was provided to the Catholic Benefits Association (CBA) and to its present and future members in the *Religious Sisters* case.

14.    CEA members are similarly situated to the *Religious Sisters* plaintiffs with respect to these claims, because all (or virtually all) CEA employers are subject to the EEOC Coverage Mandate, and several CEA members are health care entities subject to the HHS Gender Identity Mandate. The only material difference between CEA members and CBA members is that CEA members are not beneficiaries of the injunction this Court issued to the *Religious Sisters* plaintiffs.

15.    CEA members are also similarly situated to each other, all having the same Christian faith and convictions with respect to their opposition to providing, paying for health insurance coverage of, gender transition surgeries and procedures. Therefore they hold the same religious objections to gender transitions under the EEOC Coverage Mandate and HHS Gender Identity Mandate. The EEOC Coverage Mandate and HHS Gender Identity Mandate impose the same burden on CEA's members—including its Healthcare Members—and puts them to the same unlawful

choice. Thus, CEA members, present and future, are entitled to the same relief, and they seek the same relief that this Court issued to the *Religious Sisters* plaintiffs.

## II.   JURISDICTION AND VENUE

16.   This action arises under the Constitution and laws of the United States and therefore this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1361.

17.   This Court has authority to award the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, FED. R. CIV. P. 65, and 42 U.S.C. § 2000bb-1. This Court may review Defendants' unlawful actions and enter appropriate relief as provided by RFRA, 42 U.S.C. § 2000bb-1(c), and the Administrative Procedure Act, 5 U.S.C. §§ 553, 701–706. This Court may review and enjoin ultra vires or unconstitutional agency action through an equitable cause of action. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–71 (1949).

18.   This Court has authority to award costs and attorney's fees under 28 U.S.C. § 2412(d) and 42 U.S.C. § 1988(b).

19.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1) because Christian Employers Alliance resides in this district, as its place of incorporation is North Dakota. Its register agent is also in Bismarck, North Dakota.

20.   As the result of CEA residing in this district through its place of incorporation and its registered agent, venue is proper in this district because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## III.   PARTIES

### A. Plaintiff – Christian Employers Alliance

21.    CEA, a North Dakota nonprofit corporation, is a Christian membership ministry that exists to unite and serve Christian non-profit and for-profit employers who wish to live out their faith in every-day life, including their homes, schools, ministries, businesses, and communities.

22.     CEA's registered agent is located in Bismarck, North Dakota.

23.     CEA seeks relief on behalf of its current and future members.

**B. Defendants**

24.     Defendant Equal Employment Opportunity Commission (EEOC) is a federal agency that administers, interprets, and enforces certain laws, including Title VII. The EEOC is responsible for, among other things, investigating complaints and bringing enforcement actions against employers for discrimination "because of . . . sex" in violation of Title VII.

25.     Defendant Charlotte A. Burrows is the EEOC Chair. She is, in this capacity, responsible for the administration and implementation of policy within the EEOC, including investigation and enforcement pursuant to Title VII. She is sued only in her official capacity.  References herein to "EEOC" includes Burrows, unless the context dictates otherwise.

26.     Defendant United States Department of Health and Human Services (HHS) is a federal cabinet agency within the executive branch of the United States government and is an agency within the meaning of 5 U.S.C. § 551 and 701(b)(1).

27.     Defendant Xavier Becerra is the Secretary of the United States Department of Health and Human Services. Defendant Becerra is sued only in his official capacity. Defendant Becerra is responsible for the overall operations of HHS, including the Department's administration of Section 1557 of the ACA. References herein to "HHS" includes Becerra, unless the context dictates otherwise.

28.     Defendant the Office for Civil Rights (OCR) is a component of the United States Department of Health and Human Services. References herein to "HHS" includes OCR, unless the context dictates otherwise.

29.     Defendant Lisa J. Pino is the Director of the Office for Civil Rights at the United States Department of Health and Human Services. As head of OCR, Defendant Pino is responsible for enforcing Section 1557 on behalf of HHS.

References herein to "HHS" includes Defendant Pino, unless the context dictates otherwise. She is sued only in her official capacity.

## IV.  FACTUAL ALLEGATIONS

### A. CEA members' beliefs and practices regarding gender and sex.

30.   CEA members are Christ-centered organizations, dedicated to integrating their Christian convictions into every aspect of their operations, whether ministry or business. Their sincerely held religious beliefs include traditional Christian teachings on God's purposeful design and creation of individuals as male or female, which is a gift from God and immutable.

31.   CEA members believe and teach that each human being bears the image and likeness of God, and that the two, distinct biological sexes of male and female are complementary and together reflect the image and nature of God.

32.   CEA members believe and teach that rejection of one's biological sex is a rejection of the image of God within that person.

33.   CEA members sincerely believe that "[m]ale and female are immutable realities defined by biological sex" and that "[g]ender reassignment surgery is contrary to Christian Values." *See* Second Amended & Restated Bylaws of Christian Employers Alliance, art. I, § 1.3.5, attached as Exhibit 1.

34.   CEA members therefore believe and teach that gender transition and reassignment (and the procedures necessary to accomplish it) are wrong, and that they cannot, as a matter of religious conscience and conviction, knowingly or intentionally perform, participate in, pay for, facilitate, enable, or otherwise support access to gender transition surgeries and procedures, including through their employer-provided health plans or health insurance coverage.

35.   CEA works and advocates for religious freedom of Christian employers seeking to conduct their ministries and businesses according to their religious values.

7

36.    CEA's articles of incorporation state that its purposes are "exclusively religious, charitable, [and] educational." Specifically, the articles state that CEA is organized:

a.  To define and state Christian Ethical Convictions as they relate to religious exercise in the workplace;

b.  To support Christian employers and develop strategies for them, so that they, as part of their religious witness and exercise, may provide health or other employment related benefits to their respective employees and engage in other employment practices in a manner that is consistent with Christian Values;

c.  To work and advocate for religious freedom of Christian and other religious employers seeking to conduct their ministries and businesses according to their religious values;

d.  To support Christian employers in responding to changes in civil law that threaten their ability to conduct their affairs consistent with their Christian Values; and

e.  To make charitable donations to Christian ministries qualifying as religious or charitable organizations.

Articles of Incorporation of Christian Employers Alliance, art. II, attached as Exhibit 2.

37.    CEA's bylaws contain a "Statement of Faith" and a statement of "Christian Ethical Convictions." *See* Ex. 1, art. I, §§ 1.1, 1.3.

38.    Under article I, section 1.2 of the bylaws, the Statement of Faith and Christian Ethical Convictions (together with other determinations of faith and values by the CEA's board of directors and Ethics Committee) constitute "Christian Values." *Id.* art. I, § 1.2. A person who lives his or her life according to Christian Values is considered to be a Christian. *Id.*

39.    All of CEA's directors are (and required to be) Christians known by their respective pastors. *See id.* art. IV, § 4.2.

40.    All of CEA's officers are Christians. *See id.* art. VI, § 6.1.

41.    CEA's board also serves as an Ethics Committee, and it conducts outreach as needed to expert Christian ethicists. *Id.* art. V, § 5.1.1.

42.    CEA's bylaws state:

> Upon request of the Board, its Chair, or the president, the Ethics Committee shall evaluate medical ethical issues and advise the Board of its analysis and recommendation; it shall similarly advise the Board regarding all benefits, products, and services provided by the Alliance [CEA], its affiliates or subsidiaries, or their respective contractors. The purpose of the committee's advice is to help the Board determine whether certain health care coverage, medical services, practices, or medications conform to Christian Values. If they do not, the committee shall recommend to the Board the necessary corrections to achieve conformity with Christian Values.

Ex. 1, art. V, § 5.1.2.1.

43.    To be a member of CEA, an organization, at a minimum, must be a Christian employer as defined in CEA's bylaws, and must "commit to provide health care benefits consistent with Christian Ethical Convictions and to support the right and freedom of Christian employers to do so." *Id.* art. III, § 3.1.1.

44.    CEA defines "Christian Ethical Convictions," for the purposes of its membership requirements, as follows:

> 1.3.1. Human life, from the moment of conception to natural death, is sacred. Human life should be honored and protected at all stages of life.

> 1.3.2. Abortion is the intentional taking of human life or termination of pregnancy at any time from the moment of conception through birth. Abortion is contrary to Christian Values.

1.3.3. The use of human embryonic stem cells acquired from destruction of nascent human life and the use of fetal tissue acquired from abortion is contrary to Christian Values.

1.3.4. Suicide and assisted suicide are contrary to Christian Values.

1.3.5. Male and female are immutable realities defined by biological sex. Gender reassignment is contrary to Christian Values.

1.3.6. Marriage is a lifelong, permanent, and monogamous heterosexual union.

1.3.7. Unless a Member has exhausted all alternatives that do not create a greater transgression of Christian Values, and such Member has taken all reasonable steps to avoid all such transgressions, a Member cannot— consistent with Christian Values—provide services for, healthcare coverage of, reimbursement for, or access to:

   A. Abortions and abortion inducing drugs and devices.

   B. Treatments derived from human embryonic stem cells acquired from destruction of a fertilized ovum, or from fetal tissue acquired from an abortion.

   C. Assisted suicide.

   D. Gender reassignment therapies and surgery.

   E. Counseling affirming or encouraging any acts or behavior violating Christian Values, or

   F. Any medical treatments, procedures, or medication contrary to Christian Values.

1.3.8. All people have the God-given right to exercise their faith freely, without interference from the government.

1.3.9. Christians are called to exercise their faith in every area of their lives— their homes, schools, ministries, businesses, and communities.

*Id.* art. I, § 1.3.

45.    Nonprofit organizations must satisfy three additional criteria to qualify for membership. They must:

> (i) subscribe to [CEA's] Statement of Faith; (ii) affirm that either its highest executive officer or a majority of its governing body is Christian, and (iii) either have Section 501(c)(3) status or be specially approved by the President as being non-profit.

*Id.* art. III, § 3.1.2.

46.    For-profit organizations must satisfy two additional criteria for membership. They must affirm that:

> (i) Christians (or trusts or other entities wholly controlled by such Christians) own 51% or more of the Member, and (ii) 51% or more of those persons comprising the Member's governing body, if any, are Christians.

*Id.* art. III § 3.1.3.

47.    CEA members provide health benefits to their employees through insured group health plans or self-funded plans, with the possible exception of a few very small business members.

48.    CEA has numerous members.

49.    CEA has multiple members that are principally engaged in the business of providing healthcare and that receive Federal financial assistance under 42 U.S.C. § 18116.

50.    CEA members include for-profit entities, as well as non-profit entities.

51.    Most of CEA's members employ more than 15 employees and are "employers" as defined in Title VII.

52.    The commitment of CEA members to complying with Christian Values and Christian Ethical Convictions in their provision of healthcare services and health insurance or coverage benefits is part of CEA members' religious witness and religious exercise.

53.     To avoid violating their religious beliefs, CEA members wish to sponsor health plans that categorically exclude coverage of gender reassignment therapies, treatments, procedures, medication, or counseling affirming or encouraging such reassignment or transition (collectively, "gender transition services").

54.     Pursuant to these commitments, CEA members that provide health plans or health insurance coverage to their employees either already categorically exclude coverage for gender transition services or desire to categorically exclude such coverage for gender transition services.

55.     Moreover, to avoid violating their religious beliefs, CEA members that are principally engaged in providing healthcare services cannot perform or refer for gender transition services.

### B. The EEOC Coverage Mandate

#### 1. *The EEOC's interpretation of Title VII mandates employers to provide coverage for gender transition services in their health plans.*

56.     Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

57.     Title VII also makes it unlawful to discriminate against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." *Id.*

58.     Health plans and health insurance coverage are part of an employee's "compensation, terms, conditions, or privileges of employment." *See Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.,* 462 U.S. 669, 682 (1983).

59.     Title VII defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b).

60.    Congress enacted the Pregnancy Discrimination Act in 1978 to further define what constitutes "sex" discrimination under Title VII. It specified that the terms "because of sex" or "on the basis of sex" include "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).

61.    The EEOC has responsibility for interpreting and enforcing Title VII.

62.    When Congress passed Title VII and amendments thereto, it did not understand the term "sex" to include sexual orientation or gender identity; rather it understood the term to mean one of the two binary sexes: biological male or biological female.

63.    But the EEOC interprets discrimination on the basis of sex in Title VII as encompassing discrimination on the basis of gender identity. *See* EEOC, Sex-Based Discrimination ("Discrimination against an individual because of gender identity, including transgender status, or because of sexual orientation is discrimination because of sex in violation of Title VII."), attached as Exhibit 3.[1]

64.    This has been the EEOC's consistent interpretation for almost 10 years.

65.    The EEOC has applied its interpretation to require employers with fifteen or more employees that provide health plans or employee health insurance coverage to pay for and provide gender transition services within those benefits (the "EEOC Coverage Mandate").

66.    If employers fail to provide health plans that cover gender transition services, they risk facing serious and harsh penalties—including costly and detrimental civil liability—for discriminating against an individual with respect to his "terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

---

[1] Also available at https://www.eeoc.gov/sex-based-discrimination.

67.     The EEOC's interpretation of discrimination based on sex in Title VII thus categorically prohibits employers from excluding gender transition services in their group health plans.

68.     The EEOC has issued recent guidance confirming that employers must provide and pay for these gender transition services.

69.     For example, the EEOC has stated that "under Title VII employers cannot discriminate against individuals ***based on sexual orientation or gender identity*** with respect to:

- hiring

- firing, furloughs, or reductions in force

- promotions

- demotions

- discipline

- training

- work assignments

- pay, overtime, ***or other compensation***

- ***fringe benefits***

- ***other terms, conditions, and privileges of employment***"

EEOC, Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity (emphasis added), attached as Exhibit 4.[2]

70.     The EEOC has also stated: "It is illegal for an employer to discriminate against an employee in the payment of wages or ***employee benefits*** on the bases of . . . sex (***including gender identity, sexual orientation***, and pregnancy) . . . .

---

[2] Also available at https://www.eeoc.gov/laws/guidance/protections-against-employment-discrimination-based-sexual-orientation-or-gender.

***Employee benefits include*** . . . ***insurance*** . . . ." EEOC, Prohibited Employment Policies/Practices (emphasis added), attached as Exhibit 5.[3]

71.     The EEOC's interpretation is unequivocal, as exemplified by its own guidance and statements: employers must provide self-identified transgender individuals with gender transition services in their health plans.

72.     Failure to do so amounts to discrimination under Title VII. *See id.*

73.     The EEOC has specifically enforced the EEOC Coverage Mandate by requiring employer health plans to cover "medically necessary care based on transgender status." *See, e.g.,* EEOC, Deluxe Financial to Settle Sex Discrimination Suit on Behalf of Transgender Employee, 2016 WL 246967 (Jan. 21, 2016) (noting that three-year consent decree with employer "provides that, as of January 1, 2016, [employer's] national health benefits plan will not include any partial or categorical exclusion for otherwise medically necessary care based on transgender status").

74.     In one case in June 2016, a transgender male sued Dignity Health—a large health care system that includes many Catholic hospitals—for maintaining an employee health plan or health insurance coverage that categorically excluded coverage for gender transition services. *See Robinson v. Dignity Health,* No. 16-CV-3035 YGR, 2016 WL 7102832, at *1 (N.D. Cal. Dec. 6, 2016) (Order granting stay).

75.     The plaintiff's complaint asserted a violation of Title VII, claiming that "[d]iscrimination on the basis of transgender status or gender nonconformity is discrimination on the basis of 'sex' under Title VII." *Robinson v. Dignity Health,* No. 16-CV-3035 YGR, 2016 WL 3154023, at ¶ 54 (N.D. Cal. June 6, 2016) (complaint).

76.     The EEOC filed an amicus brief in the case in support of the plaintiff, arguing that the employer's transgender exclusion violated Title VII by denying the

---

[3] Also available at https://www.eeoc.gov/prohibited-employment-policiespractices#terms_and_conditions.

plaintiff "access to medically necessary treatment for his gender dysphoria, a serious health condition directly related to the fact that he is transgender." Amicus Brief of EEOC in Support of Plaintiff and in Opp. to Mot. to Dismiss, *Robinson v. Dignity Health,* No. 16-CV-3035, 2016 WL 11517056 (N.D. Cal. Aug. 22, 2016).

77. The EEOC has also taken enforcement actions against other employers for the "categorical exclusion" from their health plans of "services related to transgender treatment/sex therapy." *See* Soc'y for Human Res. Mgmt., Wal-Mart Loses Perfect LGBTQ Rating Because of Transgender Harassment, Nov. 30, 2017, attached as Exhibit 6.[4]

78. The EEOC during the current administration maintains its commitment to enforce Title VII as prohibiting the exclusion of gender transition services from employer-provided health plans or health insurance coverage.

79. Based on its interpretation of "sex" under Title VII, the EEOC would pursue Title VII enforcement actions against employers with gender transition services exclusions or limitations in their health plans.

80. Since promulgating the guidance and taking the positions and enforcement actions described above, the EEOC has consistently maintained its interpretation and application of Title VII.

81. The EEOC has, for many years, enforced the Mandate and has even cooperated with HHS to ensure employer healthcare plans cover gender transition procedures. *See* 81 Fed. Reg. 31,375, 31,432 (July 18, 2016) (HHS explaining that in enforcement of Section 1557 of the ACA that it will "refer or transfer [a] matter to the EEOC" if HHS "lacks jurisdiction over an employer").

---

[4] Also available at https://www.shrm.org/resourcesandtools/legal-and-compliance/employment-law/pages/wal-mart-lgbtq-rating.aspx#:~:text=The%20civil%20rights%20organization%20suspended,company%20harassed%20two%20transgender%20employees.

82.    Just this year, the EEOC Chair issued a new "technical assistance document" declaring that Title VII's prohibition of discrimination "because of . . . sex" prevents employers from maintaining showers, locker rooms, and bathrooms that are separated based on biological sex and requires employers to use a transgender employee's preferred pronouns. EEOC, Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity (June 15, 2021), https://bit.ly/3zgP7iP.

83.    The EEOC's official position is that exclusion or limitation of gender transition services from employer-provided health plans or health insurance coverage violates Title VII.

84.    CEA members, as part of their religious exercise, wish to arrange their employer-provided health plans or health insurance coverage to contain an explicit categorical exclusion or limitation of coverage for all health services related to gender transition.

85.    Under EEOC's interpretation of Title VII, such an exclusion would be an unlawful act by the CEA member employer.

### 2.    *Enforcement mechanisms under Title VII.*

86.    Employers in violation of Title VII—as interpreted by the EEOC—face enforcement actions brought by federal agencies or by individuals who allege they have been discriminated against.

87.    The EEOC has investigatory authority for alleged Title VII violations, may serve notices of charges of discrimination, and "shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion." 42 U.S.C. § 2000e-5(b).

88.    The EEOC may also bring a civil action against an employer. *Id.* § 2000e-5(f)(1).

89.     Employers may also face private lawsuits brought by parties claiming a violation of Title VII.

90.     An employer found to be in violation of Title VII can be enjoined from engaging in the unlawful practice, and can be ordered to take "affirmative action as may be appropriate . . . or any other equitable relief" that a court deems "appropriate." *Id.* § 2000e-5(g)(1).

91.     An employer found to have engaged in such an unlawful employment practice may also be liable for costs and the attorney's fees of the prevailing party. *Id.* § 2000e-5(k).

92.     And employers can be liable for compensatory damages, as well as punitive damages. *Id.* § 2000e-5(e)(3)(B); s*ee also* 42 U.S.C. § 1981a.

93.     CEA members face the threat of all these enforcement mechanisms for failing to comply with the EEOC Coverage Mandate.

### C. The HHS Gender Identity Mandate

#### *1. Relevant background of Section 1557 and HHS's current interpretation and enforcement of Section 1557.*

94.     Section 1557 of the ACA prohibits discrimination in "health program[s] or activit[ies]" that receive federal funding. 42 U.S.C. § 18116(a).

95.     A "health program or activity" includes "all of the operations of entities principally engaged in the business of providing healthcare that receive Federal financial assistance." 45 C.F.R. § 92.3(b).

96.     And for entities not principally engaged in the business of providing healthcare, the nondiscrimination provisions of Section 1557 apply to that entity's operations "only to the extent any such operation receives Federal financial assistance." *Id.*

97.    Multiple CEA members are principally engaged in the business of providing healthcare and receive Federal financial assistance (the "Healthcare Members").

98.    Thus, Section 1557's nondiscrimination provisions apply to the Healthcare Members.

99.    Section 1557 does not contain listed prohibited grounds for discrimination itself, but incorporates the nondiscrimination provisions of four preexisting civil rights statutes: (1) Title VI of the Civil Rights Act of 1964 (prohibits discrimination based on race, color, national origin); (2) Title IX of the Education Amendments of 1972 (prohibits discrimination based on sex); (3) the Age Discrimination Act of 1975 (prohibits discrimination based on age); and (4) the Rehabilitation Act of 1973 (prohibits discrimination based on disability). 42 U.S.C. § 18116(a).

100.    Title IX prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681(a).

101.    Thus, Section 1557—by incorporating Title IX—prohibits discrimination "on the basis of sex" in "health program[s] or activit[ies]" that receive Federal financial assistance.

102.    Section 1557 gives the Secretary of HHS authority to "promulgate regulations to implement" the section. 42 U.S.C. § 18116(c).

103.    And HHS did so in 2016 by issuing a final rule titled Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375 (May 18, 2016) (the "2016 Rule").

104.    The 2016 Rule covered virtually the entire U.S. health care system.

105.    The 2016 Rule defined discrimination "on the basis of sex" under Section 1557 as "discrimination" based on "sex stereotypes" and "gender identity," among other things. 81 Fed. Reg. at 31,467 (formerly codified at 45 C.F.R. § 92.4).

106.    The 2016 Rule's interpretation of discrimination on the basis of sex thus required any healthcare provider that accepted federal funds[5] to perform gender-transition services.

107.    HHS further explained this nondiscrimination requirement in the 2016 Rule. For example: "A provider specializing in gynecological services that previously declined to provide a medically necessary hysterectomy for a transgender man would have to revise its policy to provide the procedure for transgender individuals in the same manner it provides the procedure for other individuals." 81 Fed. Reg. at 31,455.

108.    As a result, the 2016 Rule forced healthcare providers covered by Section 1557 to perform gender transition services—including hysterectomies, mastectomies, hormone treatments, and plastic surgery—on completely healthy individuals, and without medical reasoning, if the doctor performed analogous services in other, non-transition medical practices. 81 Fed. Reg. at 31,455.

109.    In December of 2016, a Texas district court held that HHS lacked statutory authority under Section 1557 and Title IX to prohibit discrimination on the basis of gender identity in its 2016 Rule, and that religious healthcare providers had a substantial likelihood of success against that mandate under the Religious Freedom Restoration Act (RFRA). *Franciscan Alliance, Inc. v. Burwell,* 227 F. Supp. 3d 660, 695–96 (N.D. Tex. 2016).

110.    In October of 2019, the same Texas district court issued a final judgment, declaring the 2016 Rule violated the Administrative Procedure Act (APA) and RFRA. The court vacated the gender identity language from the 2016 Rule, but

---

[5] Which is most healthcare providers in the United States. *See* 81 Fed. Reg. at 31,446 ("we concluded that almost all practicing physicians in the United States are reached by Section 1557 because they accept some form of Federal remuneration or reimbursement apart from Medicare Part B.").

declined to issue a nationwide injunction. *Franciscan Alliance, Inc. v. Burwell,* 414 F. Supp. 3d 928, 945 (N.D. Tex. 2019).

111.   In 2020, HHS reversed course and repealed and replaced the 2016 Rule with a new rule that removed the 2016 Rule's gender identity language (i.e. it removed the definition of "on the basis of sex" as including gender identity, and sex stereotypes). Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority." 85 Fed. Reg. 37,160 (June 19, 2020) (the "2020 Rule").

112.   HHS stated in the 2020 Rule that it would *not* interpret Section 1557 (and Title IX as incorporated) as prohibiting discrimination on the basis of gender identity. *See id*. at 37,168 ("the 2016 Rule's extension of sex-discrimination protections to encompass gender identity was contrary to the text of Title IX.").

113.   However, after HHS promulgated the 2020 Rule, two district courts entered injunctions declaring that the gender identity language from the 2016 rule must remain in effect. *Walker v. Azar*, 480 F. Supp. 3d 417 (E.D.N.Y. 2020), *modified by* 2020 WL 6363970 (E.D.N.Y. Oct. 29, 2020); *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1 (D.D.C. 2020).

114.   And the *Whitman-Walker Clinic* court also prohibited the 2020 Rule from incorporating Title IX's religious exemption. *Whitman-Walker Clinic, Inc.,* 285 F. Supp. 3d at 43-46; *see also* 20 U.S.C. § 1681(a).

115.   On January 20, 2021, President Biden signed an executive order *requiring* that Section 1557 and Title IX be interpreted to include gender identity as a protected trait. Executive Order 13,988, Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, 86 Fed. Reg. 7023 (Jan. 20, 2021).

116.   Effective May 10, 2021, HHS issued a Notification of Interpretation and Enforcement, stating that it would interpret and enforce Section 1557 as

prohibiting discrimination on the basis of gender identity (as well as sexual orientation). 86 Fed. Reg. 27,984, 27,985 (May 25, 2021) ("2021 Notice of Enforcement"); *see also* Press Release, HHS OCR, HHS Announces Prohibition on Sex Discrimination Includes Discrimination on the Basis of Sexual Orientation and Gender Identity (May 10, 2021), https://www.hhs.gov/about/news/2021/05/10/hhs-announces-prohibition-sex-discrimination-includes-discrimination-basis-sexual-orientation-gender-identity.html.

117.   The 2021 Notice of Enforcement stated that HHS would comply with RFRA "and all other legal requirements" and "any applicable court orders that have been issued in litigation involving the Section 1557 regulation." 86 Fed. Reg. at 27,985.

118.   But the 2021 Notice of Enforcement did not detail how HHS would comply with RFRA, "all other legal requirements," and the injunctions and court orders entered related to Section 1557.

119.   As a result of the 2016 Rule, the lawsuits enjoining its application, the 2020 Rule, the lawsuits enjoining *its* application, recent Executive Order 13,988, and HHS's 2021 Notice of Enforcement, the current status of Section 1557 is a "Humpty-Dumpty Scheme" that has been "put back together again." *Franciscan All., Inc. v. Becerra*, No. 7:16-CV-00108-O, 2021 WL 3492338, at *6 (N.D. Tex. Aug. 9, 2021).

120.   In effect, HHS's current interpretation and enforcement of Section 1557 is nearly identical to the 2016 Rule.

121.   To the extent any substantive component of the 2020 Rule, or Section 1557 itself, is interpreted (incorrectly) to prohibit discrimination based on gender identity—as the 2016 Rule and 2021 Notice of Enforcement—Plaintiff challenges those as well.

122.   HHS's current interpretation and enforcement of Section 1557 prohibits gender identity discrimination by any entity principally engaged in providing healthcare that receives Federal financial assistance (referred to as the "HHS Gender Identity Mandate").

### 2. HHS requires CEA's Healthcare Members to perform gender transition services.

123.   The HHS Gender Identity Mandate thus requires covered healthcare providers to perform the following (but not limited to):

a.   Prescribe puberty blockers off-label from the FDA-approved indication to treat gender dysphoria and initiate or further transition in adults and children;

b.   Prescribe hormone therapies off-label from the FDA-approved indication to treat gender dysphoria in all adults and children;

c.   Provide other continuing interventions to further gender transitions ongoing in both adults and minors;

d.   Perform hysterectomies or mastectomies on healthy women who believe themselves to be men;

e.   Remove the non-diseased ovaries of healthy women who believe themselves to be men;

f.   Remove the testicles of healthy men who believe themselves to be women;

g.   Perform a process called "de-gloving" to remove the skin of a man's penis and use it to create a faux vaginal opening;

h.   Remove vaginal tissue from women to facilitate the creation of a faux or cosmetic penis;

i.     Perform or participate in any combination of the above mutilating cosmetic procedures to place a patient somewhere along the socially constructed gender identity spectrum;

j.     Offer to perform, provide, or prescribe any and all such interventions, procedures, services, or drugs;

k.     Refer patients for any and all such interventions, procedures, services, or drugs;

l.     End or modify their policies, procedures, and practices of not offering to perform or prescribe these procedures, drugs, and interventions;

m.    Say in their professional opinions that these gender intervention procedures are the standard of care, are safe, are beneficial, are not experimental, or should otherwise be recommended;

n.     Treat patients according to gender identity and not sex;

o.     Express views on gender interventions that they do not share;

p.     Say that sex or gender is nonbinary or on a spectrum;

q.     Use language affirming any self-professed gender identity;

r.     Use patients' preferred pronouns according to gender identity, rather than using no pronouns or using pronouns based on biological sex;

s.     Create medical records and coding patients and services according to gender identity, not biological sex;

t.     Provide the government assurances of compliance, providing compliance reports, and posting notices of compliance in prominent physical locations, if the 2016 Rule's interpretation of the term sex governs these documents;

u.     Refrain from expressing their medical, ethical, or religious views, options, and opinions to patients when those views disagree with gender identity theory or transitions;

    v.      Allow patients to access single-sex programs and facilities, such as mental health therapy groups, breastfeeding support groups, post-partum support groups, educational sessions, changing areas, restrooms, communal showers, and other single-sex programs and spaces, by gender identity and not by biological sex; and

    w.    Pay for or provide insurance coverage for any or all objectionable procedures, drugs, interventions, or speech.

124.    The Healthcare Members are healthcare providers that receive Federal financial assistance and are thus under an immediate threat of enforcement of the HHS Gender Identity Mandate.

125.    The Healthcare Members cannot refuse Federal financial assistance because of the ubiquity of federal healthcare programs such as Medicare, Medicaid, and the State Children's Health Insurance Program (CHIP).

126.    The HHS Gender Identity Mandate forces the Healthcare Members to perform or provide all of the practices listed in paragraph 113 above. For example:

    a.      The Healthcare Members' religious beliefs prohibit them from performing or referring for gender transition services because they believe that the sexes of male and female are immutable and God-ordained. But the HHS Gender Identity Mandate requires them to do so.

    b.      The HHS Gender Identity Mandate limits the Healthcare Members' ability to engage in speech advising patients of their medical judgment about gender-transition procedures and it forces them to express views on gender procedures that they do not share, refer to gender as non-binary and on a spectrum, and use gender-affirming language.

    c.     The HHS Gender Identity Mandate forces the Healthcare Members to allow biological males in female restrooms, locker-rooms, recovery rooms, screening areas, etc., and vice-versa.

    d.     The HHS Gender Identity Mandate also compels the Healthcare Members to engage in speech that inaccurately refers to sex—including using inaccurate pronouns and patient coding—in medical records and billings.

    e.     The HHS Gender Identity Mandate also chills CEA members' speech because it punishes them for discussing their medical opinions and advice with patients regarding gender transition services.

127.   The Healthcare Members currently do not have past or current policies or practices in their healthcare activities that comply with these objectionable practices, and they wish to continue their current policies and practices in the future, rather than change their practices to conform to the government's mandate.

128.   The Healthcare Members have religious, moral, ethical, conscientious, medical, and free speech objections to these practices.  These practices also expose the Healthcare Members to increased risk of malpractice liability, especially if patients regret a transition and allege that they received insufficient information.

129.   The HHS Gender Identity Mandate thus puts the Healthcare Members to an impossible choice: (a) violate your religious, moral, ethical, conscientious, medical, and free speech beliefs and perform these gender transition services; or (b) abide by your religious, moral, ethical, conscientious, medical, and free speech beliefs, refuse to perform these gender transition services, and face punishment for "discriminating on the basis of gender identity." The only other option is to exit healthcare practice.

### 3. *Enforcement mechanisms under Section 1557.*

130.    The enforcement mechanisms available under Title VI, Title IX, section 794, and the Age Discrimination Act are all available under Section 1557. 42 U.S.C. § 18116(a).

131.    Further, if a covered healthcare provider—such as one of the Healthcare Members—violates the HHS Gender Identity Mandate, it may lose federal healthcare program funding, could face potential civil lawsuits, and may be investigated by OCR or the Attorney General. *See, e.g.,* 20 U.S.C. § 1682. HHS and OCR can also pursue "any other means authorized by law" to enforce the HHS Gender Identity Mandate. *Id.*

132.    Violators of the HHS Gender Identity Mandate can also be subject to civil enforcement proceedings, debarment from doing business with the federal government, and liability under the False Claims Act, including civil penalties up to $10,000.00 per false claim "plus 3 times the amount of damages which the Government sustains because of" any false claim. *See* 31 U.S.C. § 3729, *et seq.*; *see also* 45 C.F.R. §§ 86.4, 92.4.

133.    Violators of the HHS Gender Identity Mandate may also be subject to criminal penalties. 18 U.S.C. §§ 287, 1001, 1035, 1347, 1516, 1518. For example, violators may face up to five years' imprisonment and criminal monetary penalties for making a materially false statement in connection with the delivery of or payment for healthcare benefits or services. 18 U.S.C. § 1035; *see also* 42 U.S.C. §§ 1320a-7b(a), 1320a-7b(c).

134.    Section 1557 also provides a private right of action for which alleged violators of the HHS Gender Identity Mandate may have to defend, at significant cost, and potentially face liability in those cases. Those private lawsuits could also subject violators to significant attorney's fees awards under 42 U.S.C. § 1988.

135.   Upon information and belief, HHS and OCR are now actively investigating, enforcing, and implementing the HHS Gender Identity Mandate.

136.   Upon information and belief, Defendants do not believe that RFRA or other laws require any exemptions from the HHS Gender Identity Mandate.

137.   HHS currently recognizes no RFRA exemptions under its interpretation of Section 1557 except those ordered by a court.

138.   Currently, HHS (and OCR) enforces the HHS Gender Identity Mandate and those found to be in violation of the HHS Gender Identity Mandate may face loss of federal funding, private right of action civil liability, civil liability to the government, attorney's fees, civil penalties, False Claims Act liability, and criminal penalties.

139.   CEA members face the threat of all these enforcement mechanisms for failing to comply with the HHS Gender Identity Mandate.

## V.   IRREPARABLE HARM AND INJUNCTIVE RELIEF

140.   This Court in *Religious Sisters of Mercy v. Azar* declared that the EEOC Coverage Mandate and HHS Gender Identity Mandate violate RFRA with respect to an association of religious non-profit and for-profit employers, and enjoined the EEOC and HHS from enforcing those Mandates. 513 F. Supp. 3d 1113, 1153-1154 (D.N.D. 2021), *judgment entered sub nom. Religious Sisters of Mercy v. Cochran,* No. 3:16-CV-00386, 2021 WL 1574628 (D.N.D. Feb. 19, 2021).

141.   This Court's Order in *Religious Sisters of Mercy*, as to the EEOC's enforcement of Title VII, and HHS's enforcement of Section 1557, was restricted to the *Religious Sisters* plaintiffs *Id*.

142.   As of the date of this filing, the EEOC Coverage Mandate and HHS Gender Identity Mandate remain in effect as applied to CEA members.

143.   And since this Court's Order in *Religious Sisters of Mercy* on January 19, 2021, HHS has reiterated its intent to enforce Section 1557 as prohibiting

discrimination based on gender identity, meaning the Healthcare Members face an immediate threat of enforcement requiring them to perform gender transition services.

144.    Currently, CEA members are forced to choose between paying for and providing group health plans that cover gender transition services, or withholding that coverage and risking enforcement of Title VII by EEOC.

145.    In addition, several CEA members, namely the Healthcare Members, are forced to choose between performing gender transition services, or refusing to do so and risking enforcement of Section 1557 by HHS.

146.    Based on review of the litigation filings in *Religious Sisters of Mercy*, CEA's members hold substantially the same religious objection to performing gender transition services or providing or arranging health insurance coverage of gender transition services as the *Religious Sisters* plaintiffs. *See id.* at 1132-1133.

147.    Absent relief from this Court, CEA members are currently threatened by the EEOC and HHS with time and financially-consuming investigations, civil lawsuits, fines, and other enforcement mechanisms if they refuse to perform gender transition services in accordance with their Christian beliefs or offer group health plans in a manner that reflect their Christian Values and beliefs.

148.    CEA members face irreparable harm from EEOC's and HHS's enforcement of the Mandates absent relief from this Court.

149.    Preliminary and permanent injunctive relief is necessary to redress this irreparable harm.

150.    The CEA challenges Defendants' enforcement of the EEOC Coverage Mandate, whether from EEOC interpretations or guidance, or in the alternative from Title VII itself.

151.   The CEA Healthcare Members challenge Defendants' enforcement of the Gender Identity Mandate, whether from the 2016 Rule or the May 10, 2021 Notice of Enforcement, or in the alternative the 2020 Rule or Section 1557 itself.

## VI.   <u>CLAIMS FOR RELIEF</u>

FIRST CLAIM FOR RELIEF

**Violation of RFRA — 42 U.S.C. § 2000bb-1**

**(Against Defendants EEOC and Burrows)**

152. CEA incorporates by reference paragraphs 1–151.

153. As set forth above, CEA members' sincerely held religious beliefs prohibit them from paying for, providing, or otherwise offering group health plans that cover gender transition services.

154. CEA members exercise these sincerely held religious beliefs by paying for, providing, and offering group health plans that specifically exclude coverage for gender transition services, or by seeking to do so where possible.

155. CEA members' compliance with these beliefs by maintaining these exclusions constitute the exercise of religion. *See* 42 U.S.C. § 2000bb-2(4); *see also* 42 U.S.C. § 2000cc-5(7).

156. CEA members' exercise of religion "involves 'not only belief and profession but the performance of (or abstention from) physical acts.'" *Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 710 (2014), *(quoting Emp. Div., Dep't of Human Res. of Or. v. Smith,* 494 U.S. 872, 877 (1990)).

157. CEA members wish to exercise their religion by abstaining from subsidizing and facilitating gender transition services, which contradict their beliefs.

158. RFRA prohibits the government from substantially burdening a person's exercise of religion unless the government can demonstrate that application of the burden to that person is in furtherance of a compelling governmental interest and is the least restrictive means of achieving it.

159.  This Court previously held the government cannot meet that standard as applied to a similar association of Catholic non-profit and for-profit plaintiffs because of religious objections similar to those held by CEA members. *Religious Sisters of Mercy,* 513 F. Supp. 3d at 1154.

160. Likewise, the government cannot meet that standard here.

161. The EEOC Coverage Mandate compels CEA members to violate their religious beliefs by paying for, providing, or otherwise offering group health plans that cover gender transition services, subject to penalties.

162. As such, EEOC's enforcement of the EEOC Coverage Mandate substantially burdens CEA members' exercise of religion.

163. The EEOC does not have a compelling interest in enforcing the EEOC Coverage Mandate as applied to CEA members.

164. The EEOC Coverage Mandate is not the least restrictive means of furthering any purported compelling governmental interest.

165. Myriad alternative forms of regulation would accomplish any purported compelling governmental interest without infringing on CEA members' religious exercise.

166. For example, the government could provide separate and independent coverage of gender transition services for persons who do not otherwise have such coverage.

167. The EEOC Coverage Mandate cannot survive strict scrutiny under RFRA.

168. The EEOC's interpretation of sex discrimination under Title VII and the resulting EEOC Coverage Mandate, and the EEOC's impending threat of enforcing it against CEA members, violate RFRA.

169. If Title VII is deemed to prohibit discrimination on the basis of sexual orientation or gender identity as set forth in the agency action, EEOC's enforcement

of this aspect of Title VII should be enjoined for the same reasons set forth in this claim.

170. CEA requests a preliminary and permanent injunction prohibiting enforcement of the EEOC Coverage Mandate against it and its members, and a declaratory judgment declaring the EEOC Coverage Mandate to violate RFRA.

### SECOND CLAIM FOR RELIEF
### Violation of the First Amendment — Free Exercise Clause
### (Against Defendants EEOC and Burrows)

171. CEA incorporates by reference paragraphs 1–151.

172. The EEOC Coverage Mandate is not a neutral law of general applicability.

173. The EEOC Coverage Mandate is not generally applicable because Title VII does not cover employers that employ fewer than 15 employees, and exempts other employers.

174. Even if the EEOC Coverage Mandate is facially neutral, the EEOC does not apply it generally to all employers.

175. The EEOC Coverage Mandate is riddled with individualized exemptions, but no exemption is given for religious beliefs.

176. The EEOC Coverage Mandate targets and discriminates against CEA members—and other employers that hold the same Christian Values and religious beliefs regarding gender transition and gender transition services.

177. The EEOC Coverage Mandate substantially burdens CEA members' exercise of religion as described above, including through its penalties.

178. The EEOC Coverage Mandate does not further a compelling governmental interest.

179. The EEOC Coverage Mandate is not narrowly tailored to achieve any purported compelling governmental interest.

180. The EEOC Coverage Mandate is not the least restrictive means of

furthering any purported compelling governmental interest.

181. The EEOC Coverage Mandate cannot survive strict scrutiny under the First Amendment.

182. The EEOC's interpretation of sex discrimination under Title VII and the resulting EEOC Coverage Mandate, and the EEOC's impending threat of enforcing it against CEA members, violate the Free Exercise Clause of the First Amendment.

183. If Title VII is deemed to prohibit discrimination on the basis of sexual orientation or gender identity as set forth in the agency action, EEOC's enforcement of Title VII should be enjoined for the same reasons set forth in this claim.

184. CEA requests a preliminary and permanent injunction prohibiting EEOC's enforcement of the EEOC Coverage Mandate against it and its members, and a declaratory judgment declaring the EEOC Coverage Mandate to violate the Free Exercise Clause of the First Amendment.

**THIRD CLAIM FOR RELIEF**

**Violation of RFRA — 42 U.S.C. § 2000bb-1**

**(Against Defendants HHS, Becerra, OCR, and Pino)**

185. CEA incorporates by reference paragraphs 1–151.

186. As set forth above, CEA Healthcare Members' sincerely held religious beliefs prohibit them from providing, offering, performing, facilitating, or referring for gender transition services, including (but not limited to) all the practices described in the factual allegations above.

187. CEA Healthcare Members exercise their sincerely held religious beliefs by providing healthcare services and by expressing messages in their healthcare practices.

188. CEA Healthcare Members exercise their religious beliefs by providing healthcare to low-income and underserved populations in health programs and activities that receive Federal funds.

189. CEA Healthcare Members' compliance with these beliefs and speech about these beliefs constitute the exercise of religion. *See* 42 U.S.C. § 2000bb-2(4); *see also* 42 U.S.C. § 2000cc-5(7).

190. CEA Healthcare Members' exercise of religion "involves 'not only belief and profession but the performance of (or abstention from) physical acts.'" *Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. at 710, *(quoting Emp. Div., Dep't of Human Res. of Or. v. Smith,* 494 U.S. 872, 877 (1990)).

191. CEA Healthcare Members wish to exercise their religion by providing healthcare services without having to perform or refer for gender transition services.

192. CEA Healthcare Members wish to exercise their religion by speaking to patients about gender transition services according to *their* medical, religious, and ethical judgment.

193. RFRA prohibits the government from substantially burdening a person's exercise of religion unless the government can demonstrate that application of the burden to that person is in furtherance of a compelling governmental interest and is the least restrictive means of achieving it.

194. This Court previously held the government cannot meet that standard as applied to a similar association of Catholic non-profit and for-profit plaintiffs because of religious objections similar to those held by CEA members. *See Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d at 1153-1154.

195. Likewise, the government cannot meet that standard here.

196. The HHS Gender Identity Mandate compels CEA Healthcare Members to perform gender transition services in violation of their religious beliefs and imposes an unconstitutional condition on their receipt of Federal funding. HHS thus exposes CEA Healthcare Members to civil liability and penalties, described above, as well as

criminal penalties under 18 U.S.C. §§ 287, 1001, 1035, 1516, 1518; 42 U.S.C. §§ 1320a-7b(a),1320a-7b(c).

197. As such, the HHS Gender Identity Mandate substantially burdens CEA Healthcare Members' exercise of religion.

198. HHS does not have a compelling interest in enforcing the HHS Gender Identity Mandate as applied to CEA Healthcare Members.

199. The HHS Gender Identity Mandate is not the least restrictive means of furthering any purported compelling governmental interest.

200. Myriad alternative forms of regulation would accomplish any purported compelling governmental interest without infringing on CEA Healthcare Members' religious exercise.

201. The HHS Gender Identity Mandate cannot survive strict scrutiny under RFRA.

202. HHS has not and will not enforce the HHS Gender Identity Mandate in compliance with RFRA.

203. HHS's interpretation of sex discrimination under Title IX as incorporated in Section 1557 and the resulting HHS Gender Identity Mandate, and HHS's impending threat of enforcing it against CEA Healthcare Members, violate RFRA.

204. If Section 1557 of the ACA is deemed to prohibit discrimination on the basis of sexual orientation or gender identity as set forth in the agency action, HHS's enforcement of Section 1557 should be enjoined for the same reasons set forth in this claim.

205. CEA requests a preliminary and permanent injunction prohibiting HHS's enforcement of the HHS Gender Identity Mandate against it and its Healthcare Members, and a declaratory judgment declaring the HHS Gender Identity Mandate to violate RFRA.

206. CEA requests this relief whether the current HHS Gender Identity

35

Mandate arises from the 2016 Rule or the 2021 Notice of Enforcement, or both, or alternatively from any still-in-effect sections of the 2020 Rule or applicable court orders.

**FOURTH CLAIM FOR RELIEF**

**Violation of the First Amendment — Free Exercise Clause**

**(Against Defendants HHS, Becerra, OCR, and Pino)**

207. CEA incorporates by reference paragraphs 1–151.

208. The HHS Gender Identity Mandate is not a neutral law of general applicability.

209. The HHS Gender Identity Mandate is not generally applicable because HHS does not apply it generally to all healthcare providers, and exempts many healthcare providers.

210. Specifically, the HHS Gender Identity Mandate does not apply to healthcare providers that do not receive Federal funding or that do not "principally" provide healthcare.

211. This selective applicability imposes an unconstitutional condition on receiving Federal funds.

212. And the HHS Gender Identity Mandate is not generally applicable because it provides exemptions for similar conduct based on secular and non-religious reasons, but no exemption is given for religious beliefs.

213. The HHS Gender Identity Mandate is not neutral because HHS targets and discriminates against CEA Healthcare Members—and other employers that hold the same Christian Values and religious beliefs regarding gender transition and gender transition services.

214. The HHS Gender Identity Mandate substantially burdens CEA Healthcare Members' exercise of religion. HHS exposes CEA Healthcare Members to civil liability and penalties, described above, as well as criminal penalties under 18

U.S.C. §§ 287, 1001, 1035, 1516, 1518; 42 U.S.C. §§ 1320a-7b(a), 1320a-7b(c).

215. The HHS Gender Identity Mandate does not further a compelling governmental interest.

216. The HHS Gender Identity Mandate is not narrowly tailored to achieve any purported compelling governmental interest.

217. The HHS Gender Identity Mandate is not the least restrictive means of furthering any purported compelling governmental interest.

218. The HHS Gender Identity Mandate cannot survive strict scrutiny under the First Amendment.

219. HHS's interpretation of sex discrimination under Title IX as incorporated in Section 1557 and the resulting HHS Gender Identity Mandate, and HHS's impending threat of enforcing it against CEA Healthcare Members, violate the Free Exercise Clause of the First Amendment.

220. If Section 1557 of the ACA is deemed to prohibit discrimination on the basis of sexual orientation or gender identity as set forth in the agency action, HHS's enforcement of Section 1557 should be enjoined for the same reasons set forth in this claim.

221. CEA requests a preliminary and permanent injunction prohibiting enforcement of the HHS Gender Identity Mandate against it and its Healthcare Members, and a declaratory judgment declaring the HHS Gender Identity Mandate to violate the Free Exercise Clause of the First Amendment.

222. CEA requests this relief whether the current HHS Gender Identity Mandate arises from the 2016 Rule or the 2021 Notice of Enforcement, or both, or alternatively from any still-in-effect sections of the 2020 Rule or applicable court orders.

FIFTH CLAIM FOR RELIEF

**Violation of the First Amendment — Free Speech Clause**

**(Against Defendants HHS, Becerra, OCR, and Pino)**

223. CEA incorporates by reference paragraphs 1–151.

224. The HHS Gender Identity Mandate restricts CEA Healthcare Members' speech, chills their speech, and compels their speech.

225. The HHS Gender Identity Mandate imposes a viewpoint-based speech regulation on CEA Healthcare Members' speech by prohibiting them from giving their medical, ethical, and religious views on gender identity and gender transition services to patients and prospective patients.

226. The HHS Gender Identity Mandate compels CEA Healthcare Members' speech by requiring CEA Healthcare Members: to offer gender transition services; to use "preferred" pronouns that are different from an individual's biological sex; to use medical coding and record keeping that identify an individual according to their self-identified gender and not their biological sex; to refer individuals to other healthcare providers if they do not perform the relevant services; to write policies governing speech and information at their medical practices; to provide assurances of compliance with Section 1557; and to post mandatory notices of compliance with Section 1557.

227. CEA Healthcare Members include licensed healthcare providers and entities that have an obligation to provide patients with their professional medical advice on all areas of treatment, such as gender transition. This medical advice is formed based on years of practice, experience, ethical and moral considerations, and the provider's best medical judgment. CEA Healthcare Members' medical judgment is that gender transition services are harmful and unethical to perform on a healthy individual. CEA members desire to express this viewpoint to patients.

228. Healthcare providers have an obligation to provide patients with informed-

consent, including all facts regarding documented harms associated with transgender services and treatment, as well as the permanence of electing to undergo gender transition.

229. CEA Healthcare Members hold views on the debated topic of gender identity and transition that are contrary to the government's views, but CEA Healthcare Members are prohibited from conveying their medical views on this topic to patients because doing so under the HHS Gender Identity Mandate is considered discrimination based on one's gender identity.

230. The HHS Gender Identity Mandate thus prohibits CEA Healthcare Members from expressing their views and medical concerns on the topic to patients (viewpoint regulation); forces CEA Healthcare Members to use preferred pronouns and gender identity language that is contrary to biological fact (compels speech); and discourages CEA Healthcare Members from having full and frank conversations with their patients and from giving patients proper informed consent (chills speech).

231. CEA Healthcare Members' desire to express views—including giving professional medical advice—on gender identity and gender transition is protected by the First Amendment, but the HHS Gender Identity Mandate prohibits these views and forces CEA Healthcare Members to speak only in accordance with the government's views.

232. The HHS Gender Identity Mandate thus regulates speech based on viewpoint and is presumptively unconstitutional.

233. The HHS Gender Identity Mandate threatens financial burdens on CEA Healthcare Members based on the content of the views they wish to express.

234. The HHS Gender Identity Mandate's speech restrictions, chilling of speech, and compulsion of speech do not further a compelling governmental interest.

235. The HHS Gender Identity Mandate's speech restrictions, chilling of speech,

and compulsion of speech is not narrowly tailored to achieve any purported compelling governmental interest.

236. The HHS Gender Identity Mandate's speech restrictions, chilling of speech, and compulsion of speech cannot survive strict scrutiny under the First Amendment.

237. The HHS Gender Identity Mandate and HHS's impending threat of enforcing it against CEA Healthcare Members, violate the Free Speech Clause of the First Amendment.

238. If Section 1557 of the ACA is deemed to prohibit discrimination on the basis of sexual orientation or gender identity as set forth in the agency action, HHS's enforcement of Section 1557 should be enjoined for the same reasons set forth in this claim.

239. CEA requests a preliminary and permanent injunction prohibiting enforcement of the HHS Gender Identity Mandate against it and its Healthcare Members, and a declaratory judgment declaring the HHS Gender Identity Mandate to violate the Free Speech Clause of the First Amendment.

240. CEA requests this relief whether the current HHS Gender Identity Mandate arises from the 2016 Rule or the 2021 Notice of Enforcement, or both, or alternatively from any still-in-effect sections of the 2020 Rule or applicable court orders.

SIXTH CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act — 5 U.S.C. § 701, *et seq.***
**(Against All Defendants)**

241. CEA incorporates by reference paragraphs 1–151.

242. Defendants are "agencies" under the Administrative Procedure Act ("APA"). 5 U.S.C. § 551(1).

243. HHS's 2016 Rule, 2020 Rule, and 2021 Notice of Enforcement are "rules"

40

under the APA and are "final agency action" reviewable by this Court. *See id.* § 551(4); *id.* § 704.

244. EEOC's practice and guidance that it interprets sex under Title VII as including gender identity, as discussed above and as promulgated in the attached Exhibits 3, 4, and 5, are "rules" under the APA and are "final agency action" reviewable by this Court. *See id.* § 551(4); *id.* § 704.

245. Together, the above-mentioned rules are referred to as "the agency rules."

246. The agency rules are unlawful and must be "set aside" because they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "without observance of procedure required by law," "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(A)-(C).

247. The agency rules are not in accordance with law and contrary to constitutional right, power, privilege, and immunity because the agency rules (and their resulting Mandates) violate the First Amendment and RFRA as described in the claims above.

248. Moreover, the agency rules require healthcare providers to perform gender transition services, regardless of whether they are medically necessary as determined by the providers' medical judgment. This requirement is not in accordance with law and is arbitrary and capricious.

249. The agency rules, namely the HHS rules, dictate appropriate medical treatment and the proper standard of care before a healthcare provider even has an opportunity to examine a patient. HHS's commandeering of the proper standard of care and necessary treatment usurps the medical judgment of healthcare professionals that take years of education, training, and experience to acquire. Thus the agency rules are not in accordance with law and are arbitrary and capricious.

250. The HHS rules are not in accordance with Section 1557 or Title IX and

exceed the statutory authority thereunder because neither Section 1557 nor Title IX define "sex" as encompassing gender identity and Congress intended "sex" to mean only the biological difference between male and female when it passed the ACA and Title IX.

251. The HHS rules are not in accordance with, and exceeds the authority of, Title IX because it fails to include Title IX's religious exemption. *See* 20 U.S.C. § 1681(a)(3).

252.  HHS's Gender Identity Mandate is contrary to the ACA's provision that "[n]othing in this Act shall be construed to have any effect on Federal laws regarding (i) conscience protection." 42 U.S.C. § 18023(c)(2); *see* Executive Order 13535, Enforcement and Implementation of Abortion Restrictions in [ACA], 75 Fed. Reg. 15599 (Mar. 29, 2010).

253. The HHS rules are not in accordance with and contrary to Section 1554 of the ACA, 42 U.S.C. § 18114, specifically: parts (1)–(2) and (6) because it pressures CEA Healthcare Members out of federally funded health programs and the practice of healthcare; parts (3)–(4) because it requires CEA Healthcare Members to speak in affirmance of gender identity and refrain from speaking in accordance with a patient's biological sex and related medical needs; part (5) because it requires CEA Healthcare Members to deprive patients of informed consent by preventing them from warning patients of the dangers of gender transition interventions; and also part (5) because it forces CEA Healthcare Members to violate their ethical and conscientious standards as healthcare professionals.

254. The HHS rules are not in accordance with 42 U.S.C. § 300a-7(d) because that section states that a healthcare provider shall not be required, within health service programs funded by HHS, to perform gender transition services if they are contrary to the provider's religious beliefs or moral convictions.

255. The HHS rules are not in accordance with, and are contrary to 42 U.S.C. §

1395y(a)(1)(A).

256.   The HHS rules also violate constitutional protections for free speech, association, and assembly, free exercise of religion, as described above, as well as structural protections of federalism, the Spending Clause, the clear notice canon, and the Tenth Amendment. When the government "intrudes into an area that is the particular domain of state law" because Congress must "'enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government.'" *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, No. 21A23, 2021 WL 3783142, at \*3 (U.S. Aug. 26, 2021) (citations omitted). Congress provided no such unmistakable notice here.

257. Alternatively, to the extent the 2016 Rule is *not* in effect despite the court injunctions in *Whitman-Walker Clinic* and *Walker,* HHS lacked authority to promulgate the 2021 Notice of Enforcement because the 2020 Rule repealed the gender identity language from the 2016 Rule and thus the 2021 Notice of Enforcement would have needed to undergo notice and comment under the APA to restore such gender identity language and render them enforceable. HHS thus acted without observance of procedure required by law.

258. The agency rules are also arbitrary and capricious for many reasons. Neither EEOC nor HHS accounted that sex is a biological realty and those agencies only relied on facts and considered studies from one side of the hotly-contested debate on sex and gender. HHS ignored other experts who said there is not enough evidence to require the provision of gender transition procedures.

259. Requiring healthcare providers to perform—and employers to pay for in insurance coverage—gender transition services without allowing healthcare providers to exercise their sound medical judgment and without considering religious objections is arbitrary and capricious.

260. EEOC and HHS failed to adequately consider the reliance, privacy, liberty,

and religious-freedom interests of these religious employers and healthcare providers. For example, HHS failed to adequately consider the harm to patients, who want to continue receiving care from providers like the CEA Healthcare Members, but who will not be able to do so when the mandate drives these providers out of their jobs, specific health programs, and healthcare generally.

261. HHS failed to acknowledge and to adequately explain its changes in positions from 2016 to 2020 to 2021 in its enforcement, and HHS failed to consider alternative policies, such as exempting religious organizations or respecting providers' medical judgment and conscience rights.

262. HHS's May 20, 2021 notice is internally contradictory by promising both to abide judicial opinions holding that Section 1557 does not prohibit gender identity discrimination, and to abide by other judicial opinions holding that it does.

263. HHS's enforcement of the Gender Identity Mandate is without observance of procedure required by law because, although the 2016 Rule occurred through notice and comment rulemaking, the 2020 Rule reversed HHS's positions concerning the legality and justifications for the Gender Identity Mandate.

264. Yet HHS did not undertake a new rulemaking process to reconsider the positions HHS took in the 2020 Rule reversing HHS's views on and justifications for the 2016 Gender Identity Mandate.

265. Therefore, HHS cannot enforce the 2016 Rule's Gender Identity Mandate without being arbitrary and capricious, and without undertaking notice and comment rulemaking as required by the APA. *See* 5 U.S.C. § 553.

266. Congress has not delegated to Defendants the authority to impose either the EEOC Coverage Mandate or HHS Gender Identity Mandate under Title VII and Section 1557, respectively, and thus the Mandates exceed the authority Congress conferred to HHS and the EEOC

267. The EEOC lacks authority to issue binding rules, regulations, or guidance,

such as the guidance that creates the EEOC Coverage Mandate.

268. The EEOC only has "authority from time to time to issue, amend, or rescind suitable procedural regulations to carry out the provisions of this subchapter." 42 U.S.C. § 2000e-12(a).

269. The EEOC does not have authority to issue substantive regulations or guidance that creates new mandates on employers, such as the EEOC Coverage Mandate, let alone do so without the full vote of the EEOC.

270. The EEOC Coverage Mandate thus exceeds EEOC's statutory authority and must be set aside.

271. Accordingly, the agency rules (and their resulting EEOC Coverage Mandate and HHS Gender Identity Mandate) and the enforcement mechanisms discussed above are unlawful under the APA and must be declared unlawful and set aside.

272. If Section 1557 of the ACA or Title VII is deemed to prohibit discrimination on the basis of sexual orientation or gender identity as set forth in the agency action, enforcement of these statutes in this way is unlawful for the same reasons set forth in this claim.

273. CEA requests that this Court vacate and enjoin Defendants' enforcement of the EEOC Coverage Mandate and HHS Gender Identity Mandate, and it asks this Court to enjoin and declare the EEOC Coverage Mandate and HHS Gender Identity Mandate unenforceable. CEA also request an injunction pending review by this Court in order to preserve the status and rights of CEA members. *See* 5 U.S.C. § 705.

## VII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff CEA respectfully requests that this Court enter judgment against Defendants, and provide Plaintiff, including its present and future members, with the following relief:

A.  Declare that the EEOC Coverage Mandate and HHS Gender Identity

Mandate violate the Religious Freedom Restoration Act, 42. U.S.C. § 2000bb-1, because they substantially burden CEA members' (both present and future) sincerely held religious beliefs without satisfying the government's obligations under RFRA;

B. Declare that the EEOC Coverage Mandate and HHS Gender Identity Mandate violate the Free Exercise Clause;

C. Declare that the HHS Gender Identity Mandate violates the Free Speech Clause;

D. Hold unlawful, set aside, vacate, and enjoin enforcement of HHS's 2016 Rule, any relevant portion of the 2020 Rule, and HHS's 2021 Notice of Enforcement and the resulting HHS Gender Identity Mandate, and EEOC's agency guidance and the resulting EEOC Coverage Mandate, under 5 U.S.C. §§ 701, 706;

E. Enjoin and postpone, pending this proceeding, the effective date of HHS's 2016 Rule and 2021 Notice of Enforcement and the resulting HHS Gender Identity Mandate, and EEOC's agency guidance and the resulting EEOC Coverage Mandate, under 5 U.S.C. §§ 701, 705;

F. Issue a preliminary and permanent injunction, prohibiting Defendants EEOC and Chair Charlotte Burrows, and their officers, agents, and successors, from:

   a. enforcing the EEOC Coverage Mandate against the CEA and its present and future members,

   b. interpreting or enforcing Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, or any implementing regulations thereto against the CEA members in a manner that would require them to provide insurance coverage for gender transition services,

   c. applying or enforcing the EEOC Coverage Mandate against the

insurers and third-party administrators of the CEA's present and future members,

d. interfering with the CEA's present and future members' relationships with their insurers or third-party administrators and with those members' attempts to contract for morally compliant health plans or health insurance coverage for their employees;

G. Issue a preliminary and permanent injunction, prohibiting Defendants HHS, Secretary Xavier Becerra, OCR, and Director Lisa J. Pino, and their officers, agents, and successors, from:

a. enforcing the HHS Gender Identity Mandate against the CEA and its present and future members,

b. interpreting or enforcing Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, and any implementing regulations thereto against the CEA members in a manner that would require them to provide, offer, perform, facilitate, or refer for gender transition services,

c. interpreting or enforcing Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, and any implementing regulations thereto against the CEA members in a manner that would require them to use preferred pronouns in speaking, charting, and any other medical use, or otherwise compelling speech on gender identity issues,

d. interpreting or enforcing Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, and any implementing regulations thereto against the CEA members in a manner that prevents or restricts CEA members' speech on gender identity issues;

H. Award CEA the costs of this action and reasonable attorney's fees as provided by law, including 28 U.S.C. § 2412(d) and 42 U.S.C. § 1988(b);

I. Grant any other relief this Court deems equitable, just, and proper; and

J.  Retain jurisdiction of this matter as necessary for enforcing this Court's orders.

Respectfully submitted this 18th day of October, 2021.

By:

*s/ Jacob E. Reed*
Jacob E. Reed
OH Bar No. 99020
**ALLIANCE DEFENDING FREEDOM**
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
Facsimile:  (571) 707-4656
jreed@ADFlegal.org

Julie Marie Blake
MO Bar No. 69643
**ALLIANCE DEFENDING FREEDOM**
440 First Street, NW, Ste. 600
Washington, D.C. 20001
Telephone: (202) 393–8690
Facsimile:  (202) 347–3622
jblake@ADFlegal.org

*Attorneys for Plaintiff*

### DECLARATION UNDER PENALTY OF PERJURY

I, Shannon O. Royce, a citizen of the United States and a resident of the State of North Dakota, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this __18__ day of October, 2021.

Shannon O. Royce, President
Christian Employers Alliance

49