# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| **CHRISTIAN EMPLOYERS ALLIANCE,**<br><br>      *Plaintiff,*<br><br> v.<br><br>**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, ET AL.**<br><br>      *Defendants.* | **CIVIL CASE NO.** 1-21-cv-00195-DMT-CRH<br><br>**JUDGE DANIEL M. TRAYNOR** |

### DECLARATION OF SHANNON O. ROYCE

I, Shannon O. Royce, hereby declare and state as follows:

1. I am over eighteen years of age and make this declaration on personal knowledge.

2. I am the President of Christian Employers Alliance (CEA).

3. Attached to CEA's Verified Complaint as Exhibit 1 (ECF No. 1-1) is a true and authentic copy of the Second Amended & Restated Bylaws of Christian Employers Alliance.

4. Attached to CEA's Verified Complaint as Exhibit 2 (ECF No. 1-2) is a true and authentic copy of the Articles of Incorporation of Christian Employers Alliance.

**Christian Employers Alliance Members' Beliefs**

1

5. CEA is a 501(c)(3) nonprofit corporation incorporated in the state of North Dakota.

6. CEA is a Christian membership ministry that exists to unite and serve Christian nonprofit and for-profit employers who wish to live out their faith in every-day life, including in their homes, schools, ministries, businesses, and communities. ECF No.1-1, art. I, § 1.3.9.

7. CEA's mission is to unite, equip, and represent Christian-owned [nonprofit and for-profit] businesses to protect religious freedom and provide the opportunity for employees, businesses, and communities to flourish.

8. One of CEA's primary purposes is "to support Christian employers and develop strategies for them, so that they, as part of their religious witness and exercise, may provide health or other employment related benefits to their respective employees and engage in other employment practices in a manner that is consistent with Christian Values." ECF No. 1-2, art. II., § 2.2.

9. CEA has multiple members throughout the United States.

10. Members place Jesus Christ as the center and foundation of their organizations and are called to live out their faith in every aspect of their operations, including in the workplace.

11. Members sincerely believe that God purposefully designs and creates humans as distinctly either male or female, that His purposeful design and creation of humans as male or female is immutable, that human creation reflects the image and likeness of God, and that males and females are complementary to each other.

12. Most CEA members are engaged in an industry affecting commerce and employ fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. Thus, most CEA members are "employers" subject to the requirements of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.

13. CEA also has multiple members that are principally engaged in providing healthcare services and that receive Federal financial assistance, like Medicare or Medicaid. These "Healthcare Members" are therefore subject to the requirements of the Affordable Care Act's nondiscrimination statute and regulations.

14. These Healthcare Members are also "employers" under Title VII.

15. To become a member of CEA, prospective members must meet the requirements as set forth in Second Amended & Restated Bylaws. *See* ECF No. 1-1, art. III.

16. Members must be an "employer" as defined in the Bylaws (*see* ECF No. 1-2, art. V) and must subscribe to CEA's "Christian Values," which are defined as "the Statement of Faith and Christian Ethical Convictions, together with such other determinations of faith and values as determined by the Board of Directors." ECF No. 1-1, art. I, § 1.2.

17. CEA defines a "Christian" as "one who lives his or her life according to Christian Values. *Id.*

3

18. Specifically, members must be an "employer[] that commit[s] to provide health care benefits consistent with Christian Ethical Convictions and to support the right and freedom of Christian employers to do so." *Id.*, art. III, § 3.1.1.

19. Nonprofit members must subscribe to CEA's Statement of Faith, have a Christian highest executive officer or majority of its governing body, and have Section 501(c)(3) status or receive special approval by the President. *Id.*, art. III, § 3.1.2.

20. For profit members must be owned by a 51% majority of Christians and have a 51% majority of Christians on the member's governing body. *Id.*, art. III, § 3.1.3.

21. As stated, all members must subscribe to CEA's Statement of Faith (*see id.*, art. I, § 1.1) and Christian Ethical Convictions (*see id.*, art. I, § 1.3), collectively, the "Christian Values."

22. All CEA members therefore believe that "[m]ale and female are immutable realities defined by biological sex" and that "[g]ender reassignment is contrary to Christian Values." *Id.*, art. I, § 1.3.5.

23. Because of these Christian Ethical Convictions, members agree that they cannot "provide services for, healthcare coverage of, reimbursement for, or access to . . . [g]ender reassignment therapies and surgery, [c]ounseling affirming or encouraging any acts or behavior violating Christian values, [or] [a]ny medical treatments, procedures, or medication contrary to Christian Values." *Id.*, art. I, § 1.3.7.

24. As such, CEA members cannot perform, refer for, provide, or otherwise facilitate any form of gender transition services.

25. Gender transition services would include (but not be limited to) the taking of any medication in attempt to alter one's biological sex (e.g., puberty blockers), surgeries to change the appearance of one's biological sex (e.g., breast removal in a female), counseling affirming one's belief that they are a sex different than their biological sex, and surgeries to change/remove one's biological reproductive organs (e.g., hysterectomy on a healthy woman).

26. Gender transition services are contrary to Christian Values.

**Christian Employers Alliance Members' Religious Exercise**

27. CEA members, as employers, provide health benefits to their employees through insured group health plans or self-funded plans. Many CEA members are *required* to do so under the Affordable Care Act, but CEA members do so for another reason: because their religious beliefs—consistent with CEA's Christian Values—compel them to care for their employees. *See* ECF No. 1-2, art. II., § 2.2.

28. CEA members' religious beliefs compel the Healthcare Members to provide healthcare services to individuals, including the sick, needy, unfortunate, and impoverished.

29. CEA members thus exercise their religion by providing group health insurance or coverage benefits to their employees and by providing healthcare services, consistent with CEA's Christian Values, Christian Ethical Convictions,

5

and their religious beliefs. Their commitment to doing so likewise is part of their religious witness and exercise.

30.     CEA members therefore wish to exclude coverage for gender transition services in their employee health plans, so as to comply with their religious beliefs.

31.     Several CEA members currently provide group health plans to their employees that categorically exclude coverage for gender transition services. And all CEA members desire to provide group health plans that include such exclusions.

32.     And the Healthcare Members currently refuse to perform, refer for, offer, or facilitate gender transition services in their provision of healthcare.

33.     If CEA members were forced to offer gender transition services coverage in their health plans, or were forced to perform or facilitate gender transition services, they would violate their religious exercise.

**EEOC and the EEOC Coverage Mandate**

34.     Defendants Equal Employment Opportunity Commission and its Chair Charlotte Burrows (collectively "EEOC") interpret and enforce Title VII's prohibition on discrimination on the "basis of sex" to include discrimination "on the basis of gender identity."

35.     The EEOC applies this interpretation to require "employers" as defined in Title VII that offer employee healthcare plans to pay for and provide coverage for gender transition services in those healthcare plans—the EEOC Coverage Mandate. This requirement applies to the CEA members that provide their employees with group health insurance plans, which is most members.

6

36. If CEA members fail to offer coverage for gender transition services in these plans, they face severe and devastating legal ramifications. CEA members could incur costly and detrimental civil liability, administrative investigations, possible punitive damages, attorney's fees, and other penalties under Title VII for not providing this coverage.

37. The EEOC prohibits CEA members from excluding gender transition services in their group health plans, regardless of their religious beliefs and objections.

38. CEA members' religious exercise is burdened by EEOC's impending threat to enforce its requirement that employers cover gender transition services in their healthcare plans.

**HHS and the HHS Gender Mandate**

39. In the same manner, Defendants U.S. Department of Health and Human Services, Secretary Xavier Becerra, HHS Office for Civil Rights, and Director Lisa J. Pino (collectively "HHS") interpret and enforce ACA Section 1557's prohibition on discrimination on the "basis of sex" to include discrimination "on the basis of gender identity." This was made clear by HHS's Notification of Interpretation and Enforcement that was issued on May 25, 2021.

40. This interpretation and enforcement applies to the Healthcare Members and it requires them to perform numerous gender transition services, to offer these services, refer for these services, and speak positively about these services—the HHS Gender Mandate.

7

41. The HHS Gender Mandate forces the Healthcare Members to perform services that attempt to change or alter a biological male to a female, and vice-versa. These services plainly conflict with the Healthcare Members' belief about God's immutable and binary creation of male and female and conflicts with CEA's Christian Values.

42. HHS thus forces the Healthcare Members to perform (or refer for and facilitate) the following objectionable practices:

   a. Prescribe puberty blockers off-label from the FDA-approved indication to treat gender dysphoria and initiate or further transition in adults and children;

   b. Prescribe hormone therapies off-label from the FDA-approved indication to treat gender dysphoria in all adults and children;

   c. Provide other continuing interventions to further gender transitions ongoing in both adults and minors;

   d. Perform hysterectomies or mastectomies on healthy women who believe themselves to be men;

   e. Remove the non-diseased ovaries of healthy women who believe themselves to be men;

   f. Remove the testicles of healthy men who believe themselves to be women;

   g. Perform a process called "de-gloving" to remove the skin of a man's penis and use it to create a faux vaginal opening;

h. Remove vaginal tissue from women to facilitate the creation of a faux or cosmetic penis;

i. Perform or participate in any combination of the above mutilating cosmetic procedures to place a patient somewhere along the socially constructed gender identity spectrum;

j. Offer to perform, provide, or prescribe any and all such interventions, procedures, services, or drugs;

k. Refer patients for any and all such interventions, procedures, services, or drugs;

l. End or modify their policies, procedures, and practices of not offering to perform or prescribe these procedures, drugs, and interventions;

m. Say in their professional opinions that these gender intervention procedures are the standard of care, are safe, are beneficial, are not experimental, or should otherwise be recommended;

n. Treat patients according to gender identity and not sex;

o. Express views on gender interventions that they do not share;

p. Say that sex or gender is nonbinary or on a spectrum;

q. Use language affirming any self-professed gender identity;

r. Use patients' preferred pronouns according to gender identity, rather than using no pronouns or using pronouns based on biological sex;

s. Create medical records and coding patients and services according to gender identity, not biological sex;

9

t. Provide the government assurances of compliance, providing compliance reports, and posting notices of compliance in prominent physical locations, if HHS's 2016 Rule's interpretation of the term sex governs these documents;

u. Refrain from expressing their medical, ethical, or religious views, options, and opinions to patients when those views disagree with gender identity theory or transitions;

v. Allow patients to access single-sex programs and facilities, such as mental health therapy groups, breastfeeding support groups, post-partum support groups, educational sessions, changing areas, restrooms, communal showers, and other single-sex programs and spaces, by gender identity and not by biological sex; and

w. Pay for or provide insurance coverage for any or all objectionable procedures, drugs, interventions, or speech.

43. HHS does not give a religious exemption from these requirements to the Healthcare Members.

44. If the Healthcare Members fail to perform these gender transition services, they face severe and devastating legal ramifications. The Healthcare Members could lose all Federal funding, could incur costly and detrimental civil liability, administrative investigations, attorney's fees, False Claims Act liability, and possible criminal penalties.

45. The Healthcare Members' religious exercise is burdened by HHS's impending threat to enforce its requirement that the Healthcare Members perform and offer these gender transition services.

46. The Healthcare Members currently do not have past or current policies or practices in their healthcare activities that comply with the objectionable practices, and they wish to continue their current policies and practices in the future, rather than change their practices to conform to the government's mandate.

### *Religious Sisters of Mercy* and CEA's Similar Beliefs

47. I am aware there has been much litigation regarding the EEOC Coverage Mandate and HHS Mandate, including at least one case in this Court: *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1153-54 (D.N.D. 2021), judgment entered sub nom. *Religious Sisters of Mercy v. Cochran*, No. 3:16-CV-00386, 2021 WL 1574628 (D.N.D. Feb. 19, 2021).

48. I understand that in *Religious Sisters*, this Court enjoined the EEOC and HHS from enforcing the Mandates against the Catholic Benefits Association (CBA), which is an organization much like CEA.

49. Based on information and belief, and my review of the Court documents and assertions put forth by the CBA and other plaintiffs in the *Religious Sisters* case, CEA holds substantially the same Christian religious beliefs about God's immutable creation of male and female, sexuality, and procreation as CBA and the other plaintiffs in that case.

50. And based on information and belief, and my review of the Court documents and assertions put forth by the CBA and other plaintiffs in the *Religious Sisters* case, CEA holds substantially the same religious objections to performing and covering gender transition services as CBA and the other plaintiffs in that case.

51. But CEA members did not receive any protection from the injunctions issued in *Religious Sisters*, as those injunctions applied only to the plaintiffs in that case.

52. As of today, CEA members remain compelled to perform and cover gender transition services under threat of enforcement from the EEOC and HHS.

I declare that the foregoing is true and correct under penalty of perjury under the laws of the United States of America. Executed this October 19, 2021, in Falls Church VA.

_____
Shannon D. Royce