IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

CHRISTIAN EMPLOYERS ALLIANCE,

*Plaintiff,*

v.

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, ET AL.

*Defendants.*

CIVIL CASE NO. 1:21-cv-00195-DMT-CRH

JUDGE DANIEL M. TRAYNOR

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION

Oral Argument Requested

## TABLE OF CONTENTS

Table of Authorities ..................................................................................................iii

Introduction ........................................................................................................... 1

Statement of Facts ................................................................................................ 3

I.     CEA and its members. ..................................................................................... 3

II.    EEOC and the EEOC Coverage Mandate. ...................................................... 5

III.   HHS and the Gender Identity Mandate. ......................................................... 7

       A.     Previous Section 1557 rulemaking and litigation recognized HHS's
              unlawful burdens on religious exercise. ................................................. 7

       B.     HHS requires the Healthcare Members to perform, facilitate, and
              speak about gender transition services. ............................................... 11

IV.    The Permanent Injunction in *Religious Sisters of Mercy*. ............................ 13

Argument ............................................................................................................ 15

I.     Legal Standard .............................................................................................. 15

II.    CEA has a substantial likelihood of success on the merits. .......................... 15

       A.     The EEOC Coverage and HHS Gender Identity Mandates violate
              RFRA. ................................................................................................... 15

              1.     CEA members' religiously informed health-insurance decisions
                     are the exercise of religion, protected by RFRA. ....................... 16

              2.     The EEOC Coverage Mandate and HHS Gender Identity
                     Mandate substantially burden CEA members' exercise of
                     religion. ..................................................................................... 17

              3.     The EEOC Coverage Mandate and HHS Gender Identity
                     Mandate fail strict scrutiny under RFRA. ................................. 20

                     i.     The EEOC Coverage Mandate and the HHS Gender
                            Identity Mandate do not further a compelling
                            governmental interest. ........................................................ 20

ii. The EEOC Coverage Mandate and HHS Gender Identity Mandate are not the least restrictive means of furthering any governmental interest. ...............................................23

B. The EEOC Coverage and HHS Gender Identity Mandates violate CEA members' Free Exercise rights. .............................................................26

 1. The EEOC Coverage Mandate is not generally applicable.........26

 2. The HHS Gender Identity Mandate is neither neutral nor generally applicable.......................................................................28

 3. The EEOC Coverage Mandate and HHS Gender Mandate fail strict scrutiny under the Free Exercise Clause...........................30

C. The HHS Gender Identity Mandate violates CEA members' Free Speech rights. ..................................................................................... 30

 1. The HHS Gender Identity Mandate compels, chills, and restricts the Healthcare Members' speech. .................................32

 2. The HHS Gender Identity Mandate's speech requirements cannot satisfy strict scrutiny........................................................34

D. The EEOC Coverage and HHS Gender Identity Mandates violate the Administrative Procedure Act (APA). .....................................................36

 1. The EEOC Coverage Mandate is contrary to law, without proper procedure, and is arbitrary and capricious......................36

 2. HHS's Gender Identity Mandate is contrary to law, arbitrary and capricious, and skipped require notice-and-comment procedures. ...............................................................................39

III. The other preliminary injunction factors also weigh in favor of CEA. ...........45

Conclusion ...................................................................................................47

**Table of Authorities**

## Cases

*Alabama Association of Realtors v. Department of Health & Human Services*,
 2021 WL 3783142 (U.S. Aug. 26, 2021) ........................................................ 41

*Arlington Central School District Board of Education v. Murphy*,
 548 U.S. 291 (2006) ........................................................................................ 41

*Biden v. Texas*,
 2021 WL 3732667 (Aug. 24, 2021) ................................................................ 37

*Blackhawk v. Pennsylvania*,
 381 F.3d 202 (3d Cir. 2004) ..................................................................... 26, 27

*Board of Education of Hendrick Hudson Central School District, Westchester County
 v. Rowley*,
 458 U.S. 176 (1982) ........................................................................................ 41

*Bond v. United States*,
 564 U.S. 211 (2011) ........................................................................................ 41

*Bond v. United States*,
 572 U.S. 844 (2014) ........................................................................................ 41

*Bostock v. Clayton County, Georgia*,
 140 S. Ct. 1731 (2020) ......................................................................... 11, 38, 44

*Brush & Nib Studio, LLC v. City of Phoenix*,
 448 P.3d 890 (Ariz. 2019) .............................................................................. 35

*Burwell v. Hobby Lobby Stores, Inc.*,
 573 U.S. 682 (2014) ................................................................................. passim

*Carcieri v. Salazar*,
 555 U.S. 379 (2009) ........................................................................................ 41

*Carson v. Simon*,
 978 F.3d 1051 (8th Cir. 2020) ........................................................................ 46

*Christian Legal Society v. Walker*,
 453 F.3d 853 (7th Cir. 2006) .......................................................................... 46

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
 508 U.S. 520 (1993) ................................................................................... 26, 29

*Conant v. Walters,*
    309 F.3d 629 (9th Cir. 2002) .................................................................. 31

*Dataphase Systems, Inc. v. C L Systems, Inc.,*
    640 F.2d 109 (8th Cir.1981).................................................................... 15

*Dellmuth v. Muth,*
    491 U.S. 223 (1989) ................................................................................ 42

*Department of Homeland Security v. Regents of the University of California,*
    140 S. Ct. 1891 (2020)................................................................... 37, 43, 44

*Elrod v. Burns,*
    427 U.S. 347, 373 (1976) ........................................................................ 45

*Employment Division, Department of Human Resources of Oregon v. Smith,*
    494 U.S. 872 (1990) ................................................................................ 16

*Equal Employment Opportunity Commission v. Deluxe Financial Services, Inc.,*
    Case No. 0:15-cv-2646 (D. Minn. Jan. 21, 2016)........................................ 6

*Franciscan Alliance Inc. v. Becerra,*
    843 F. App'x 662 (5th Cir. 2021) ............................................................ 11

*Franciscan Alliance, Inc. v. Becerra,*
    2021 WL 3492338 (N.D. Tex. Aug. 9, 2021)......................................... passim

*Franciscan Alliance, Inc. v. Burwell,*
    227 F. Supp. 3d 660 (N.D. Tex. 2016) ................................................ 24, 25

*Fulton v. City of Philadelphia,*
    141 S. Ct. 1868 (2021)............................................................................ passim

*General Electric Company v. Gilbert,*
    429 U.S. 125 (1976) ................................................................................ 38

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
    546 U.S. 418 (2006) ....................................................................... 20, 21, 34

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ................................................................................ 41

*Home Instead, Inc. v. Florance,*
    721 F.3d 494 (8th Cir. 2013) .................................................................. 15

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
    515 U.S. 557 (1995) ................................................................................ 35

*Janus v. American Federation of States, County,*
  *and Municipal Employees, Council 31,*
  138 S. Ct. 2448 (2018)........................................................................ 34

*Knox v. Service Employees International Union, Loc*al 1000,
  567 U.S. 298 (2012) ........................................................................... 31

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
  140 S. Ct. 2367 (2020)............................................................. 18, 37, 38

*Loudoun County School Board v. Cross,*
  No. 210584 (Va. Aug. 30, 2021) ...................................................... 34

*Lowry ex rel. Crow v. Watson Chapel School District,*
  540 F.3d 752 (8th Cir. 2008) ........................................................... 45

*Meriwether v. Hartop,*
  992 F.3d 492 (6th Cir. 2021) ........................................................... 35

*Michigan v. Environmental Protection Agency,*
  576 U.S. 743 (2015) ........................................................................... 37

*Minnesota Citizens Concerned for Life, Inc. v. Swanson,*
  692 F.3d 864 (8th Cir. 2012) ........................................................... 45

*Motor Vehicle Manufacturers Association of United States, Inc. v. State Farm*
  *Mutual Automobile Insurance Co*mpany,
  463 U.S. 29 (1983) ...................................................................... 37, 44

*National Institute of Family & Life Advocates v. Becerra,*
  138 S. Ct. 2361 (2018)........................................................................ 31

*Newsom ex rel. Newsom v. Albemarle County School Board,*
  354 F.3d 249 (4th Cir. 2003) ........................................................... 46

*Pennhurst State School & Hospital v. Halderman,*
  451 U.S. 1 (1981)......................................................................... 41, 42

*Religious Sisters of Mercy v. Azar,*
  513 F. Supp. 3d 1113 (D.N.D. 2021)...................................... passim

*Riley v. National Federation of the Blind of North Carolina, Inc.,*
  487 U.S. 781 (1988) ........................................................................... 31

*Sharpe Holdings, Inc. v. United States Department of Health & Human Services,*
  801 F.3d 927 (8th Cir. 2015) .................................................... passim

*Tandon v. Newsom,*
  141 S. Ct. 1294 (2021) ............................................................ 26, 28

*Telescope Media Group v. Lucero,*
  936 F.3d 740 (8th Cir. 2019) ............................................................ 35

*Texas v. Equal Employment Opportunity Commission,*
  933 F.3d 433 (5th Cir. 2019) ............................................................ 39

*Texas v. Johnson,*
  491 U.S. 397 (1989) ............................................................ 35

*United States v. Thomason,*
  991 F.3d 910 (8th Cir. 2021) ............................................................ 33

*United States v. Varner,*
  948 F.3d 250 (5th Cir. 2020) ............................................................ 33

*Walker v. Azar,*
  480 F. Supp. 3d 417 (E.D.N.Y. 2020) ............................................................ 9, 32

*Ward v. Polite,*
  667 F.3d 727 (6th Cir. 2012) ............................................................ 34

*Watkins Inc. v. Lewis,*
  346 F.3d 841 (8th Cir. 2003) ............................................................ 15

*Whitman-Walker Clinic, Inc. v. United States Department of Health & Human
  Services,*
  2021 WL 4033072 (D.D.C. Sept. 3, 2021) ............................................................ 9

*Whitman-Walker Clinic, Inc. v. United States Department of Health & Human
  Services,*
  485 F. Supp. 3d 1 (D.D.C. 2020) ............................................................ 9, 32

## **Statutes**

5 U.S.C. § 553 ............................................................ 39, 44

5 U.S.C. § 705 ............................................................ 36, 45

5 U.S.C. § 706 ............................................................ 36, 38, 45

18 U.S.C. § 1035 ............................................................ 18

20 U.S.C. § 1681 ............................................................ 7, 9, 39, 43

20 U.S.C. § 1682 ........................................................................................... 13, 18

29 U.S.C. § 794 .................................................................................................... 13

31 U.S.C. § 3729 .................................................................................................. 18

42 U.S.C. § 300 .................................................................................................... 43

42 U.S.C. § 18023 ............................................................................................... 43

42 U.S.C. § 18114 ............................................................................................... 42

42 U.S.C. § 18116 ......................................................................................... 4, 7, 13

42 U.S.C. § 2000 ........................................................................................... passim

## Regulations

EEOC Guidance Requirements,
    29 C.F.R. § 1695 (2020) ............................................................... 39

Executive Order No. 13,988,
    86 Fed. Reg. 7023 (Jan. 20, 2021) ............................................. 10

Federal funds. Patient Protection and Affordable Care Act,
    45 C.F.R. § 92.3(b) (2010) .................................................. 22, 28, 29

Nondiscrimination in Health and Health Education Programs or Activities,
    85 Fed. Reg. 37,160 (June 19, 2020) ................................ 8, 30, 39, 40

Nondiscrimination in Health Programs and Activities,
    81 Fed. Reg. 31,375 (May 18, 2016) ........................................ passim

Notification of Interpretation and Enforcement of Section 1557 of the
    Affordable Care Act and Title IX of the Education Amendments of 1972,
    86 Fed. Reg. 27,984 (May 25, 2021) .............................. 10, 11, 25, 30

## Introduction

Just ten months ago, in *Religious Sisters of Mercy v. Azar*, this Court ruled for religious employers and healthcare providers on the same claims raised in this case. 513 F. Supp. 3d 1113, 1153-54 (D.N.D. 2021), *judgment entered sub nom. Religious Sisters of Mercy v. Cochran*, No. 3:16-CV-00386, 2021 WL 1574628 (D.N.D. Feb. 19, 2021). Under the Religious Freedom Restoration Act (RFRA), the Court permanently enjoined the EEOC from forcing Catholic employers to cover gender transition services in their employee healthcare plans, and it enjoined HHS from forcing Catholic healthcare providers to perform gender transition services. In August, another district court likewise enjoined HHS under RFRA from imposing its gender identity mandate on another group of healthcare providers. *Franciscan All., Inc. v. Becerra*, No. 7:16-CV-00108-O, 2021 WL 3492338, at *9 (N.D. Tex. Aug. 9, 2021). But, as to the rest of the country, EEOC and HHS have since publicly announced that they *will* enforce universal gender identity mandates.

Plaintiff Christian Employers Alliance (CEA) and its members sit in the same posture as the *Religious Sisters of Mercy* plaintiffs, and they seek substantially the same relief. CEA is a nationwide Christian membership organization consisting of for-profit and nonprofit employer entities. CEA members hold traditional Christian beliefs that God created humans distinctly as male and female, and that this sex is immutable and unchangeable.

As such, CEA members who provide health insurance coverage object to providing insurance coverage for gender transition services. Most members employ more than 15 employees, and so Title VII regulates their employee health insurance

1

plans. But, as this Court previously concluded, the EEOC interprets Title VII's prohibition of "sex" discrimination to mandate employee health insurance for gender transitions—the "EEOC Coverage Mandate."

CEA has several members ("Healthcare Members") that are principally engaged in the business of providing healthcare, each of whom receive Federal financial assistance, like participation in Medicaid or Medicare. These Healthcare Members fall under Section 1557 of the ACA, which regulates healthcare services. CEA's Healthcare Members likewise object to participating in, referring for, or affirming gender transition services. But HHS interprets Section 1557's prohibition of "sex" discrimination to require healthcare providers to perform gender transition services, even on fully healthy individuals and when medically unnecessary—the "HHS Gender Identity Mandate." This mandate also forces the Healthcare Members to offer and affirm gender transition services, and it censors their contrary medical opinions.

Congress enacted the Religious Freedom Restoration Act (RFRA) to protect against this very sort of governmental compulsion. As this Court recognized in January in *Religious Sisters*, the government's mandates violate RFRA. These mandates also violate the Free Exercise Clause, Free Speech Clause, and the Administrative Procedure Act.

If CEA members follow their beliefs, they risk liability, investigations, punitive damages, attorney's fees, and other penalties under Title VII and Section

1557 of the Affordable Care Act (ACA). This Court should thus issue a preliminary injunction to preserve and protect CEA members' fundamental rights.

## Statement of Facts

### I.     CEA and its members.

CEA is a Christian membership ministry that exists to unite and serve Christian nonprofit and for-profit employers who wish to live out their faith in every-day life, including in their homes, schools, ministries, businesses, and communities. Declaration of Shannon O. Royce, ¶ 6, attached as Exhibit 1; *see also* Second Amended & Restated Bylaws of Christian Employers Alliance, art. I, § 1.3.9, ECF No. 1-1. CEA exists, in part, "to support Christian employers and develop strategies for them, so that they, as part of their religious witness and exercise, may provide health or other employment related benefits to their respective employees and engage in other employment practices in a manner that is consistent with Christian Values." *Id.* ¶ 8; *see also* Articles of Incorporation of Christian Employers Alliance, art. II., § 2.2, ECF No. 1-2.

CEA members are Christ-centered organizations, dedicated to integrating their Christian convictions into every aspect of their operations, whether ministry or business. *Id.* ¶¶ 6, 10; ECF No. 1-1, art. I, § 1.3.9. As a Christian membership ministry, CEA believes that God purposefully designs and creates humans as distinctly either male or female. *Id.* ¶ 11. CEA members believe that God's creation of individuals as either a biological male or female is immutable, reflects the image and likeness of God, and is complementary to each other. *Id.*

3

CEA has members nationwide and most of these members are "employers" as defined in Title VII of the Civil Rights Act of 1964. *Id.* ¶¶ 9, 12. Many members have more than 50 employees, so they must provide employee health insurance under the ACA's employer mandate. Several members are also principally engaged in providing healthcare, receive Federal financial assistance like Medicaid or Medicare, and thus are subject to Section 1557 of the ACA's nondiscrimination provisions, too. *Id.* ¶ 13; *see* 42 U.S.C. § 18116(a).

CEA requires all its members to be a "Christian employer" as defined by its bylaws and to "commit to provide health care benefits consistent with Christian Ethical Convictions and to support the right and freedom of Christian employers to do so." *Id.* ¶¶ 16, 18; ECF No. 1-1, art. III, § 3.1.1. CEA's Christian Ethical Convictions—to which members must adhere—state that "[m]ale and female are immutable realities defined by biological sex" and that "[g]ender reassignment is contrary to Christian Values." *Id.* ¶¶ 21, 22; ECF No. 1-1, art. I, § 1.3.5. Because of these convictions, CEA members cannot, "consistent with Christian Values" "provide services for, health care coverage of, reimbursement for, or access to: ... [g]ender reassignment therapies and surgery, [c]ounseling affirming or encouraging any acts or behavior violating Christian values, [or] [a]ny medical treatments, procedures, or medication contrary to Christian Values." *Id.* ¶ 23; ECF No. 1-1, art. I, § 1.3.7.

CEA Healthcare Members thus cannot perform, or refer for, gender transition services because they conflict with their religious beliefs. *Id.* ¶¶ 32, 33.

Nor can CEA members pay for insurance covering gender transition services. *Id.* ¶ 30. Many CEA members, as employers, provide health benefits to their employees through insured group health plans or self-funded plans. *Id.* ¶ 27. The members' commitment to comply with CEA's Christian Values and Christian Ethical Convictions in their provision of healthcare services and health insurance or coverage benefits is part of their religious witness and religious exercise. *Id.* ¶ 29. To avoid violating their religious beliefs, CEA members thus wish to exclude coverage of gender transition services in their employee health plans, many seek to continue this exclusion in their existing policies, and the Healthcare Members refuse to perform or facilitate gender transition services. *Id.* ¶¶ 30-33.

## II.     EEOC and the EEOC Coverage Mandate.

The EEOC interprets Title VII's prohibition of "sex" discrimination to encompass discrimination based on gender identity. *Id.* ¶ 34. It says that "Discrimination against an individual because of gender identity, including transgender status, or because of sexual orientation is discrimination because of sex in violation of Title VII." Ver. Compl.*, ECF No, 1; ECF No. 1-3. The EEOC thus requires employers subject to Title VII to pay for insurance coverage for gender transition services for employees, regardless of any conscientious or religious objection—the EEOC Coverage Mandate. *Id.* ¶¶ 35, 37; Ver. Compl. ¶¶ 65, 67, 83.

If those employers fail to provide this coverage, they risk serious civil liability, administrative investigations, punitive damages, attorney's fees, and other penalties. *Id.* ¶ 36; Ver. Comp. ¶¶ 66, 86-93; 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 2000e-5 (enforcement mechanisms under Title VII).

The EEOC has enforced the EEOC Coverage Mandate in various ways. For instance, the EEOC sued an employer for transgender status discrimination and then entered into a consent decree with the employer, to prevent the employer from including "partial or categorical exclusions for otherwise medically necessary care solely on the basis of sex (including transgender status) and gender dysphoria." *EEOC v. Deluxe Fin. Services, Inc.*, Case No. 0:15-cv-2646 (D. Minn. Jan. 21, 2016) (consent decree); *see also* EEOC Amicus Brief Supporting Plaintiff, *Robinson v. Dignity Health,* No. 16-CV-3035 YGR, 2016 WL 11517056 (N.D. Cal. Aug. 22, 2016) (arguing that "disparate treatment in the provision of employee benefits, because of an individual's sex"—including denying sex transformation surgery—"may violate Title VII."). The EEOC has, for many years, enforced the Mandate and has even cooperated with HHS to ensure employer healthcare plans cover gender transition procedures. *See* Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375, 31,432 (May 18, 2016) ("2016 Rule") (HHS explaining that in enforcement of Section 1557 of the ACA that it will "refer or transfer [a] matter to the EEOC" if HHS "lacks jurisdiction over an employer"). Just this year, the EEOC Chair issued a new "technical assistance document" declaring that Title VII's prohibition of discrimination "because of . . . sex" prevents employers from maintaining showers, locker rooms, and bathrooms that are separated based on biological sex and requires employers to use a transgender employee's preferred pronouns. EEOC, Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity (June 15, 2021), https://bit.ly/3zgP7iP. In sum, the EEOC has

enforced the EEOC Coverage Mandate in the past, and it will continue to do so today against CEA members.

## III.   HHS and the Gender Identity Mandate.

Section 1557 of the ACA prohibits discrimination in "health program[s] or activit[ies]" that receive "Federal financial assistance." 42 U.S.C. § 18116(a). CEA's Healthcare Members are principally engaged in the business of providing healthcare and receive Federal financial assistance, making them subject to Section 1557. Ex. 1 ¶ 13; Ver. Comp. ¶¶ 97, 98.

Section 1557 does not address gender identity but HHS's current interpretation of Section 1557 does. Section 1557 of the ACA incorporates Title IX of the Education Amendments of 1972, which prohibits discrimination "on the basis of sex," understood as a biological binary, and it gives broad exemptions for religious institutions. 20 U.S.C. § 1681(a). Despite various rule changes and lawsuits, HHS enforces its Gender Identity Mandate purportedly under Section 1557's authority.

### A.   Previous Section 1557 rulemaking and litigation recognized HHS's unlawful burdens on religious exercise.

In 2016, HHS promulgated a regulation to implement Section 1557. *See* 42 U.S.C. § 18116(c). That rule defined discrimination "on the basis of sex" under Section 1557 as "discrimination" based on "sex stereotyping" and "gender identity," among other things. 2016 Rule, 81 Fed. Reg. at 31,467. The 2016 Rule required covered healthcare providers to perform gender transition services, even if those services were not medically necessary. Thus, if a healthy individual desired medical procedures to change features of his or her biological sex, the healthcare provider

had to perform those services; or if the provider did not typically perform those services (i.e., did not specialize in them), the provider had to refer the individual to someone who did. *See id.* at 31,455. This means that a gynecologist that performs hysterectomies would have to revise its policy to provide hysterectomies to gender dysphoric women. *Id.*; *see also* Ver. Compl. ¶¶ 106-108.

Litigation over the 2016 Rule ensued. In October 2019, a Texas district court entered final judgment, declaring the 2016 Rule violated the Administrative Procedure Act (APA) and RFRA. *Franciscan All., Inc. v. Burwell,* 414 F. Supp. 3d 928, 945 (N.D. Tex. 2019). The *Franciscan Alliance* plaintiffs asked the court for a nationwide injunction of the 2016 Rule, but the court declined and only vacated the gender identity language from the Rule. *Id.*

Other religious parties sued in this Court in consolidated cases. *Religious Sisters of Mercy v. Burwell,* Case No. 3:16-cv-00386, Doc. No. 1 (D.N.D. Nov. 7, 2016); *Cath. Benefits Assoc. v. Burwell,* Case No. 3:16-cr-00432, Doc. No. 1 (D.N.D. Dec. 28, 2016); *Religious Sisters of Mercy*, 513 F. Supp. 3d at 1127-1131 (explaining history).

Then, in 2020, HHS issued a new rule that changed course and repealed the definition of sex as including gender identity. Nondiscrimination in Health and Health Education Programs or Activities, 85 Fed. Reg. 37,160, 37,168 (June 19, 2020) (the "2020 Rule"). The 2020 Rule also incorporated Title IX's religious exemption. *Id.* at 37,205 ("This final rule emphasizes that the Section 1557 regulation will be implemented consistent with various statutes enacted by

8

Congress, including conscience and religious freedom statutes."); *see also* 20 U.S.C. § 1681(a)(3).

Even so, after HHS promulgated the 2020 Rule, two district courts entered injunctions ordering HHS to reinstate the 2016 Rule's definition of "sex" to include gender identity, and they eliminated from the ACA the religious exemption protection from Title IX. *Walker v. Azar*, 480 F. Supp. 3d 417, 430 (E.D.N.Y. 2020), *modified by* 2020 WL 6363970 (E.D.N.Y. Oct. 29, 2020) ("[T]he Court stays the repeal of the 2016 definition of discrimination on the basis of sex. As a result, the definitions of 'on the basis of sex,' 'gender identity,' and 'sex stereotyping' currently set forth in 45 C.F.R. § 92.4 will remain in effect."); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 64 (D.D.C. 2020) ("HHS will be preliminarily enjoined from enforcing the repeal of the 2016 Rule's definition of discrimination '[o]n the basis of sex' insofar as it includes 'discrimination on the basis of . . . sex stereotyping'" and "from enforcing its incorporation of the religious exemption contained in Title IX."); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. CV 20-1630 (JEB), 2021 WL 4033072, at *2 (D.D.C. Sept. 3, 2021) ("HHS is enjoined from enforcing the 2020 Rule's redefinition of 'on the basis of sex,' its incorporation of the Title IX religious exemption, and the repeal of the regulation prohibiting the denial of health services to transgender individuals because of their gender identity."). In short, those court orders struck the 2020 Rule's definition of discrimination based on sex, reinstated the 2016 Rule's definition, and eliminated the religious exemption protection from Title IX. The

*Walker* and *Whitman-Walker Clinic* courts unilaterally put a prohibition on gender identity discrimination back into Section 1557.

This Court then enjoined applying this mandate to a group of Catholic employers under RFRA. *Religious Sisters of Mercy*, 513 F. Supp. 3d at 1127–31.

Compounding the *Walker* and *Whitman-Walker Clinic* orders, and despite this Court's RFRA ruling, President Biden signed an executive order on his first day in office *requiring* that Section 1557 and Title IX be interpreted nationwide to include gender identity as a protected trait. Executive Order No. 13,988, 86 Fed. Reg. 7023 (Jan. 20, 2021). Next, HHS issued a Notification of Interpretation and Enforcement that took effect May 10, 2021. Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972, 86 Fed. Reg. 27,984 (May 25, 2021) ("2021 Notice of Enforcement"). The 2021 Notice of Enforcement made clear that HHS, through OCR, "will interpret and enforce Section 1557's prohibition on discrimination on the basis of sex to include: . . . discrimination on the basis of gender identity." *Id.* at 27,985.

*After* all of this, the Texas district court in *Franciscan Alliance* permanently enjoined "the 2016 rule and the underlying statute" for the *Franciscan Alliance* plaintiffs under RFRA because they "still suffer a substantial threat of irreparable harm under the 2016 rule and the subsequent developments." *Franciscan All., Inc. v. Becerra*, No. 7:16-CV-00108-O, 2021 WL 3492338, at *9 (N.D. Tex. Aug. 9, 2021) (internal quotation marks and citation omitted). The "subsequent developments"

referred to the 2020 Rule, the injunctions in *Walker* and *Whitman-Walker Clinic*, the Supreme Court's decision in *Bostock v. Clayton Cnty., Ga*, 140 S. Ct. 1731 (2020), President Biden's Executive Order No. 13,988, Department of Justice guidance, and HHS's notice of enforcement. *Franciscan All., Inc. v. Becerra,* 843 F. App'x 662-63 (5th Cir. 2021). After evaluating this "significant[] shift[]" in the "legal landscape," *id.*, from 2019 to 2021, the *Franciscan Alliance* court still held that "the current Section 1557 regulatory scheme substantially burdens [the plaintiffs] religious exercise in clear violation of RFRA." *Franciscan All.*, 2021 WL 3492338 at *10.

### B.   HHS requires the Healthcare Members to perform, facilitate, and speak about gender transition services.

Like the EEOC with Title VII, HHS *currently* interprets discrimination "on the basis of sex" in Section 1557 to include gender identity. Ex. 1 ¶ 39; Ver. Compl. ¶ 122; 2021 Notice of Enforcement, 86 Fed. Reg. at 27,985. HHS refrains from applying that mandate only against the Catholic employers and healthcare providers in *Religious Sisters* and the plaintiffs in *Franciscan Alliance,* due to the injunctions issued in those cases. As a result of this interpretation, HHS requires any entity principally engaged in providing healthcare that receives Federal financial assistance to perform medically-unnecessary procedures to transition a biological male to traits resembling another gender (i.e., female) and vice versa.

The HHS Gender Identity Mandate requires CEA members to do or pay for all the following, even when it is not medically necessary:

- prescribe puberty blockers,

11

- perform hysterectomies on healthy women,

- remove healthy ovaries from healthy women,

- remove healthy testicles from healthy men,

- remove healthy vaginal tissue to create a cosmetic penis,

- offer to perform these and other gender transition services,

- refer patients to providers that perform these and other gender transition services,

- change their medical policies, procedures, and practices so that they *must* perform these and other gender transition services,

- affirmatively state that performing these gender transition services are the medical standard of care,

- affirmatively state that these gender transition services are safe, are beneficial, are not experimental, or should otherwise be recommended,

- express views on gender interventions that they do not share and use the preferred pronouns of patients—including in coding and records—even if they do not correspond to the patient's biological sex,

- refrain from expressing their medical, ethical, or religious views, options, and opinions to patients when those views disagree with gender identity theory or desired transition services.

*Id.* ¶¶ 41, 42; Ver. Compl. ¶¶ 123-26. This list of required services is not exhaustive. *See e.g.*, *id.* ¶ 42. And the Healthcare Members currently do not have past or current policies or practices in their healthcare activities that comply with these

objectionable practices, and they wish to continue their current policies and practices in the future, rather than change their practices to conform to the government's mandate. *Id*. ¶ 46. Moreover, the HHS Gender Identity Mandate includes no exemption for religious or conscientious objections. *Id*. ¶ 43. Thus, if an entity declines to perform these services, it is engaged in "discrimination" under Section 1557, as HHS sees it.

If the Healthcare Members violate the HHS Gender Identity Mandate, they face the enforcement mechanisms available under other civil rights laws, like Title VI (race discrimination), Title IX, 29 U.S.C. § 794 (nondiscrimination based on disability), and the Age Discrimination Act. 42 U.S.C. § 18116(a). The Healthcare Members may lose Federal healthcare program funding and may be investigated by OCR or the Attorney General. 20 U.S.C. § 1682. The Healthcare Members may also face private and government suits, civil penalties, False Claims Act liability, attorney's fees, and criminal penalties. Ex. 1 ¶ 44; *see also* Ver. Compl. ¶¶ 130-39.

## IV.   The Permanent Injunction in *Religious Sisters of Mercy.*

In January, 2021, this Court held that the EEOC Coverage and HHS Gender Identity Mandates violated RFRA and permanently enjoined the EEOC and HHS from enforcing them against an association of religious nonprofit and for-profit employers, much like CEA. *Religious Sisters of Mercy,* 513 F. Supp. 3d at 1153-54.

*Religious Sisters* involved two consolidated cases. The first was filed against HHS by a group of Catholic healthcare providers: the Religious Sisters of Mercy, Sacred Heart Mercy Health Center, SMP Health System, and the University of Mary. *Id.* at 1131-32. The second was filed by the Catholic Benefits Association—an

organization much like CEA—and three of its members, challenging both the EEOC Coverage Mandate and the HHS Gender Identity Mandate. *Id.* at 1133. The *Religious Sisters* plaintiffs all objected to facilitating and providing health insurance coverage for gender transition services and objected to performing or offering those gender transition services because changing one's biological gender conflicted with their religious beliefs. *Id.* at 1132-33, 1147 ("Catholic Plaintiffs have explained that their religious beliefs regarding human sexuality and procreation prevent them from facilitating gender transitions through either medical services or insurance coverage."). CEA members hold substantially the same religious beliefs and hold substantially the same objections as the *Religious Sisters* plaintiffs. Ex. 1 ¶¶ 21-33, 49, 50; Ver. Compl. ¶¶ 30-55, 146.

This Court held that the EEOC Coverage Mandate violated RFRA and it permanently enjoined the EEOC from "interpreting or enforcing" Title VII "or any implementing regulations thereto against the [Catholic Plaintiffs] in a manner that would require them to provide insurance coverage for gender-transition procedures . . . ." *Religious Sisters of Mercy,* 513 F. Supp. 3d at 1154.

This Court also held that the HHS Gender Identity Mandate violated RFRA and it permanently enjoined the HHS from "interpreting or enforcing Section 1557 of the ACA . . . or any implementing regulations thereto against the Catholic Plaintiffs in a manner that would require them to perform or provide insurance coverage for gender-transition procedures . . . ." *Id.* at 1153. Although the EEOC and HHS have since appealed that ruling to the Eighth Circuit, they have not

sought a stay pending appeal and they appealed only on justiciability grounds. The permanent injunctions therefore remain in full force, though only for the Catholic plaintiffs in that case. *Id.*

CEA seeks similar protection for CEA members: a preliminary injunction prohibiting the EEOC from enforcing the EEOC Coverage Mandate and prohibiting HHS from enforcing the HHS Gender Identity Mandate.

## Argument

### I.   Legal Standard

Courts consider four factors to determine whether a preliminary injunction is warranted: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to other litigants; and (4) the public interest." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (en banc)). The likelihood of success on the merits is the most important factor. *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013). CEA satisfies each factor.

### II.   CEA has a substantial likelihood of success on the merits.

#### A.   The EEOC Coverage and HHS Gender Identity Mandates violate RFRA.

This Court has already ruled on the RFRA legal issues present here in *Religious Sisters*. 513 F. Supp. 3d at 1153-54. And for purposes of this motion, there are no meaningful differences between that case and this one. *Religious Sisters*

therefore should control and a preliminary injunction in favor of CEA members should issue on the same RFRA claims.

RFRA prohibits the EEOC and HHS from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability," unless the government proves that the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1.

The EEOC Coverage and HHS Gender Identity Mandates violate RFRA for three reasons: (1) CEA members exercise their religion by not performing gender transition services and by not providing health insurance covering those services; (2) both mandates substantially burden that exercise; and (3) the government lacks a compelling interest furthered by the least restrictive means.

> **1.  CEA members' religiously informed health-insurance decisions are the exercise of religion, protected by RFRA.**

RFRA defines "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A). The exercise of religion "involves 'not only belief and profession but the performance of (or abstention from) physical acts.'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 710 (2014) (quoting *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990)). In *Hobby Lobby*, the Supreme Court held that employers exercised religion within the meaning of RFRA when they objected to covering certain items in employee healthcare plans. 573 U.S. at 720. The same is true here.

Under this standard, CEA members exercise their religion when they seek to exclude coverage for gender transition services that conflict with their religious beliefs. And the CEA members that provide healthcare services—the Healthcare Members—exercise their religion when they provide healthcare services to individuals but exclude performing or referring for gender transition services. The Healthcare Members also exercise their religion by offering their full and frank medical opinions on sex and gender, by sharing their medical, ethical, and religious positions on gender transitions, and by not affirming false gender narratives, such as by using inaccurate pronouns or by mis-coding patients in charts and records.

CEA members believe that "[m]ale and female are immutable realities defined by biological sex" and that "[g]ender reassignment is contrary to Christian Values." ECF No. 1-1, art III, § 3.1.1. Thus, performing (or referring for or affirming), and providing healthcare coverage for, gender transition services cuts directly against their religious beliefs. CEA members' provision of healthcare services and healthcare plans that reflect their own religious beliefs constitutes the exercise of religion protected by RFRA.

> **2.** **The EEOC Coverage Mandate and HHS Gender Identity Mandate substantially burden CEA members' exercise of religion.**

The government's new mandates burden CEA members' exercise of religion. "When the government imposes a direct monetary penalty to coerce conduct that violates religious belief, there has never been a question that the government imposes a substantial burden on the exercise of religion." *Sharpe Holdings, Inc. v.*

*U.S. Dep't of Health & Hum. Servs.*, 801 F.3d 927, 938 (8th Cir. 2015), *vacated on other grounds*, 2016 WL 2842448 (U.S. May 16, 2016) (cleaned up).

The government substantially burdens the exercise of religion when: (1) non-compliance would have "substantial adverse practical consequences" on the party exercising its religion, or (2) compliance would "cause the objecting party to violate its religious beliefs, as it sincerely understands them." *Religious Sisters,* 513 F. Supp. 3d at 1147 (quoting *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,* 140 S. Ct. 2367, 2389 (2020) (Alito, J., concurring); *accord Hobby Lobby*, 573 U.S. at 720-26. Both factors are met here.

First, if CEA members disregard the EEOC Coverage Mandate, they will face substantial adverse practical consequences. Noncompliance would likely lead to CEA members incurring civil liability under 42 U.S.C. § 2000e-5, including EEOC investigations, lawsuits brought by *both* the EEOC and private parties, attorney's fees and punitive damages, and potential orders to violate their beliefs. Likewise, if the Healthcare Members disregard the HHS Gender Identity Mandate, they may lose federal funding, would have to defend lawsuits brought by private citizens, would face investigations brought by the OCR or the Attorney General, may incur False Claims Act liability, and could even face criminal penalties. 20 U.S.C. § 1682; 31 U.S.C. § 3729; 18 U.S.C. § 1035. And even though CEA members face many adverse practical consequences for noncompliance, the mere possibility of having to pay significant monetary penalties—such as punitive damages and attorney's fees—

by itself "indisputably qualifies as a substantial burden." *Religious Sisters,* 513 F.

Supp. 3d at 1147 (quoting *Sharpe Holdings*, 801 F.3d at 937).

Second, CEA members cannot comply with the EEOC Coverage Mandate or

the HHS Gender Identity Mandate without violating their sincerely held religious

beliefs. As detailed above, CEA members believe that God purposefully created

persons either as a male or female, that one's God-given sex is immutable and

unchangeable, and that they cannot pay for, provide, perform, refer for, offer, or

facilitate access to gender transition services. Ex. 1 ¶¶ 11, 22-26; Ver. Comp. ¶¶ 30-

55; ECF No. 1-1, art. I. These beliefs are not for the government to second-guess.

*See Hobby Lobby* 573 U.S. at 724 (declining to decide whether a religious belief is

"reasonable" and explaining that the Court will not address "important question[s]

of religion and moral philosophy"); *Religious Sisters,* 513 F. Supp. 3d at 1147 (noting

it is not the court's "domain" to question the "sincerity" of religious beliefs).

Put simply, both the EEOC Coverage Mandate and the HHS Gender Identity

Mandate put CEA members to an impermissible choice: (A) comply with the

mandates and violate your religious beliefs and convictions, or (B) follow your

beliefs and risk civil or criminal liability, loss of funding, punitive damages,

attorney's fees, costs, and injunctions. That is no choice at all—and not a lawful one.

Just as this Court held in *Religious Sisters*, "[b]ecause the interpretations of Section

1557 and Title VII threaten to penalize" CEA members "for adhering to their

beliefs, a substantial burden weighs on the exercise of religion." *Id.* at 1147-48; *see

also Franciscan All., Inc. v. Becerra*, No. 7:16-CV-00108-O, 2021 WL 3492338, at

*10 (N.D. Tex. Aug. 9, 2021) (noting that the government did not dispute "that the current Section 1557 regulatory scheme threatens to burden Christian Plaintiffs' religious exercise in the same way as the 2016 scheme").

> ### 3. The EEOC Coverage Mandate and HHS Gender Identity Mandate fail strict scrutiny under RFRA.

Because the government's mandates substantially burden CEA members' exercise of religion, they are valid under RFRA only if they satisfy strict scrutiny, but neither mandate furthers a compelling governmental interest by the least restrictive means. 42 U.S.C. § 2000bb-1(b); *Hobby Lobby*, 573 U.S. at 726.

> #### i. The EEOC Coverage Mandate and the HHS Gender Identity Mandate do not further a compelling governmental interest.

The government bears the burden of establishing that the EEOC Coverage and HHS Gender Identity Mandates further a compelling interest in coercing CEA members. Any purported "compelling interest" must be "of the highest order." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). "Broadly formulated" or "sweeping governmental interests are inadequate." *Sharpe Holdings*, 801 F.3d at 943 (citations omitted). Rather, Defendants must prove that they have a compelling interest in applying the mandates *to CEA members*—"the particular claimant[s] whose sincere exercise of religion is being substantially burdened." *Hobby Lobby*, 573 U.S. at 726 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31 (2006)). This requires EEOC and HHS to prove not that they have a compelling interest in enforcing the EEOC Coverage and HHS Gender Identity Mandates generally, but that they have such

an interest in denying an exception to CEA members. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1882 (2021).

The government cannot satisfy its burden. It has no valid interest—let alone a *compelling* one—in mandating that third parties perform, affirm, or pay for another person's gender transition surgeries and procedures. Indeed, this Court suggested as much in *Religious Sisters*, expressing "serious doubts that a compelling interest exists." 513 F. Supp. 3d at 1148. To be sure, this Court acknowledged that the EEOC asserted a "compelling interest in combating discrimination in the workforce," and HHS asserted an interest "in ensuring nondiscriminatory access to healthcare." *Id.* (citations omitted). But it concluded that such broadly stated interests could not justify the mandates. *Id.* The Court instead "scrutinize[d] the asserted harm of granting specific exemptions to particular religious claimants and to look to the marginal interests in enforcing the challenged government action in that particular context." *Id.* (quoting *Holt v. Hobbs*, 574 U.S. 352, 363 (2015) (cleaned up)). But neither the EEOC nor HHS showed how exempting the *Religious Sisters* plaintiffs would harm the government's interests. *Id.*; *see also Franciscan All.*, 2021 WL 3492338 at *10 (cleaned up) ("government asserts no harm in granting *specific* exemptions to Christian Plaintiffs").

So too here. The government's "broadly formulated," *O Centro*, 546 U.S. at 431, and generic interests in preventing workplace discrimination and nondiscriminatory access to healthcare are not compelling enough to justify the

infringement of the CEA members' religious beliefs. There is no harm to any purported governmental interest in granting CEA members an exemption, especially with so many other employers, plans, and providers available.

The many exemptions to each mandate also undermine any governmental interest. A "law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Religious Sisters,* 513 F. Supp. 3d at 1148 (quoting *281 Care Comm. v. Arneson*, 766 F.3d 774, 787 (8th Cir. 2014)). The government's "creation of a system of exceptions" "undermines" the argument that its interest in nondiscrimination "can brook no departures." *Fulton,* 141 S. Ct. at 1882

Thus, these interests here are not "compelling" because the EEOC Coverage and HHS Gender Identity Mandates "leave gaps," *id.*, for example by not applying to the government's own healthcare programs, such as the military's TRICARE health insurance. *See* TRICARE Policy Manual 6010.60-M, Chapter 7, § 1.2 at 4.1 (Issued: Sept. 6, 2016, revised Nov. 15, 2017), attached as Exhibit 2 (excluding coverage for sex gender change surgery). And the EEOC Coverage Mandate does not apply to employers with fewer than fifteen employees, 42 U.S.C. § 2000e(b), or to the employment of aliens outside any state, *id.* § 2000e-1(a). Likewise, the HHS Gender Identity Mandate exempts healthcare providers that are not principally engaged in providing healthcare and those that do not receive Federal funds. 45 C.F.R. § 92.3(b). The HHS Gender Identity Mandate also incorporates multiple

categorical statutory exemptions. *See id.* § 92.6; *infra* §§ II.B.1., II.B.2. (detailing exemptions).

Because the government does not have a compelling interest in forcing CEA members to perform or cover gender transition services, the EEOC Coverage Mandate and HHS Gender Identity Mandate fail to satisfy strict scrutiny.

> ### ii.  The EEOC Coverage Mandate and HHS Gender Identity Mandate are not the least restrictive means of furthering any governmental interest.

The EEOC Coverage and HHS Gender Identity Mandates also fail strict scrutiny because there are many less restrictive ways to achieve any asserted interest. "To satisfy the least restrictive means test, the government must 'come forward with evidence' to show that its policies 'are the only feasible means . . . to achieve its compelling interest." *Religious Sisters of Mercy*, 513 F. Supp. 3d at 1148 (quoting *Sharpe Holdings*, 801 F.3d at 943). This test is "exceptionally demanding." *Hobby Lobby*, 573 U.S. at 728. It is met only "if no alternative forms of regulation would accomplish those interests without infringing on a claimant's religious-exercise rights." *Religious Sisters,* 513 F. Supp. 3d at 1148 (internal quotation marks omitted) (quoting *Sharpe Holdings*, 801 F.3d at 943). "Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S. Ct. at 1881.

Here, several alternative forms of regulation could accomplish any claimed governmental interest while still protecting CEA members' religious freedom.

For example, if the government's interest is to increase access to gender transition services by increasing insurance coverage and expanding financial

support for those procedures, then "'the most straightforward way of doing this would be for the Government to assume the cost of providing gender-transition procedures for those 'unable to obtain them under their health-insurance policies due to their employers' religious objections.'" *Religious Sisters,* 513 F. Supp. 3d at 1149 (quoting *Hobby Lobby*, 573 U.S. at 728). The government could provide "subsidies, reimbursements, tax credits, or tax deductions to employees" for these procedures or could pay for them "at community health centers, public clinics, and hospitals with income-based support." *Sharpe Holdings*, 801 F.3d at 945. Finally, the government can offer insurance coverage for these services through its own healthcare exchanges, "treat[ing] employees whose employers do not provide complete coverage for religious reasons the same as it does employees whose employers provide no coverage at all." *Religious Sisters,* 513 F. Supp. 3d at 1149. (quoting *Sharpe Holdings*, 801 F.3d at 945). It is much less restrictive, for the government to subsidize these services rather than force private employers to violate their religious convictions by paying for them in employee healthcare plans.

And if the government wishes to make obtaining gender transition services from healthcare providers easy, it can help individuals wanting those services find the many places that provide them. *Religious Sisters,* 513 F. Supp. 3d at 1149. After all, there is a "growing number of healthcare providers who offer and specialize in those services." *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 693 (N.D. Tex. 2016). And once the government locates a provider, it can then help pay for the

costs of those procedures. *Id.* The government even could partner with these specialists, ensuring easy and affordable access, with no risk of provider objections.

The Supreme Court in *Hobby Lobby*, 573 U.S. at 728-29; the Eighth Circuit in *Sharpe Holdings*, 801 F.3d at 945; the Northern District of Texas in *Franciscan Alliance* (twice), 227 F. Supp. 3d at 693 and 2021 WL 3492338 at \*10; and this Court in *Religious Sisters,* 513 F. Supp. 3d at 1149, all held that the government failed to show that these less restrictive alternatives to paying for insurance coverage of objectionable items or providing objectionable services were infeasible. And the government cannot show these alternatives are infeasible now. The only thing that has changed since this Court ruled in *Religious Sisters* is that HHS has doubled down on its mandate. 2021 Notice of Enforcement, 86 Fed. Reg. at 27,984.

The EEOC Coverage and HHS Gender Identity Mandates are thus not the "only feasible means" to further the government's interest, whether that interest is increased access to gender transition services, increased financial support for those services, or some other asserted interest. Exempting CEA and its members from these mandates would not defeat the government's interests or stop it from using the many other, less restrictive ways to achieve its interests. The government has no compelling interest in denying an exemption to CEA members; even so, because it can further any purported interests without burdening their religious exercise, "it must do so." *Fulton*, 141 S. Ct. at 1881.

**B.      The EEOC Coverage and HHS Gender Identity Mandates violate CEA members' Free Exercise rights.**

For much the same reasons, the mandates also violate the Free Exercise Clause. A law or regulation that burdens religious practice and that is not neutral and generally applicable violates the Free Exercise Clause unless it satisfies "the most rigorous of scrutiny." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993). Just as under RFRA, the EEOC Coverage and HHS Gender Identity Mandates burden CEA members' religious practice. Neither of the exemption-riddled mandates are generally applicable, the HHS Gender Identity Mandate is not neutral, and neither are valid under strict scrutiny.

**1.      The EEOC Coverage Mandate is not generally applicable.**

The EEOC Coverage Mandate is not generally applicable for several reasons. A regulation is not generally applicable if it treats "*any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam) (emphasis in original). To determine whether activities are "comparable," they "must be judged against the asserted government interest that justifies the regulation at issue." *Id.* A law also "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877. Any "categorical exemptions" in a law "likewise trigger strict scrutiny." *Blackhawk v. Pennsylvania*, 381 F.3d 202, 211 (3d Cir. 2004).

The EEOC Coverage Mandate is not generally applicable because it exempts broad categories of employers. *See* 42 U.S.C. § 2000e-1.

First, the EEOC Coverage Mandate does not apply to employers that employ fewer than 15 employees. 42 U.S.C. § 2000e(b).

Second, Title VII contains multiple categorical exemptions built into the statute. It does "not apply to an employer with respect to the employment of aliens outside any State ...." *Id*. § 2000e-1(a). And it does not apply to employers "with respect to an employee in a workplace in a foreign country" if compliance would violate the law of that foreign country. *Id*. § 2000e-1(b). Like Pennsylvania's fee and licensing requirement for keeping wild animals in *Blackhawk*, which included statutory exemptions for "zoos and nationally recognized circuses," 381 F.3d at 211, Title VII contains broad statutory, categorical exemptions—meaning the EEOC Coverage Mandate does not reach a number of employers. So any governmental interest in "combating discrimination in the workforce," *Religious Sisters*, 513 F. Supp. 3d at 1148, is undercut by the fact that many employers employ thousands of people worldwide and thus receive a pass to "discriminate" when it comes to those employees "outside" any U.S. state.

Third, the EEOC Coverage Mandate does not apply to *the government's own insurance programs*. The U.S. military's health insurance program, TRICARE, excludes coverage for "[a]ll services and supplies directly and or indirectly related to surgical treatment for gender dysphoria (i.e., sex gender change)," including the removal of ovaries and testicles. Ex. 2, Ch. 7, § 1.2 at 4.1. TRICARE also excludes coverage for "[c]osmetic, reconstructive or plastic surgery procedures." *Id*. at 4.2. Thus, the U.S. military—an employer to which Title VII applies, *see* 42 U.S.C. §

2000e-16—is exempt from having to provide health insurance that covers gender transition surgeries, but CEA members are not.

The EEOC Coverage Mandate is thus underinclusive: the EEOC provides exemptions based on size, location, and government status. A law cannot be generally applicable when it contains significant exemptions but burdens religious practice. *That* is unfavorable treatment.

> **2.    The HHS Gender Identity Mandate is neither neutral nor generally applicable.**

Similarly, the HHS Gender Identity Mandate is not generally applicable because it does not apply to *all* healthcare providers. It does not apply to healthcare providers that are not "principally" providing healthcare or those that do not receive Federal funds. *See* 45 C.F.R. § 92.3(b). A religious healthcare provider that receives Federal funds is "comparable" to a healthcare provider (religious or not) that does not receive Federal funds because any government interest in "ensuring nondiscriminatory access to healthcare" would equally apply to private services. *Religious Sisters*, 513 F. Supp. 3d at 1148. But the unfunded secular healthcare provider is treated more favorably than the funded religious healthcare provider. It does not matter that *funded* secular healthcare providers are treated the same. *See Tandon,* 141 S. Ct. 1296 ("[i]t is no answer that [the government] treats some comparable secular businesses or activities as poorly as or even less favorably than the religious exercise at issue").

Additionally, the HHS Gender Identity Mandate contains several categorical exemptions built into the regulations that implement Section 1557. *See* 45 C.F.R. §

92.6 (incorporating the exemptions listed in Title VI, VII, IX, and various other statutes). The result is that the HHS Gender Identity Mandate does not apply to many entities because of the various exemptions available under the regulatory scheme.

The Mandate is also not neutral. A law is not neutral towards religion if its "object" "is to infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533. A law or regulation may appear neutral on its face, but the Free Exercise Clause "forbids subtle departures from neutrality and covert suppression of particular religious beliefs." *Id.* at 534 (internal quotation marks and citations omitted). "Apart from the text, the effect of a law in its *real operation* is strong evidence of its object." *Id.* at 535 (emphasis added).

The effect of the HHS Gender Identity Mandate in its "real operation" is to force *religious* healthcare providers to perform and facilitate gender transition services. The HHS Gender Identity Mandate disproportionately affects religious healthcare providers who, for reasons of faith and belief, refuse to perform or partake in gender transition services. HHS's recent rulemaking highlights its hostility and disproportionate effect on religious healthcare providers like the Healthcare Members. For instance, comments in response to the proposed incorporation of Title IX's religious exemption in the 2020 Rule showed hostility towards religion—hostility that has pervaded and continues to pervade the entire enforcement process. *See* 2020 Rule, 85 Fed. Reg. at 37,160-01, 37,205 (commenters "asserted that preventing discrimination on the basis of gender identity ... is more

critical than religious freedom rights, which should be more heavily scrutinized for pretextual discrimination"); *see also id.* at 37,206; *id.* at 37,188. With this disproportionate effect and these hostile comments in mind, HHS still issued its 2021 Notice of Enforcement, acquiescing in the *Whitman-Walker Clinic* court's injunction of enforcement of the religious exemption. *See* 2021 Notice of Enforcement, 86 Fed. Reg. at 27,985. HHS has thus implicitly (if not explicitly) adopted the HHS Gender Identity Mandate knowing full well its religiously hostile object and disregarding Congress's intent to protect religious providers. For this reason the Mandate is not neutral towards religion.

> **3.    The EEOC Coverage Mandate and HHS Gender Mandate fail strict scrutiny under the Free Exercise Clause.**

Because the mandates are neither neutral nor generally applicable, they must be narrowly tailored to achieve a compelling interest. *Fulton*, 141 S. Ct. at 1881. This burden is the same as under RFRA. *See* 42 U.S.C. § 2000bb(b)(1) (Congress's purpose in enacting RFRA was "to restore the compelling interest test" set forth by the Court before *Smith's* neutral and generally applicable rule). For the same reasons stated above, *supra* § II.A.3, the mandates fail this burden and violate the Free Exercise Clause.

> **C.    The HHS Gender Identity Mandate violates CEA members' Free Speech rights.**

The Free Speech Clause of the First Amendment "creates 'an open marketplace' in which differing ideas about political, economic, and social issues can compete freely for public acceptance without improper governmental interference." *Knox v. Serv. Emps. Int'l Union, Loc.* 1000, 567 U.S. 298, 309 (2012). It ensures that

"[t]he government may not prohibit the dissemination of ideas that it disfavors, nor compel the endorsement of ideas that it approves." *Id.* It protects "the decision of both what to say and what *not* to say." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 797 (1988) (emphasis in original). And these speech protections extend to "professionals," such as healthcare providers. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra,* 138 S. Ct. 2361, 2371-72 (2018).

Accordingly, laws and regulations that regulate speech based on its content "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* (citation omitted). Content regulations in the healthcare field are not permissible when the government seeks to "suppress unpopular ideas or information" and impose its own. *Id.* at 2373-76. Open communication in healthcare is "critical" because "[d]octors help patients make deeply personal decisions," and yet "[t]hroughout history, governments have manipulated the content of doctor-patient discourse to increase state power and suppress minorities." *Id.* at 2374 (internal quotation marks and citations omitted). It is thus essential in the medical context that doctors have the freedom to maintain "good-faith disagreements, both with each other and with the government, on many topics in their respective fields.... [T]he people lose when the government is the one deciding which ideas should prevail." *Id.* at 2374-75*; see Conant v. Walters,* 309 F.3d 629, 636 (9th Cir. 2002) ("An integral component of the practice of medicine is the communication between a

doctor and a patient. Physicians must be able to speak frankly and openly to patients.").

> ### 1. The HHS Gender Identity Mandate compels, chills, and restricts the Healthcare Members' speech.

HHS not only compels the Healthcare Members' conduct by forcing them to provide gender transition services, it compels and silences their speech, too.

First, the mandate requires the Healthcare Members to provide and *offer* gender transitions. This would require a Christian doctor to tell a gender dysphoric patient, "I can perform surgery to make you look more like a boy," and so forth.

Second, the mandate requires the Healthcare Members to revise their written policies to affirm and offer gender transition services, irrespective of the provider's religious beliefs, medical judgment, or ethical concerns. *See* 2016 Rule, 81 Fed. Reg. at 31,455 ("A provider specializing in gynecological services that previously declined to provide a medically necessary hysterectomy for a transgender man *would have to revise its policy* to provide the procedure for transgender individuals in the same manner it provides the procedure for other individuals." (emphasis added)).[1]

---

[1] Because of the court orders in *Walker*, 480 F. Supp. 3d 417, and *Whitman-Walker Clinic*, 485 F. Supp. 3d 1, declaring that "sex discrimination" includes "gender identity discrimination," HHS's analysis and comments related to gender transition services from the 2016 Rule still express the practical effects of the HHS Gender Identity Mandate, even though the 2020 Rule repealed and replaced these segments. *See generally Religious Sisters,* 513 F. Supp. 3d at 1130-31 (explaining the effects of *Walker* and *Whitman-Walker Clinic*). In the alternative, if these segments were in fact vacated beforehand by the Texas court, then they could not be revived, and so any 2021 enforcement of them would be invalid for lack of notice and comment and for lack of reasoned decision making, as explained below.

Third, the mandate requires the Healthcare Members to affirm transgender identities and to use a person's "preferred pronoun." *Id.* at 31,406. Thus, a provider would have to call a biological male a female, or vice versa. Or the provider would have to use any of the other dozens of pronouns upon demand. HHS also requires a provider to use incorrect descriptions of sex in medical charting and billing, even if it endangered patients with incorrect and confusing records.

Not only is this unworkable from a practical perspective, but it is also unconstitutional. *See, e.g.*, *United States v. Varner,* 948 F.3d 250, 257 (5th Cir. 2020) (discussing the several pronouns created for gender-dysphoric persons and that requiring preferred pronoun usage would "hinder communication" and is a "quixotic undertaking"); *United States v. Thomason,* 991 F.3d 910, 915 (8th Cir. 2021) (acknowledging there is no precedent that courts and litigants must use preferred pronouns). If a healthcare provider recognizes the reality of a biological binary of sex, he or she ought to be able to perform his or her job without being forced to speak in accordance with the contrary false view.

Fourth, the mandate restricts the Healthcare Members from giving their sound medical opinions, judgment, and informed consent on gender transition services. *See* 2016 Rule, 81 Fed. Reg. at 31,435. HHS has explained that categorizing gender transition services as "experimental" "is outdated and not based on current standards of care." *Id.* at 31,435. Healthcare Members therefore cannot offer their own medical judgment that such services are unnecessary, dangerous, unproven, and ineffective. HHS wants the Healthcare Members to offer *its* (HHS's)

viewpoint on these services, and it shuts the door on countervailing viewpoints under threat of prosecution and penalty. But the government is in no place to dictate the standard of care for highly debatable and evolving medical procedures. Simply put, the HHS Gender Identity Mandate "mandates orthodoxy, not anti-discrimination." *Ward v. Polite*, 667 F.3d 727, 735 (6th Cir. 2012).

> **2.    The HHS Gender Identity Mandate's speech requirements cannot satisfy strict scrutiny.**

The HHS Gender Identity Mandate thus discriminates against the Healthcare Members' speech based on its content and viewpoint. For the same reasons the Mandate fails to satisfy strict scrutiny under RFRA and the Free Exercise Clause, it also fails strict scrutiny under the Free Speech Clause. See *O Centro*, 546 U.S. at 429-30 (no matter if strict scrutiny is triggered by the Free Speech Clause or RFRA, "the consequences are the same"). HHS must prove that it has a compelling interest in prohibiting the Healthcare Members from giving *their* positions on gender transition services and in requiring the Members to affirm a nonbinary view of sex.

No such compelling interest exists. The government is free to offer its own opinions, but it has no interest in forcing any segment of the public to echo its views. "[G]ender identity" is a "sensitive political topic[]" and "undoubtedly" a matter of "profound value and concern to the public." *Janus v. AFSCME Council 31*, 138 S. Ct. 2448, 2476 (2018) (citations omitted). Speech on this subject is not "unprotected" but receives strong protection. *Loudoun Cnty. Sch. Bd. v. Cross*, No. 210584, slip op. at *9–10 (Va. Aug. 30, 2021) (citations omitted). And the

government does not have a compelling interest in ensuring transgender individuals never hear views that the individual does not share. "[T]he government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson,* 491 U.S. 397, 414 (1989). The government lacks any legitimate objective "to produce speakers free" from bias, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 578–79 (1995), and so any non-discrimination "interest is not sufficiently overriding as to justify compelling" speech. *Brush & Nib Studio, LC v. City of Phoenix*, 448 P.3d 890, 914–15 (Ariz. 2019). "[R]egulating speech because it is discriminatory or offensive is not a compelling state interest." *Telescope Media Grp. v. Lucero,* 936 F.3d 740, 755 (8th Cir. 2019). "Even antidiscrimination laws, as critically important as they are, must yield to the Constitution." *Id*.; *see supra* § II.C.1.

Moreover, here the "First Amendment interests are especially strong," especially on the use of pronouns, because the speech reflects core religious beliefs and protected exercise. *Meriwether v. Hartop*, 992 F.3d 492, 509 (6th Cir. 2021). No government interest requires censoring religiously informed policies or compelling doctors to express views contrary to their medical judgment and religious beliefs. Far from being "always" a "compelling interest," any interest in avoiding disagreement or offense with third parties is "comparatively weak." *Id*.at 510.

HHS's content and viewpoint-based restriction on the Healthcare Members' speech thus violates the Free Speech Clause.

### D.   The EEOC Coverage and HHS Gender Identity Mandates violate the Administrative Procedure Act (APA).

Under the APA, a reviewing court must "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," "contrary to constitutional right, power, privilege or immunity," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2). The mandates violate these APA provisions, and thus should be held unlawful and set aside, *id.*, and enjoined pending review, 5 U.S.C. § 705.

### 1.   The EEOC Coverage Mandate is contrary to law, without proper procedure, and is arbitrary and capricious.

The EEOC acted contrary to law, arbitrarily and capriciously, without proper procedure, and without statutory authority or constitutional right in determining that all employers must cover gender transition services in their health plans.

First, Title VII does not compel employers to pay for insurance for all gender transitions on demand. When Congress passed Title VII and amendments thereto, it did not understand the term "sex" to include sexual orientation or gender identity; rather it understood the term to mean one of the two binary sexes: biological male or biological female. It is thus not discrimination on the basis of whether an employee is a man or a woman to preclude coverage of gender transitions services to any men or women. When compared against each other, both sexes are subject to the same equal treatment. And nothing in the text of Title VII purports to require such an unforeseen result.

Second, "agency action is lawful only if it rests on a consideration of the relevant factors." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (internal citation omitted). Whether the agency action concerns a rule or concerns enforcement, it must address "legitimate reliance" on past policies or legitimate alternative policies. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1910–15 (2020). In this case the EEOC failed to "consider an important aspect of the problem" presented by gender identity coverage in employer sponsored health insurance. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). EEOC failed to adequately consider that in medical practice, sex is a biological reality, patients are harmed by imposing the provision of controversial and dangerous medical procedures, and patients are harmed by preventing doctors from providing full and timely disclosure of all relevant health information about gender identity procedures and interventions. The EEOC decided to compel all covered employers to provide health insurance coverage for gender transition services without considering the important counterevidence.

EEOC also failed to consider the religious liberty implications of its mandate. RFRA must be considered in reasoned decision making, *Little Sisters of the Poor v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020), and the agency must consider significant issues like religious entities' reliance interests, even where it has statutory authority. *Biden v. Texas*, No. 21A21, 2021 WL 3732667, at *1 (Aug. 24, 2021) (citing *Regents*, 140 S. Ct. at 1909–15).

In *Bostock v. Clayton County*, the Supreme Court said that "[b]ecause RFRA operates as a kind of super statute, displacing the normal operation of other federal laws, it might supersede Title VII's commands in appropriate cases." 140 S. Ct. 1731, 1754 (2020). Moreover, any reliance on *Bostock*'s holding is misplaced as that case resolved only a single question: whether terminating an employee "simply for being homosexual or transgender" constitutes discrimination "'because of . . . sex.'" 140 S. Ct. at 1737-38 (quoting 42 U.S.C. § 2000e-2(a)(1)). *Bostock* specified it was not ruling on such matters as employer health insurance coverage—it was only ruling on "whether an employer who *fires* someone simply for being homosexual or transgender" violates Title VII. 140 S. Ct. at 1753 (emphasis added). Thus, not only does *Bostock* not support the EEOC's position, it identifies an important aspect of the problem that EEOC was on notice of. EEOC's failure to "overtly consider" these privacy and religious freedom reliance interests renders it fatally flawed. *Little Sisters of the Poor*, 140 S. Ct. at 2383.

Third, the EEOC may not issue rules or regulations, and so EEOC also exceeded its statutory authority and acted without proper procedure. *See* 5 U.S.C. § 706(2)(C). "Congress, in enacting Title VII, did not confer upon the EEOC authority to promulgate rules or regulations pursuant to that Title." *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 141 (1976) (citation omitted); *see* 42 U.S.C. § 2000e-12(a) (the EEOC can "issue, amend, or rescind suitable *procedural* regulations" (emphasis added)). But its enforcement actions, in its policies, and in the "technical assistance document" that the EEOC Chair published, purport to define employer obligations.

EEOC thus "overstepped its substantive statutory authority" in issuing guidance that amounted to "a substantive rule." *Texas v. EEOC*, 933 F.3d 433, 451 (5th Cir. 2019). Plus, any significant guidance or substantive rules require procedural steps, including full EEOC approval and notice-and-comment, which were omitted. 5 U.S.C. § 553; 29 C.F.R. §§ 1695.2(d), 1695.6(a), 1695.1(b)(1), 1695.5.

> 2.   **HHS's Gender Identity Mandate is contrary to law, arbitrary and capricious, and skipped require notice-and-comment procedures.**

HHS's mandate violates the APA for much the same reasons.

First, the mandate is contrary to the ACA. Many provisions in the ACA show that Congress understood "sex" to mean the biological binary of male and female, and not to encompass the concept of gender identity. *See, e.g.*, Patient Protection and Affordable Case Act, Pub. L. No. 111-148, §§ 2301, 2951, 3509 4102, 4207, 5405, 6702, 7002, 10101, 124 Stat. 119 at 292, 334, 343. 536, 551, 577, 650, 785, 809, 890, 966. For example, the ACA requires the provision of "information to women and health care providers on those areas in which differences between men and women exist." *Id*. at 536–37. Likewise, language throughout Title IX reflects that Congress understood "sex" as a biological binary and not as including gender identity. *See, e.g.*, 20 U.S.C. §§ 1681(a)(2); 1681(a)(8), 1686.

HHS thus correctly concluded in the 2020 Rule, after consideration of and responses to public comments, that the Gender Identity Mandate was unlawful and unwarranted. 2020 Rule, 85 Fed. Reg. at 37,178-80, 37,183-86. For example, the 2020 Rule concluded:

- "'Sex' according to its original and ordinary public meaning refers to the biological binary of male and female."

- "The Department disagrees with commenters who contend that Section 1557 or Title IX encompass gender identity discrimination within their prohibition on sex discrimination."

- "The text of Title IX also demonstrates that it is not susceptible to an interpretation under which it would prohibit gender identity discrimination."

- "For most of the history of Title IX case law, the commonplace practices that account for real physiological differences between the sexes without treating either sex less favorably were uncontroversial and not considered discriminatory." (cleaned up)

- "Distinctions based on real differences between men and women do not turn into discrimination merely because an individual objects to those distinctions. Title IX does not require covered entities to eliminate reasonable distinctions on the basis of sex whenever an individual identifies with the other sex, or with no sex at all, or with some combination of the two sexes."

*Id.*

Not only were HHS's conclusions correct about its mandate's lack of authority under Section 1557, but the agency failed to consider the import of the Constitution's clear-notice canon, which compels a narrow interpretation. *Bostock* did not displace the constitutional limits on other statutes like Title IX or the ACA that impose grant conditions, or that preempt core state police-power regulations, or

that act in traditional areas of state responsibility—such as over medicine and health insurance. *See, e.g.*, *Bond v. United States (Bond II)*, 572 U.S. 844, 858 (2014); *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 24 (1981).

These structural principles protect citizens, as well as states. *Bond v. United States (Bond I)*, 564 U.S. 211, 220, 222 (2011). Under this substantive canon, Congress must speak clearly to grant powers of "vast 'economic and political significance.'" *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, No. 21A23, 2021 WL 3783142, at *3 (U.S. Aug. 26, 2021) (citation omitted). The Supreme Court thus applies this canon to protect private parties when the government "intrudes into an area that is the particular domain of state law," because Congress must "'enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property'" and practices. *Id.* (citations omitted).

Under this canon, Congress must make "its intention" "'unmistakably clear in the language of the statute,'" *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (citation omitted), measured at the time of enactment, *Carcieri v. Salazar*, 555 U.S. 379, 388 (2009). Congress may not use "expansive language," *Bond II*, 572 U.S. at 857–58, 860, to impose "a burden of unspecified proportions and weight, to be revealed only through case-by-case adjudication," *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 190 n.11 (1982); *Arlington Cent. Sch. Dist. Bd. of Edu. v. Murphy*, 548 U.S. 291, 296 (2006); *Dellmuth v. Muth*, 491

U.S. 223, 232 (1989). Nor may the federal government "surpris[e] participating States with post-acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25.

Here, there is no serious argument in favor of the proposition that the 2010 Congress *unmistakably* required anyone, let alone every religious healthcare provider, to provide unlimited gender transition services on demand, regardless of medical judgment or religious beliefs. *Bostock* did not consider the "particularly strict" effect of the clear-notice canon on Title IX or the ACA when it interpreted Title VII. Just because a federal law addresses sex discrimination does not mean it is "materially identical" to Title VII, and even less does it mean that it incorporates the government's aggressive and retroactive sex stereotyping, sexual orientation, and gender identity theories in every detail, with *unmistakable notice* at passage.

Second, in addition, the Gender Identity Mandate is contrary to Section 1554 of the ACA, 42 U.S.C. § 18114; specifically: parts (1)–(2) and (6) because it pressures CEA Healthcare Members out of federally funded health programs and the practice of healthcare; parts (3)–(4) because it requires CEA Healthcare Members to speak in affirmance of gender identity and refrain from speaking in accordance with a patient's biological sex and related medical needs; part (5) because it requires CEA Healthcare Members to deprive patients of informed consent by preventing them from warning patients of the dangers of gender transition interventions; and also part (5) because it forces CEA Healthcare Members to violate their ethical and conscientious standards as professionals.

Third, the HHS Gender Identity Mandate also violates 42 U.S.C. § 300a-7(d) because it compels CEA Healthcare Members, within health service programs funded by HHS, to provide gender identity procedures, interventions, and information, including sterilizations, in violation of their religious beliefs and moral convictions.

Fourth, HHS's mandate is arbitrary and capricious. Redefining sex to mean self-professed gender identity, especially in medicine, where biological sex is essential to proper treatment, is inherently arbitrary and capricious. And, just as the EEOC did, HHS ignored the important reliance interests of all healthcare providers in sound medicine, and the interests of religious healthcare providers in following their religious beliefs—despite notice of these interests from comments and litigation. HHS also considered no alternative policies, such as (1) delaying compliance dates; (2) grandfathering existing categories of healthcare; (4) exempting religious institutions; or (5) crafting privacy exemptions. Nor did HHS consider the ACA's interplay with Title IX's definition of sex, with Title IX's religious exemption, 20 U.S.C. § 1681(a)(3), or other laws that require a religious exemption, such as RFRA or the ACA's provision that "[n]othing in this Act shall be construed to have any effect on Federal laws regarding (i) conscience protection." 42 U.S.C. § 18023(c)(2).

Considering these policy and legal concerns "was the agency's job, but the agency failed to do it." *Regents,* 140 S. Ct. at 1914. Instead, its 2021 Notice of

Enforcement rested only on its view that prior policy was unlawful, which violates the APA under *Regents*. *Id*. at 1909–13.

And, in taking the reverse course now, HHS has utterly failed to offer reasoned explanations for why it changed its view of the law or policy. It has not undergone notice and comment rulemaking to restore enforcement of the 2016 Rule, much less has it responded to the discussions of comments and conclusions reached by itself in 2020. But if an agency changes course and fails to offer reasons why it was changing its view, address reliance interests, and address alternatives, that decision is arbitrary and capricious. *Regents*, 140 S. Ct. at 1910-15 (invalidating rescission of a previous administration's immigration policies); *see also State Farm*, 463 U.S. at 42 ("an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change."). Neither President Biden's Executive Order, nor HHS's May 10, 2021 Notice of Enforcement, offer any examination of the thorough reasoning presented in the 2020 Rule or explanation of why it has changed position, other than citing *Bostock*. But *Bostock* explicitly disavowed that it was ruling beyond decisions of firing in Title VII. 140 S. Ct. at 1753. And the Court was "deeply concerned with preserving" religious institutions' freedom. *Id*. at 1753–54.

Fifth, HHS's mandate also violates the notice and comment requirement of the APA, 5 U.S.C. § 553. To reimpose the 2016 Gender Identity Mandate, which had been vacated, HHS would—at minimum—need to undergo notice and comment to

consider and address both its own positions taken in the 2020 Rule's response to comments, and to respond to other public comments. HHS did not do this.

Sixth and finally, the mandate also violates RFRA and the First Amendment, so it exceeds HHS's statutory authority and violates constitutional rights.

For all these reasons both mandates should be held unlawful and set aside under 5 U.S.C. § 706 and enjoined under 5 U.S.C. § 705.

## III.   The other preliminary injunction factors also weigh in favor of CEA.

Because CEA members are likely to succeed on their RFRA and First Amendment claims, the other preliminary injunction factors are met. "A[] RFRA violation is comparable to the deprivation of a First Amendment right." *Religious Sisters,* 513 F. Supp. 3d at 1152. Thus, "[w]hen a plaintiff has shown a likely violation of his or her First Amendment rights" or a violation of RFRA, "the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc) (internal quotation marks and citation omitted); *Religious Sisters of Mercy,* 513 F. Supp. 3d at 1153. Because CEA members are likely to succeed on their RFRA and First Amendment claims, the other preliminary injunction factors are deemed satisfied.

CEA members will suffer irreparable harm absent preliminary injunctive relief. "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Here, the mandates compel CEA members to perform and cover gender

transition services in violation of their religious beliefs, convictions, and practices. The loss of this First Amendment freedom, whether actual or imminent, irreparably harms CEA members.

The balance of the harms also favors CEA. Without preliminary injunctive relief, the government can and will enforce the mandates against CEA members, causing them to suffer irreparable injury by being forced to perform and pay for gender transition services that contradict their religious beliefs and thus undermine their religious exercise. On the other hand, the potential harm to the government is minimal: at worst, Defendants will be enjoined from enforcing the mandates *only* against current and future CEA members. And the government is not harmed by being prohibited from enforcing an unconstitutional law. *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (defendant is not "harmed by issuance of a preliminary injunction which prevents it from enforcing a regulation, which, on this record, is likely to be found unconstitutional.").

Likewise, a preliminary injunction will advance the public interest. "[I]t is always in the public interest to protect constitutional rights." *Carson v. Simon*, 978 F.3d 1051, 1061 (8th Cir. 2020) (internal quotation marks and citation omitted); *see also Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("[I]njunctions protecting First Amendment freedoms are always in the public interest."). Protecting CEA members' First Amendment rights therefore benefits the public interest. CEA thus satisfies the remaining three factors, which warrant a preliminary injunction.

## Conclusion

For the reasons set forth above, CEA's Motion for Preliminary Injunction should be granted in full.

Respectfully submitted this 21st day of October 2021.

By: /s/ *Jacob E. Reed*

| | |
|---|---|
| JACOB E. REED | JULIE MARIE BLAKE |
| OH Bar No. 99020 | MO Bar No. 69643 |
| **ALLIANCE DEFENDING FREEDOM** | **ALLIANCE DEFENDING FREEDOM** |
| 44180 Riverside Parkway | 440 First Street, NW, Ste. 600 |
| Lansdowne, VA 20176 | Washington, D.C. 20001 |
| Telephone: (571) 707-4655 | Telephone: (202) 393–8690 |
| Facsimile:  (571) 707-4656 | Facsimile: (202) 347–3622 |
| jreed@ADFlegal.org | jblake@ADFlegal.org |

*Attorneys for Plaintiff*