## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Christian Employers Alliance,<br><br>           Plaintiff,<br><br>vs.<br><br>United States Equal Opportunity Commission,<br><br>Charlotte A. Burrows, *in her official capacity as Chair of the United States Equal Employment Opportunity Commission*, United States Department of Health and Hunan Services,<br><br>Xavier Becerra, *in his official capacity as Secretary of the United States Department of Health and Human Services*,<br><br>Office for Civil Rights of the United States Department of Health and Human Services, and<br><br>Lisa J. Pino*, in her official capacity as Director of the Office for Civil Rights of the United States Department of Health and Human Services*,<br><br>           Defendants. | Case No. 1:21-cv-195 |

### ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

[¶1] THIS MATTER comes before the Court upon a Motion for Preliminary Injunction filed by the Plaintiff on October 21, 2021. Doc. No. 6. A Response by all the Defendants was filed on November 22, 2021. Doc. No. 18. A Reply was filed on December 23, 2021. Doc. No. 31. A hearing was held on May 2, 2022. Doc. No. 37. For the reasons set forth below, the Court

-1-

**GRANTS** the Plaintiff's Motion for Preliminary Injunction.

## BACKGROUND

[¶2]     This action commenced on October 18, 2021, with the filing of a Complaint. Doc. No. 1. The Plaintiff, Christian Employers Alliance ("the Alliance"), is a Christian membership ministry that "exists to unite and serve Christian nonprofit and for-profit employers who wish to live out their faith in every-day life, including in their homes, schools, ministries, businesses, and communities." Doc. No. 6-2, ¶ 6. The Alliance exists, in part, "to support Christian employers and develop strategies for them, so that they, as part of their religious witness and exercise may provide health or other employment related benefits to their respective employees and engage in other employment practices in a manner that is consistent with Christian values." Doc. No. 1-2, art. II, § 2.2. The Alliance requires all of its members to be a "Christian employer" as defined by its bylaws and to "commit to provide health care benefits consistent with Christian Ethical Convictions and to support the right and freedom of Christian employers to do so." Doc. No. 1-1, art. III, § 3.1.1. The Alliance's Christian Ethical Convictions states, "male and female are immutable realities defined by biological sex" and "gender reassignment is contrary to Christian Values." Id. at art. I, § 1.3.5.

[¶3]     The Plaintiff challenges the implementation of Section 1557 of the Patient Protection and Affordable Care Act ("ACA"). P.L. 111-138, Title I, §1557; 42 U.S.C. § 18116(a). The Plaintiff contends the Department of Health and Human Services ("HHS"), the Equal Employment Opportunity Commission ("EEOC"), the Office of Civil Rights of the United States Department of Health and Human Services ("OCR") and its agents interpret Section 1157 and related anti-discrimination laws in a way that requires them to complete or provide health insurance coverage for gender transitions services; compels them to affirm gender transitions; and prevents them from

maintaining views and facilities in accordance with their religious beliefs. The Alliance alleges if its members do not comply, they will suffer from loss of federal funding, incur civil liabilities, EEOC investigations, lawsuits brought by both the EEOC and private parties, investigations by the OCR or the Attorney General, and could even face criminal penalties. Doc. No. 6-2, ¶ 44. The Alliance states its members' religiously-informed health-insurance decisions are an exercise of religion and alleges the interpretation and implementation of the Section 1557 violates their religious rights protected by the Religious Freedom Restoration Act ("RFRA"), the Free Exercise Clause, and their Free Speech Rights. The Alliance further argues the implementation of the mandate violated the Administrative Procedure Act ("APA").

[¶4]     Section 1557 of the ACA prohibits any federally funded or administered health program or activity from engaging in discrimination. 42 U.S.C. § 18116. The grounds for discrimination are set forth in four preexisting civil rights statutes: (1) Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.) (prohibiting discrimination based on race, color, or national origin); (2) Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.) (prosecuting discrimination based on sex); (3) the Age Discrimination Act of 1975 (42 U.S.C. § 6101 et seq.) (prohibiting discrimination based on age); and (4) the Rehabilitation Act of 1973 (29 U.S.C. § 794) (prohibits discrimination based on disability). Section 1557 also adopts the enforcement mechanisms available under each incorporated statute. 42 U.S.C. § 18116(a). The Secretary of HHS holds discretionary authority to promulgate implementing regulations. Id. at § 18116(c).

[¶5]     Of particular importance to this case is Title IX, forbidding discrimination "on the basis of sex." 20 U.S.C. § 1681(a).  Under Title IX, administrative agencies may revoke federal funding for an offending health program or activity. 20 U.S.C. § 1682. Agencies may also pursue "any other means authorized by law," including civil enforcement proceedings, debarment from doing

business with the federal government, lawsuits under the False Claims Act, and even criminal penalties. Id. In addition, Section 1557 supports a private right of action for damages and attorney's fees. See Rumble v. Fairview Health Servs., No. 14-cv-2037, 2015 WL 1197415, at *7 n.3 (D. Minn. Mar. 16, 2015).

[¶6]   Chief Judge Peter D. Welte of the United States District Court for the District of North Dakota previously discussed at length the history of administrative rules regarding Section 1557 that were promulgated in 2016, subject to litigation, and rules that were later promulgated in 2020 and also challenged. See Religious Sisters of Mercy v. Azar, 513 F. Supp. 3d 1113, 1126 (D.N.D. 2021) (Chief Judge Peter D. Welte). This Court adopts that history and provides the portions relevant to the present dispute.

[¶7]   In 2016, HHS promulgated a regulation that defined discrimination "on the basis of sex" to include "sex stereotyping" and "gender identity." 81 Fed. Reg. at 31,467. ("2016 Rule"). The 2016 Rule defined sex stereotypes, in part, as "the expectation that individuals will consistently identify with only one gender and that they will act in conformity with the gender-related expressions stereotypically associated with that gender." Id. at 31,468. This rule applied to "almost all practicing physicians in the United States," over 133,000 hospitals, clinics, and other healthcare facilities along with approximately 180 insurers that offered health plans. Id. at 31,445-46.

[¶8]   HHS expressly required health care providers to offer medical services for gender transitions if a provider offered the service to others, such as hysterectomies, hormone therapy, and psychotherapy. 81 Fed. Reg. at 31,435-36; 31,455. HHS specifically stated, "[a] provider specializing in gynecological services that previously declined to provide a medically necessary hysterectomy for a transgender man would have to revise its policy to provide the procedure for transgender individuals in the same manner it provides the procedure for other individuals." Id. at

31,455. HHS expressly prohibited insurers and third-party administrators from offering plans without coverages for gender transitions, finding limited coverage "for all health services related to gender transition is unlawful on its face." 81 Fed. Reg. at 31,429. HHS also did not permit any religious exemption under the 2016 Rule and explained RFRA "would be the proper means to evaluate any religious concerns about the application of Section 1157." Demands for an exception are evaluated "on a case-by-case basis" turning on the individual facts of each case. Id. at 31,380. This essentially requires providers to prove their religiosity to be exempt by the HHS.

[¶9] Additionally, Title VII of the Civil Rights Act bans employers with 15 or more employees from engaging in sex discrimination. 42 U.S.C §§ 2000e-2(a)-2000e(b). The Alliance notes most of its members are "employers as defined in Title VII." Doc. No. 1. The EEOC interprets and enforces Title VII. See Griggs v. Duke Power Co., 401 U.S. 424, 433-34 (1971). The EEOC also interpreted Title VII to protect against gender identity discrimination. See Macy v. Holder, EEOC Appeal No. 0120120821, 2012 WL 1435995, at *7 (Apr. 20, 2012). The EEOC and HHS work together to enforce the requirements of HHS's 2016 rule against nonhealthcare employers with gender transition exclusions in their groups plans. When HHS lacks jurisdiction for enforcement proceedings, HHS would refer or transfer the matter to the EEOC. 81. Fed. Reg. at 31,432.

[¶10] Unsurprisingly, litigation ensued. In December of 2016, a nationwide preliminary injunction was entered prohibiting enforcement of the rule based on "gender identity." Franciscan All., Inc. v. Burwell, 227 F. Supp. 3d 660, 695 (N.D. Tex. 2016). There were additional cases in other courts, including in the District of North Dakota. See Religious Sisters of Mercy v. Burwell, Case No. 3:16-cv-00386 (D.N.D. 2016); Cath. Benefits Assoc. v. Burwell, Case No. 3:16-cv-00432 (D.N.D. 2016). In 2019, HHS issued a Notice of Proposed Rulemaking to revise the 2016 Rule. See Nondiscrimination in Health and Heath Education Programs or Activities, 84 Fed. Reg.

27,846. ("NPRM").  The same year, the Franciscan Alliance court granted summary judgment for the plaintiffs. Franciscan All., Inc. v. Burwell, 414 F. Supp. 3d 928, 945 (N.D. Tex. 2019). Significantly, the Franciscan Alliance court declined to enter a nationwide permanent injunction. Id.

[¶11]   During the final year of then-President Donald J. Trump's term in office, the Trump HHS finalized a new rule in 2020. Nondiscrimination in Health and Health Education Programs or Activities, 85 Fed. Reg. 37,160 (June 19, 2020) ("2020 Rule"). The 2020 Rule applied much more narrowly than the 2016 Rule. The 2020 Rule eliminated the definition of sex as including gender identity, relying solely on discrimination being prohibited under Title IX, and carving out several religious exceptions, including RFRA. (See 45 C.F.R. § 92.6(b); "This final rule emphasizes that the Section 1157 regulation will be implemented consistent with various statues enacted by Congress, including conscience and religious freedom statutes." Id. at 37,205).

[¶12]   Shortly after, the United States Supreme Court issued an opinion in Bostock, which states, in part, "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex." Bostock v. Clayton Cty., Georgia, 140 S. Ct. 1731, 1747 (2020). Bostock specifically notes, however, the Supreme Court was "deeply concerned" with preserving the free exercise of religion and specifically pointed to the Religious Freedom Restoration Act and the First Amendment, noting that this was an issue for future cases, as none of the employers had brought the issue before the Court. Id. at 1754. Litigation to prevent enforcement of the 2020 Rule was the result. Two district courts reinstated parts of the 2016 Rule. See Walker v. Azar, No. 20CV2834FBSMG, 2020 WL 6363970, at *1 (E.D.N.Y. Oct. 29, 2020) ("The definitions of 'on the basis of sex,' 'gender identity,' and 'sex stereotyping' currently set forth in 45 C.F.R. § 92.4 will remain in effect."); Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs., No.

CV 20-1630 (JEB), 2021 WL 4033072, at *2 (D.D.C. Sept. 3, 2021) ("In its September 2, 2020, preliminary-injunction Opinion, the Court barred HHS from "enforcing the repeal of the 2016 Rule's definition of discrimination '[o]n the basis of sex' insofar as it includes 'discrimination on the basis of ... sex stereotyping'" and "from enforcing [HHS's] incorporation of the religious exemption contained in Title IX." Whitman-Walker Clinic, Inc., 485 F. Supp. 3d 1, 64)(quoting 2016 Rule, 81 Fed. Reg. at 31,467 and 45 C.F.R. § 92.6(b)"). In summary, these orders struck the 2020 Rule's definition of discrimination based on sex, reinstated the 2016 Rule's definition, and eliminated the religious exemption protection from Title IX.

[¶13] President Joseph R. Biden, Jr., subsequently issued an executive order, citing Bostock, and directing agencies to prohibit discrimination on the basis of gender identity. Executive Order 13,988, 86 Fed. Reg. 7023 (Jan. 20, 2021). In response to the Executive Order, the HHS under the Biden administration issued a document entitled Notification of Interpretation and Enforcement of Section 1157 of the Affordable Care Act and Title IX of the Education Amendments of 1972. ("Notification") 86 Fed. Reg. 27,984, 27, 985 (May 25, 2021). The Notification explained HHS "will interpret and enforce Section 1557's prohibition on discrimination on the basis of sex to include: … discrimination on the basis of gender identity." Id. at 27,984. The Notification stated Bostock held "the plain meaning of 'because of sex' in Title VII necessarily included discrimination because of sexual orientation and gender identity." 86 Fed. Reg. at 27,985. The Notification indicated, "[c]onsistent with the Supreme Court's decision in Bostock and Title IX, beginning today, OCR will interpret and enforce Section 1557's prohibition on discrimination on the basis of sex to include: (1) discrimination on the basis of sexual orientation; and (2) discrimination on the basis of gender identity." Id. The Notification further said, "interpretation will guide the [OCR] in processing complaints and conducting investigations" but that HHS would

"comply with [RFRA] and all other legal requirements." Id. at 27,984-5.

[¶14]   On March 2, 2022, the Biden administration HHS issued a document entitled HHS Notice and Guidance on Gender Affirming Care, Civil Rights, and Patient Privacy ("Guidance"). Doc. No. 38-1. The HHS Guidance notes "attempts to restrict, challenge, or falsely characterize this potentially lifesaving care as abuse is dangerous." Id. The HHS Guidance continues, "[a]s a law enforcement agency, OCR is investigating, and, where appropriate, enforcing Section 1157 of the Affordable Care Act…. This means that if people believe they have been discriminated against in a health program or activity that receives financial assistance from HHS, they can file a complaint." Id. The HHS Guidance continues to encourage individuals to file a complaint noting "[p]arents or caregivers who believe their child has been denied health care, including gender affirming care, on the basis of that child's gender identity, may file a complaint with the OCR." Id. The HHS Guidance also gives an example of a scenario that would, in HHS's determination, likely violate Section 1557. "Similarly, federally-funded covered entities restricting an individual's ability to receive medically necessary care, including gender-affirming care, from their health care provider solely on the basis of their sex assigned at birth or gender identity likely violates Section 1157." Id.

## JURISDICTION

[¶15]   The Defendants contend the Alliance has not demonstrated standing and ripeness to challenge the EEOC's future enforcement of Title VII or as to HHS's enforcement of Section 1557.  Standing requires "1) an injury in fact, 2) a sufficient causal connection between the injury and the conduct complained of, and 3) a likelihood that the injury will be redressed by a favorable decision." Hughes v. City of Cedar Rapids, Iowa, 840 F.3d 987, 992 (8th Cir. 2016).  Plaintiffs contend they have associational standing because "(1) the individual members would have

standing to sue in their own right; (2) the organization's purpose relates to the interests being vindicated; and (3) the claims asserted do not require the participation of individual members." Sierra Club v. U.S. Army Corps of Eng'rs, 645 F.3d 978, 986 (8th Cir. 2011) (citations omitted). If any member would have standing, that is sufficient. Iowa League of Cities v. EPA, 711 F.3d 844, 869 (8th Cir. 2013). Defendants take issue that members of the Alliance are anonymous. However, members are permitted to be unnamed. Disability Rights Wis., Inc. v. Walworth Cnty. Bd. of Supervisors, 522 F.3d 796, 802 (7th Cir. 2008); Doe v. Stincer, 175 F.3d 879, 882 (11th Cir. 1999).

[¶16]   Plaintiff meets the first requirement for associational standing. Plaintiff's members would have standing to sue as they have an injury with a causal connection to the conduct that is complained of, i.e. they will be imminently injured by forcing to choose between complying with the requirements of the EEOC or HHS or choosing their sincerely held religious beliefs. The Alliance meets the second requirement of associational standing because its purpose relates to the interests being vindicated. Specifically, part of the Alliance's purpose is "to support Christian employers and develop strategies for them, so that they, as part of their religious witness and exercise may provide health or other employment related benefits to their respective employees and engage in other employment practices in a manner that is consistent with Christian values." Doc. No. 6-1. This Court concludes Plaintiff has associational standing.

[¶17]   Regarding ripeness, Defendants primarily allege the mandates in question do not exist. In particular, at the hearing held on May 2, 2022, the Defendants argued the Franciscan Alliance case vacated the 2016 rule and the Whitman-Walker Clinic case did not re-effectuate it. This Court is not convinced by this argument. The Whitman-Walker Clinic case expressly held HHS was enjoined from enforcing the repeal of the 2016 Rule's definition of on the basis of sex in so far as

it included sex stereotyping, but specifically stated the plaintiff did not have standing to address the prohibition on "gender identity" discrimination. Whitman-Walker Clinic, 485 F. Supp. 3d at 64 (D.D.C. 2020). However, a separate court issued a nationwide injunction prohibiting HHS from enforcing the 2020 Rule's repeal of the 2016 Rule's definitions of "on the basis of sex," "gender identity," and "sex stereotyping." See Walker v. Azar, 480 F. Supp. 3d at 430 (E.D.N.Y. 2020); see also 45 C.F.R. § 92.4 (2019). The end result is the 2016 Rule was put back into effect.

[¶18] The Biden Administration HHS Notification at issue here is substantially the same as the 2016 Rule. This Court is not the first to reach this conclusion. In fact, the court which originally entered a nationwide preliminary injunction against the 2016 Rule, but no permanent injunction, has found similarly. Franciscan All., Inc. v. Becerra, 553 F. Supp. 3d 361 (N.D. Tex. 2021), amended, No. 7:16-CV-00108-O, 2021 WL 6774686 (N.D. Tex. Oct. 1, 2021 (finding the Biden HHS Notification "materially indistinguishable from the 2016 Rule"). The Biden HHS Notification can easily be compared with the prior 2016 Rule and the enforcement is nearly identical. See 86 Fed. Reg. 27,984 (May 25, 2021) and 81. Fed. Reg. 31,376, 31,466, 31,467 (May 18, 2016).

[¶19] Defendants attempt to prevent the federal court's reach by arguing there has never been an enforcement proceeding against Plaintiff or anyone else. However, at the hearing on May 2, 2022, the Defendants admitted there have been complaints that have likely gone through the conciliation process. Plaintiff and its members do not need to wait until enforcement has commenced for there to be an injury. Rather, a showing of "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder" is sufficient. Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, (1979). Government harassment of religious organizations requiring them to prove they

are religious or evaluating whether their religious preferences can withstand a case-by-case analysis is a sufficient injury. Accordingly, this matter is ripe for consideration at this time.

## ANALYSIS

[¶20] The Plaintiff seeks to obtain a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. The preliminary injunction is sought on several grounds: the interpretation and implementation of the Section 1557 and EEOC's actions under Title VII violates their members' religious rights protected by the Religious Freedom Restoration Act ("RFRA"), the Free Exercise Clause, and their Free Speech Rights. The Alliance further argues the implementation of the mandate violated the Administrative Procedure Act ("APA"). The Plaintiff asks this Court to hold both the EEOC and HHS's actions unlawful and set them aside. Even if there has been a violation of the APA, at this time, for the purposes of a preliminary injunction it is unnecessary for this Court to address that issue. For purposes of the preliminary injunction, this Court will only address the Plaintiff's statutory and constitutional religious rights. Violations of the APA may need be to be address later once the Court has a full record. Furthermore, as another court in this District has also stressed, the effect of setting aside HHS's interpretation of Section 1557 would effectively lead to conflicting decisions by separate courts, each holding that HHS must enforce Section 1557 in opposite manners. See Religious Sisters of Mercy, 513 F. Supp. 3d at 1144 (D.N.D. 2021); Whitman-Walker Clinic, 485 F. Supp. 3d 1 (D.D.C. 2020).

[¶21] Having determined that this Court has jurisdiction, this Court must now weigh the Dataphase factors. In determining whether a preliminary injunction should be issued courts must consider the factors set forth in Dataphase Systems, Inc., v. C L Systems, Inc., 640 F.2d 109, 114 (8th Cir. 1981). The Dataphase factors include: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on

other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Id. Central to this analysis "is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." Id

[¶22] The movant has the burden of establishing the necessity of a preliminary injunction. Baker Elec. Coop., Inc. v. Chaske, 28 F.3d 1466, 1472 (8th Cir. 1994). "No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction." Id. Probability of success on the merits "is the most significant" factor. Home Instead, Inc. v. Florance, 721 F.3d 494, 497 (8th Cir. 2013). "A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 24 (2008).

### I. Irreparable harm

[¶23] Plaintiff, the Alliance, likely faces injury. Defendants argue that failure to provide coverage or complete gender transitions would not "always" constitute discrimination. Doc. No. 18, p. 47-48. The Defendants fail to take into account that this "sometimes discrimination" could turn into "almost always." The uncertainty left by the Defendants' coy interpretation will invariably cause a chill on the free exercise of the Plaintiff's religious doctrine. Plaintiff alleges its members' First Amendment rights will be violated if they are forced to comply. Defendants counter that the possibility of an injury is not enough. Id. at pp. 65-67. The Alliance must "demonstrate that irreparable injury is *likely* in the absence of an injunction." Winter, 555 U.S. at 22 (2008) (emphasis in original). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976). Even some loss of First Amendment freedoms is an injury. Compliance with the mandate requires the

Plaintiff and its members to violate their religious beliefs, convictions, and practices. This is an irreparable injury.

[¶24] Defendants allege the mandates in question do not exist. This Court considered the background of these mandates and does not find this argument compelling. Again, this is not the first Court to reach this conclusion. Franciscan All., Inc. v. Becerra, 553 F. Supp. 3d 361 (N.D. Tex. 2021), amended, No. 7:16-CV-00108-O, 2021 WL 6774686 (N.D. Tex. Oct. 1, 2021 (calling the Notification "materially indistinguishable from the 2016 Rule"). The Biden HHS Notification can easily be compared with the prior 2016 Rule. The enforcement is nearly identical. Compare 86 Fed. Reg. 27,984 (May 25, 2021) with 81. Fed. Reg. 31,376, 31,466, 31,467 (May 18, 2016). No government agency ought to be in the business of evaluating the sincerity of another's religious beliefs.

[¶25] Additionally, since the issuance of the Biden HHS Notification, HHS has also released new guidance with the newest HHS Guidance. In fact, the HHS Guidance encourages a parent to file a complaint if a medical provider refuses to gender transition their child, of any age, including an infant. The thought that a newborn child could be surgically altered to change gender is the result of the Biden HHS Notification and HHS Guidance that brands a medical professional's refusal to do so as discrimination.[1] Indeed, the HHS Guidance specifically invites the public to file complaints for acting in a manner the Alliance says is consistent with their sincerely held religious beliefs. The Alliance must either violate its sincerely held beliefs or face monetary losses, fines,

---

[1] Beyond the religious implications, the Biden HHS Notification and resulting HHS Guidance frustrate the proper care of gender dysphoria, where even among adults who experience the condition, a diagnosis occurs following the considered involvement of medical professionals. See, e.g., Bostock, 140 S.Ct. at 1738 (noting Plaintiff Aimee Stephens was clinically diagnosed with gender dysphoria by clinicians who recommended she live as a woman). By branding the consideration as "discrimination," the HHS prohibits the medical profession from evaluating what is best for the patient in what is certainly a complex mental health question.

and even civil liabilities. The Plaintiffs and their members face a very real irreparable harm if they are either forced to comply or if they refuse to comply.

[¶26]   The burden on the Alliance is not permissible and will irreparably harm its members. Violating the Alliance's statutory rights under RFRA is an irreparable harm, comparable to those of First Amendment rights. See Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, 1146 (10th Cir. 2013), aff'd, 573 U.S. 682 (2014). Additionally, the Alliance's members will be compelled to speak in a certain manner or face harassment from these agencies in the form of enforcement proceedings or loss of funding. In fact, HHS's Guidance characterizes the Alliance's stated beliefs as "abuse" or "discrimination" and urges the public to submit a complaint. Doc. No. 38-1. A First Amendment claim alone may establish irreparable harm. Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1., 690 F.3d 996, 1000 (8th Cir. 2012). Thus, the irreparable harm factor weighs strongly in favor of the Plaintiff.

### II.   Balance

[¶27]   The balance of the harms weighs in favor of Plaintiff. The Alliance has already shown it faces an injury. Absent a preliminary injunction, the Alliance and its members will be forced to violate their sincerely held religious beliefs or incur severe monetary penalties. The balance of harm factor analysis also examines the harm to all parties to the dispute and other interested parties, including the public. See Dataphase, 640 F.2d at 114; Glenwood Bridge, Inc. v. City of Minneapolis, 940 F.2d 367, 372 (8th Cir. 1991).  The Alliance's membership is nationwide. The current interpretation by the EEOC and HHS will cause harm to health care providers, and the Alliance's members who provide insurance across the county. The harm to the Defendants is minimal at best. The harm to the Plaintiff is to force its members to violate their sincerely held religious beliefs. This factor clearly weights in favor of enjoining the Defendants.

### III.  Probability of success

[¶28]  The Court must "flexibly weigh the case's particular circumstances to determine 'whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.'"  Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc., 815 F.2d 500, 503 (8th Cir. 1987).  At this preliminary stage, the Court need not decide whether the party seeking the preliminary injunction will ultimately prevail.  PCTV Gold, Inc. v. SpeedNet, LLC, 508 F.3d 1137, 1143 (8th Cir. 2007).  Although a preliminary injunction cannot be issued if the movant has no chance on the merits, "the Eighth Circuit has rejected a requirement as to a 'party seeking preliminary relief prove a greater than fifty percent likelihood that he will prevail on the merits.'"  Id.  The Eighth Circuit has also held that of the four factors to be considered by the district court in considering preliminary injunctive relief, the likelihood of success on the merits is "most significant."  S & M Constructors, Inc. v. Foley Co., 959 F.2d 97, 98 (8th Cir. 1992).  A likelihood of success on the merits of even one claim can be sufficient to satisfy the "likelihood of success" Dataphase factor.  See Nokota Horse Conservancy, Inc. v. Bernhardt, 666 F. Supp. 2d 1073, 1078-80 (D.N.D. 2009).

[¶29]  The Alliance notes compliance would require its members to violate sincerely held religious beliefs, which is impermissible under the First Amendment and the Religious Freedom Restoration Act ("RFRA"). 42 U.S.C. § 2000bb-4.

> To state a claim under RFRA, a religious objector must show that the government substantially burdens a sincere religious exercise or belief. See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 428, (2006). The burden then shifts to the government to show that it has a "compelling interest" in applying "the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." Id. at 429–30 (quoting 42 U.S.C. § 2000bb–1(b)). To satisfy the compelling-interest requirement, the government must do more than identify "broadly formulated interests justifying the general applicability of government

> mandates." Id. at 431. The government also bears the burden of showing that "application of the burden to the person ... is the least restrictive means of furthering" its compelling interest. Id. at 424. This burden-shifting approach applies even at the preliminary-injunction stage. Id. at 429–30.

Sharpe Holdings, Inc. v. U.S. Dep't of Health & Hum. Servs., 801 F.3d 927, 937 (8th Cir. 2015), cert. granted, judgment vacated sub nom on other grounds.

[¶30] It is completely undisputed that the Plaintiffs, compelled by fines and civil liability, must perform or provide coverage for gender transition procedures. Under Title IX, administrative agencies may revoke federal funding for an offending health program or activity or use "any other means authorized by law," including civil enforcement proceedings, debarment from doing business with the federal government, lawsuits under the False Claims Act, and even criminal penalties. 20 U.S.C. § 1682. Imposing monetary penalties for their refusal to violate religious beliefs is a substantial burden. Sharpe, 801 F.3d at 945.

[¶31] Defendants argue they will comply with RFRA but cannot predict ahead of time how RFRA will apply to the facts of a particular matter. RFRA "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 726 (2014). The Free Exercise Clause does not permit a substantial burden on one's free exercise of religion. See Patel v. U.S. Bureau of Prisons, 515 F.3d 807, 813 (8th Cir. 2008). Religious freedom cannot be encumbered on a case-by-case basis. "To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance 'interests of the highest order' and must be narrowly tailored in pursuit of those interests." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 546 (1993). The Alliance maintains if the government interest is to increase access to gender transition services, the government itself could assume the costs for those unable to afford them

or obtain them under their employer's religious objections in the health insurance policies. The Alliance reiterates the government could also provide subsidies, reimbursements, tax credits or deductions. Defendants must demonstrate a compelling interest to the Alliance's substantial burden and have failed to do so. Determining on a case-by-case basis if a religious exemption should apply is certainly not the least restrictive means. The Alliance has shown a likelihood of success on the merits. This factor weighs significantly in favor of granting the preliminary injunction.

**IV. Public Interest**

[¶32]   Defendants argue there will be "inherent harm to an agency" from preventing it from enforcing regulations and statutes. Doc. No. 18.  However, if this enforcement, as shown, is in violation of Constitutional rights, there is certainly no harm to an agency. A preliminary injunction will also protect the public interest. The Alliance has shown its constitutional and statutory rights are at stake. "[I]t is always in the public interest to protect constitutional rights." Carson v. Simon, 978 F.3d 1051, 1061 (8th Cir. 2020). Religious freedoms are at the heart of this case. It is in the public interest to ensure these rights are not violated. The public interest factor weighs in favor of Plaintiff.

## CONCLUSION

[¶33]   The Dataphase factors weigh in favor of granting the Plaintiff's Motion for a Preliminary Injunction and requires the Court to intervene until the merits of the case are determined. As such, the Plaintiff's Motion for a Preliminary Injunction is **GRANTED**.

[¶34]   For purposes of Plaintiff's Motion for Preliminary Injunction, the Court further **ORDERS**:

- (1) The EEOC is enjoined from interpreting or enforcing Title VII of the Civil Rights Act against the Alliance in a manner that would require its present or future members to provide insurance coverage for gender transition services.

(2) The EEOC is enjoined from applying or enforcing these same regulations against the insurers and third-party administrators of the Alliance's present and future members.

(3) HHS is enjoined from interpreting or enforcing Section 1557 of the ACA and any regulations against the Alliance's present or future members in a manner that would require them to provide, offer, perform, facilitate, or refer for gender transition services.

(4) HHS is enjoined from interpreting or enforcing Section 1557 of the ACA and implementing regulations against the Alliance's present or future members in a manner that prevents, restricts or compels the Alliance's members' speech on gender identity issues.

[¶35]    **IT IS SO ORDERED.**

DATED May 16, 2022.

Daniel M. Traynor, District Judge
United States District Court