## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
## WESTERN DIVISION

| | |
|---|---|
| **Christian Employers Alliance**, on behalf of itself and its members, | |
| *Plaintiff,* | |
| v. | **1:21-cv-00195-DMT-CRH** |
| **United States Equal Employment Opportunity Commission**, et al., | **Oral Argument Requested** |
| *Defendants.* | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... iv

INTRODUCTION ............................................................................... 1

RECITATION OF FACTS UNDER LOCAL CIV. R. 7.1(A)(2) ..................................... 2

I.    CEA and its members are committed to specific religious principles.............. 2

II.   The EEOC Coverage Mandate governs employer health insurance................ 6

III.  HHS's Gender Identity Mandate governs insurance and medical care........... 8

PROCEDURAL HISTORY ................................................................... 13

STANDARD FOR GRANTING THE MOTION........................................... 14

ARGUMENT .................................................................................. 15

I.    CEA is entitled to final relief on the merits.................................... 15

    A.    Both Mandates violate RFRA. ........................................... 15

        1.    CEA members' health insurance and medical care decisions are the exercise of religion, protected by RFRA. ...................... 15

        2.    Both Mandates substantially burden CEA members' exercise of religion. .................................................................. 16

    B.    Both Mandates fail strict scrutiny under RFRA................................. 18

        1.    Neither Mandate furthers a compelling governmental interest. ................................................................. 18

        2.    Neither Mandate is the least restrictive means of furthering a compelling governmental interest. ......................... 22

II.   CEA has standing and this case is ripe. ........................................ 24

    A.    CEA faces a credible threat of injury. ................................... 24

        1.    CEA members engage in conduct affected with constitutional interests................................................. 24

        2.    CEA's members' conduct is arguably proscribed by the government's Mandates. ............................................. 25

   3. There is a credible threat of enforcement.................................. 27

 B. RFRA authorizes this suit. ................................................................ 29

 C. CEA members' injury is traceable to the government, and a favorable ruling from this Court will redress their harm. ................... 31

 D. CEA has associational standing on behalf of its members.................. 32

 E. CEA's RFRA claims are ripe................................................................. 33

III. The other injunction factors also weigh in favor of CEA................................ 34

CONCLUSION................................................................................................................... 36

## TABLE OF AUTHORITIES

### Cases

*281 Care Comm. v. Arneson*, 638 F.3d 621 (8th Cir. 2011) ................................. 28, 32

*281 Care Comm. v. Arneson*, 766 F.3d 774 (8th Cir. 2014) ........................................ 20

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) ........................................................ 22

*Am. Farm Bureau Fed'n v. E.P.A.*, 836 F.3d 963 (8th Cir. 2016) .............................. 31

*Am. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021) ....................................... 33

*Bank One, Utah v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999) ................................... 14

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ................ 15–19, 22–23, 29

*Calzone v. Hawley*, 866 F.3d 866 (8th Cir. 2017) ....................................................... 31

*Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020) ........................................................ 35

*Cath. Benefits Assoc. v. Burwell*, Case No. 3:16-cr-00432, Doc. No. 1 (D.N.D. Dec. 28, 2016) ........................................................................................................... 9

*Catholic Benefits Ass'n v. Hargan*, No. CIV-14-240-R (W.D. Okla. March 7, 2018) ....................................................................................................................... 35

*Christian Emps. All. v. Azar*, No. 3:16-cv-309, 2019 WL 2130142 (D.N.D. May 15, 2019) ....................................................................................... 15, 29, 35, 36

*Christian Emps. All. v. United States Equal Opportunity Comm'n,* No. 1:21-CV-195, 2022 WL 1573689 (D.N.D. May 16, 2022) (ECF 39) ................. *passim*

*Christian Legal Soc'y v. Walker*, 453 F.3d 853 (7th Cir. 2006) ................................. 35

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ..................................................................................................................... 18

*Collins v. Yellen*, 141 S. Ct. 1761 (2021) ..................................................................... 31

*Conforti v. St. Joseph's Healthcare System, Inc.*, No. 2:17-cv-00050, 2017 WL 67114 (D.N.J. Jan. 5, 2017) ................................................................................. 28

*Dep't of Health & Human Servs. v. CNS Int'l Ministries*, No. 15-775, 2016 WL 2842448 (U.S. May 16, 2016) ...................................................................... 14

*Disability Rights Wis., Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796 (7th Cir. 2008) ............................................................ 32

*Doe v. Stincer*, 175 F.3d 879 (11th Cir. 1999) .................................................. 32

*Dordt College v. Burwell*, 801 F.3d 946 (8th Cir. 2015) ................................. 29

*EEOC v. Deluxe Fin. Services, Inc.*, Case No. 0:15-cv-2646 (D. Minn. Jan. 21, 2016) ................................................................................................... 7

*EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018) .................................................................................................... 28

*Elrod v. Burns*, 427 U.S. 347 (1976) .............................................................. 34

*Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872 (1990) ........................ 16

*Fletcher v. Alaska*, 443 F. Supp. 3d 1024 (D. Alaska 2020) ............................... 27, 28

*Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928 (N.D. Tex. 2019) ...................... 9

*Franciscan All., Inc. v. Becerra*, No. 553 F. Supp. 3d 361 (N.D. Tex. 2021).. 18, 19, 26

*Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016) .................... 23

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) ............................................................................................... 19, 20

*Holt v. Hobbs*, 574 U.S. 352 (2015) ............................................................... 19

*Iowa League of Cities v. E.P.A.*, 711 F.3d 844 (8th Cir. 2013) .............................. 30

*Levin v. Harleston*, 966 F.2d 85 (2d Cir. 1992) ............................................... 14

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020) ........................................................................................ 17

*Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752 (8th Cir. 2008) ........ 34

*Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799 (8th Cir. 2019) .................... 14

*Marcus v. Iowa Pub. Television,* 97 F.3d 1137 (8th Cir. 1996) ............................... 34

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ......................................... 22

*Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864 (8th Cir. 2012) .................................................................................................... 34

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361 (2018) ...................... 21

*Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249 (4th Cir. 2003) ................................................................................................. 21, 35

*Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658 (8th Cir. 2023) ................................................................................................. 33

*Reaching Souls Int'l, Inc. v. Azar*, No. CIV-13-1092-D, 2018 WL 1352186 (W.D. Okla. Mar. 15, 2018) ............................................................... 36

*Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113 (D.N.D. 2021)........... *passim*

*Religious Sisters of Mercy v. Becerra*, 55 F.4th 583 (8th Cir. 2022) ................. *passim*

*Religious Sisters of Mercy v. Burwell*, Case No. 3:16-cv-00386, Doc. No. 1 (D.N.D. Nov. 7, 2016) ......................................................................... 9

*Rodgers v. Bryant*, 942 F.3d 451 (8th Cir. 2019) ........................................ 28

*Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*, 801 F.3d 927 (8th Cir. 2015) ................................................................. 14, 17–18, 22–23

*St. Paul Area Chamber of Com. v. Gaertner*, 439 F.3d 481 (8th Cir. 2006) ............. 27

*State of Mo. v. Biden*, No. 21-3494 (8th Cir. Motion, Exh. J. at 3. Decl. of Shannon O. Royce, filed Nov. 5, 2021) ............................................. 33

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ................................... 32

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)................... 24–26, 28–29, 33

*Tandon v. Newsom*, 141 S. Ct. 1294 (2021) .............................................. 21

*Telescope Media Grp. v. Lucero*, 936 F.3d 740 (8th Cir. 2019)........................... 24, 25

*Tovar v. Essentia Health*, 342 F. Supp. 3d 947 (D. Minn. 2018)............................ 27

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021)................................... 24

*Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694 (8th Cir. 2021)......... 24, 29, 31

*United States v. Thomason*, 991 F.3d 910 (8th Cir. 2021) .......................... 22

*United States v. Varner*, 948 F.3d 250 (5th Cir. 2020)............................... 22

*Walker v. Azar*, 480 F. Supp. 3d 417 (E.D.N.Y. 2020).................................. 10, 25, 26

*Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012) ............................................................. 22

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1 (D.D.C. 2020) ............................................................ 10, 26

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. CV 20-1630 (JEB), 2021 WL 4033072 (D.D.C. Sept. 3, 2021) ............................... 10

## Statutes

18 U.S.C. § 1035 ......................................................................................................... 17

20 U.S.C. § 1681, Title IX of the Education Amendments of 1972, ................. 5, 8, 10

20 U.S.C. § 1682 ......................................................................................................... 17

31 U.S.C. § 3729 ......................................................................................................... 17

42 U.S.C. § 2000e-16 .................................................................................................. 20

42 U.S.C. § 2000e-5 .................................................................................................... 17

## Other Authorities

Administrative Complaint, *ACLU v. Ascension Health*, U.S. Dep't of Health & Human Servs., Office for Civil Rights (Oct. 25, 2016) .................................... 28

EEOC Amicus Brief Supporting Plaintiff, *Robinson v. Dignity Health*, No. 16-CV-3035 YGR, 2016 WL 11517056 (N.D. Cal. Aug. 22, 2016) ......................... 7

EEOC, "Sex-Based Discrimination" (Oct. 14, 2021, 1:25 PM), https://www.eeoc.gov/sex-based-discrimination ................................................. 6

EEOC, Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity (June 15, 2021) ................................................. 8

Executive Order No. 13,988, 86 Fed. Reg. 7023 (Jan. 20, 2021) ................................ 10

HHS, Notice of Interpretation and Enforcement, 86 Fed. Reg. 27,984 (May 25, 2021) ............................................................................................................. 26

TRICARE Policy Manual 6010.60-M, Chapter 7, § 1.2 at 4.1 (Issued: Sept. 6, 2016, revised Nov. 15, 2017), ECF No. 6-3 ...................................................... 20

**Regulations**

45 C.F.R. § 92.3 ................................................................................. 8, 21, 26

45 C.F.R. § 92.6 ................................................................................. 21

Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375
     (May 18, 2016) ("2016 Rule") ............................................... 8

Nondiscrimination in Health Programs and Activities, 87 Fed. Reg. 47,824
     (Aug. 4, 2022) ..................................................................... 30

**Rules**

Fed. R. Civ. P. 54 ............................................................................. 36

Fed. R. Civ. P. 56 ............................................................................. 14

Local Civ. R. 7.1 ............................................................................... 2

**Treatises**

13C Wright, Miller & Cooper, Federal Prac. & Proc. Juris. § 3533.5 (3d ed.) .......... 14

## INTRODUCTION

This case involves two federal government mandates that violate religious freedom. They seek to compel employers, healthcare providers, and their insurers to violate their religious beliefs and to perform or pay for dangerous, life-altering procedures that attempt or support gender "transitions"—such as administering puberty blockers to children and the removal of healthy reproductive organs. But employers should be free not to pay for such actions, and doctors should be free to follow sound medical judgment and their consciences.

Your Honor and Judge Welte have twice held that these mandates violate the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb, et seq., as to healthcare providers and employers who object. *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113 (D.N.D. 2021) (granting final relief against defendants U.S. Department of Health and Human Services (HHS) and Equal Employment Opportunity Commission (EEOC)); *Christian Emps. All. v. United States Equal Opportunity Comm'n,* No. 1:21-CV-195, 2022 WL 1573689 (D.N.D. May 16, 2022) (ECF 39) (granting parallel preliminary injunction). The Eighth Circuit affirmed that RFRA relief is appropriate against these mandates. *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 588 (8th Cir. 2022). The Fifth Circuit affirmed a similar injunction. *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 380 (5th Cir. 2022).

In *Religious Sisters*, the Eighth Circuit held that identifying at least one member can support standing for an association to obtain injunctive relief, but the association in that case had not identified a member that was not also a plaintiff. *Id.* at 602. CEA has met this burden here, both before the preliminary injunction and in the amended complaint. It identified one non-healthcare employer and one healthcare employer affected by these mandates in the same way as the plaintiffs that received relief in *Religious Sisters*. See ECF 68 at 62–75 (identifying Trinity Bible College & Graduate School, in Ellendale, North Dakota ("Trinity Bible

1

College"), and the Children's Center Rehabilitation Hospital, located in Bethany, Oklahoma ("The Children's Center")); *see also* Royce Decl., ECF 31-1 (same). Consequently, CEA and its members are entitled to permanent injunctive relief.

Counsel for CEA understands that Defendants may seek to stay this case yet again because HHS is planning a future rule to again impose the gender identity mandate. That is hardly a reason to delay. It did not cause delay for the Eighth Circuit, and the history of these two mandates shows that this administration intends to continue issuing and enforcing gender identity mandates. RFRA clearly protects CEA and its members from EEOC and HHS forcing them to provide or pay for gender transition actions. They need permanent relief—the same relief awarded in *Religious Sisters*—to finally resolve this case.

## RECITATION OF FACTS UNDER LOCAL CIV. R. 7.1(A)(2)

### I. CEA and its members are committed to specific religious principles.

CEA is a Christian membership ministry that exists to unite and serve Christian non-profit and for-profit employers who wish to live out their faith in everyday life, including their homes, schools, ministries, businesses, and communities. ECF 68 ¶ 21 (CEA's First Amended Verified Complaint). CEA exists, in-part, "to support Christian employers and develop strategies for them, so that they, as part of their religious witness and exercise, may provide health or other employment related benefits to their respective employees and engage in other employment practices in a manner that is consistent with Christian Values." Articles of Incorporation of Christian Employers Alliance, art. II, § 2.2, ECF 68-2; ECF 68 ¶ 37.CEA works and advocates for religious freedom of Christian employers seeking to conduct their ministries and businesses according to their religious values. ECF 68 ¶ 36. This includes supporting Christian employers so that they can "provide health or other employment related benefits to their respective

employees…in a manner consistent with Christian Values" and advocating for religious freedom for Christian employers who seek "to conduct their ministries and businesses according to their religious values." ECF 68-2 art. II; ECF 68 ¶ 37. Upon request, the Ethics Committee will evaluate medical ethical issues "to help the Board determine whether certain health care coverage, medical services, practices, or medications conform to Christian Values." ECF 68 ¶ 43; Fourth Amended and Restated Bylaws of Christian Employers Alliance, art V, § 5.1.2.1, ECF 68-1.

CEA members commit to integrating their Christian convictions into every aspect of their operations, whether ministry or business. ECF 68 ¶ 31. CEA has members from across the nation and are for-profit entities as well as non-profit entities. ECF 68 ¶¶ 54–56. Most CEA members employ more than 15 employees and are "employers" as defined in Title VII. ECF 68 ¶ 57. CEA is strongly committed to maintaining a high threshold in its membership criteria, including in being a Christian employer, the Statement of Faith, the Christian Ethical Convictions, and Christian governance or control of nonprofits and for-profits. ECF 68, ¶ 51; ECF 68-1, art. III. CEA requires each of its members to be a "Christian employer" as defined in CEA's bylaws and to also "commit to provide health care benefits consistent with Christian Ethical Convictions and to support the right and freedom of Christian employers to do so." ECF 68 ¶¶ 45–47;  ECF 68-1, art. III, § 3.1.1. Nonprofit organizations and for-profit organizations must each satisfy additional criteria for membership depending on their classification.  ECF 68 ¶¶ 49–50; ECF 68-1, art. III, § 3.1.2–3.1.3.

CEA members believe and teach that God's creation of individuals as two, distinct biological sexes of male and female, is immutable, reflects the image and likeness of God, and is complementary to each other. ECF 68 ¶¶ 32–34; ECF 68-1, art. I, §§ 1.1.8, 1.3.5. CEA's Christian Ethical Convictions state and CEA members must adhere to the belief "[m]ale and female are immutable realities defined by

biological sex" and that "[g]ender reassignment surgery is contrary to Christian Values." ECF 68 ¶ 34; ECF 68-1, art. I, § 1.3.5. CEA members believe and teach that the rejection of one's biological sex is a rejection of the image of God within that person. ECF 68 ¶ 33.  A CEA member cannot, "consistent with Christian Values" "provide services for, healthcare coverage of, reimbursement for, or access to: … [g]ender reassignment therapies and surgery, [c]ounseling affirming or encouraging any acts or behavior violating Christian Values, or [a]ny medical treatments, procedures, or medication contrary to Christian Values." ECF 68 ¶ 48; ECF 68-1, art. I, § 1.3.7. CEA members therefore believe and teach that gender transition and reassignment (and the procedures necessary to accomplish it) are wrong, and that they cannot, as a matter of religious conscience and conviction, knowingly or intentionally perform, participate in, pay for, facilitate, enable, or otherwise support access to gender transition surgeries and procedures, including through their employer-provided health plans or health insurance coverage. ECF 68 ¶¶ 35, 48; ECF 68-1, art. I, § 1.3.7.

CEA members provide health benefits to their employees through insured group health plans or self-funded plans, with the possible exception of a few very small business members. ECF 68 ¶ 53. CEA has several members that are principally engaged in the business of providing healthcare and that receive Federal financial assistance under 42 U.S.C. § 18116. ECF 68 ¶ 55. The commitment of CEA members to comply with Christian Values and Christian Ethical Convictions in their provision of healthcare services and health insurance or coverage benefits is part of CEA members' religious witness and religious exercise. ECF 68 ¶ 58. CEA subscribes to the same commitments with respect to its employer-sponsored health insurance that apply to CEA's members in providing employer-sponsored health insurance for its own employees. ECF 68 ¶ 44. To avoid violating their religious beliefs, CEA and its members wish to sponsor health plans that categorically

exclude coverage of gender reassignment therapies, treatments, procedures, medication, or counseling affirming or encouraging such reassignment or transition. ECF 68 ¶¶ 44, 59. Pursuant to these commitments, CEA members that provide health plans or health insurance coverage to their employees either already categorically exclude coverage for gender transition services or desire to categorically exclude such coverage for gender transition services. ECF 68 ¶ 60. Moreover, to avoid violating their religious beliefs, CEA members that are principally engaged in providing healthcare services cannot perform or refer for gender transition services. ECF 68 ¶ 61.

CEA's members include Trinity Bible College & Graduate School and the Children's Center Rehabilitation Hospital. ECF 68 ¶ 62. Both meet CEA's membership criteria, including affirming the Statement of Faith and Christian Ethical Convictions set forth in CEA's bylaws. ECF 68 ¶¶ 63–64. Neither is a member of the Catholic Benefits Association. ECF 68 ¶ 65. Both are "employers" as defined in Title VII and both sponsor health insurance coverage or health plans for their employees and are thus subject to Title VII's nondiscrimination requirements. ECF 68 ¶¶ 66–67. The EEOC Coverage Mandate affects both as employers with more than 15 employees, and HHS's Gender Identity Mandate burdens them through health insurers and third-party administrators. *Id.* Additionally, The Children's Center is principally engaged in the business of providing healthcare and participates in health programs which receive federal financial assistance. ECF 68 ¶¶ 70–71. The Children's Center is therefore subject to the nondiscrimination provisions interpreted and enforced by HHS (including Section 1557, Title IX, and Section 504) and the HHS Gender Identity Mandate directly regulates it and its healthcare actions. ECF 68 ¶ 72. The Children's Center firmly intends to continue to provide healthcare consistent with its faith and its commitments as a CEA member, including by categorically excluding the provision of health services and

speech as required by the HHS Gender Identity Mandate, but fears liability from Defendants and disqualification from federally funded programs if it continues to practice and speak consistent with Christian Values and its faith. ECF 68 ¶ 74. Both The Children's Center and Trinity Bible College have sincerely-held religious beliefs under which they firmly intend to arrange their employer-provided health insurance coverage or health plans to categorically exclude health services related to gender transition. ECF 68 ¶ 68. As a result, Trinity Bible College and the Children's Center operate under a credible threat of enforcement—either from the government or from private persons—under Section 1557 (and Title IX and Section 504) and Title VII, all as interpreted and enforced by Defendants, because of their religiously guided provision of insurance coverage and medical services, as described above and in the complaint. ECF 68 ¶ 75. Both thus face potential liability from Defendants, or the loss of the opportunity to provide employee health insurance, for exercising their religion by categorically excluding coverage for gender transition services in their health plans. ECF 68 ¶ 69.

## II.    The EEOC Coverage Mandate governs employer health insurance.

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1); ECF 68 ¶77. Employees' health plans and health insurance coverage falls within this provision ECF 68 ¶ 78. The EEOC has the responsibility for interpreting and enforcing Title VII and has interpreted Title VII's prohibition on "sex" discrimination to encompass discrimination on the basis of "gender identity, including transgender status, or because of sexual orientation." ECF 68 ¶¶ 81, 83; See EEOC, "Sex-Based Discrimination" (Oct. 14, 2021, 1:25 PM), https://www.eeoc.gov/sex-based-discrimination, ECF 68-3. The EEOC has applied

this interpretation to require employers that are subject to Title VII to pay for and provide gender transition services for employees through health plans or employee health insurance coverage (the "EEOC Coverage Mandate"). ECF 68 ¶ 85. The EEOC's interpretation categorically prohibits employers from excluding gender transition services in their group health plans. ECF 68 ¶ 87. Based on its interpretation of "sex" under Title VII, the EEOC would pursue Title VII enforcement actions against employers with gender transition services exclusions or limitations in their health plans. ECF 68 ¶ 99.

CEA members, as part of their religious exercise, wish to arrange their employer-provided health plans or health insurance coverage to contain an explicit categorical exclusion or limitation of coverage for all health services related to gender transition. ECF 68 ¶ 103. Such an exclusion by a CEA member would be an unlawful act under the EEOC's interpretation. ECF 68 ¶ 104. Failure to comply with the EEOC Coverage Mandate amounts to discrimination under Title VII and may result in serious civil liability brought by the EEOC, private right of action civil liability, administrative investigations, punitive damages, attorney's fees, and other penalties. ECF 68 ¶¶ 92, 105–12.

The EEOC has enforced the EEOC Coverage Mandate in various ways. For instance, the EEOC sued an employer for transgender status discrimination and then entered into a consent decree with the employer, to prevent the employer from including "partial or categorical exclusions for otherwise medically necessary care solely on the basis of sex (including transgender status) and gender dysphoria." ECF 68 ¶ 93–96; *EEOC v. Deluxe Fin. Services, Inc.*, Case No. 0:15-cv-2646 (D. Minn. Jan. 21, 2016) (consent decree); *see also* EEOC Amicus Brief Supporting Plaintiff, *Robinson v. Dignity Health*, No. 16-CV-3035 YGR, 2016 WL 11517056 (N.D. Cal. Aug. 22, 2016) (arguing that "disparate treatment in the provision of employee benefits, because of an individual's sex"—including denying sex

transformation surgery—"may violate Title VII."). The EEOC has, for many years, enforced the Mandate and has even cooperated with HHS to ensure employer healthcare plans cover gender transition procedures. ECF 68 ¶101; *see* Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375, 31,432 (May 18, 2016) ("2016 Rule") (HHS explaining that in enforcement of Section 1557 of the ACA that it will "refer or transfer [a] matter to the EEOC" if HHS "lacks jurisdiction over an employer"). In 2021, the EEOC Chair issued a new "technical assistance document" declaring that Title VII's prohibition of discrimination "because of . . . sex" prevents employers from maintaining showers, locker rooms, and bathrooms that are separated based on biological sex and requires employers to use a transgender employee's preferred pronouns. EEOC, Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity (June 15, 2021), https://bit.ly/3zgP7iP. In sum, the EEOC has enforced the EEOC Coverage Mandate in the past, and it will continue to do so today against CEA members. ECF 68 ¶¶ 98–101.

### III.   HHS's Gender Identity Mandate governs insurance and medical care.

Section 1557 of the ACA prohibits discrimination in "health program[s] or activit[ies]" that receive federal funding. 42 U.S.C. § 18116(a); ECF 68 ¶ 113. For entities not principally engaged in the business of providing healthcare, the nondiscrimination provisions of Section 1557 apply to that entity's operations "to the extent it receives Federal financial assistance." 45 C.F.R. § 92.3(b); ECF 68 ¶ 115. Section 1557 does not contain listed prohibited grounds for discrimination itself but incorporates the nondiscrimination provision of Title IX of the Education Amendments of 1972 which prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681(a); ECF 68 ¶ 118. Multiple CEA members, including the Children's Center, are principally engaged in the business of providing healthcare who receive Federal

financial assistance (the "Healthcare Members") and are thus subject to Section 1557's nondiscrimination provisions. ECF 68 ¶¶ 71, 116–17. CEA's non-healthcare members are subject to HHS's mandate to the extent their health plan insurers and third-party administrators must comply. ECF 68 ¶¶ 30, 67, 162.

Since 2016, HHS has promulgated rules and notices insisting that Section 1557 prohibits gender identity discrimination by any entity principally engaged in providing healthcare that receives Federal financial assistance (referred to as the "HHS Gender Identity Mandate"). ECF 68 ¶¶ 122–43. The 2016 Rule required covered healthcare providers to perform gender transition services, even if those services were not medically necessary. Thus, if a healthy individual desired medical procedures to change features of his or her biological sex, the healthcare provider had to perform those services; or if the provider did not typically perform those services (i.e., did not specialize in them), the provider had to refer the individual to someone who did. ECF 68 ¶¶ 126–27; 2016 Rule, 81 Fed. Reg. at 31, 455. This means that a gynecologist that performs hysterectomies would have to revise its policy to provide hysterectomies to gender dysphoric women. 2016 Rule, 81 Fed. Reg. at 31, 455; *see also* ECF 68 ¶ 128. Litigation over the 2016 Rule ensued and in October 2019, a Texas district court entered final judgment, declaring the 2016 Rule violated the Administrative Procedure Act (APA) and RFRA. *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 945 (N.D. Tex. 2019); ECF 68 ¶ 129–30. The *Franciscan Alliance* plaintiffs asked the court for a nationwide injunction of the 2016 Rule, but the court declined and only vacated the gender identity language from the Rule. *Id.* Other religious parties sued in this Court in consolidated cases. *Religious Sisters of Mercy v. Burwell*, Case No. 3:16-cv-00386, Doc. No. 1 (D.N.D. Nov. 7, 2016); *Cath. Benefits Assoc. v. Burwell*, Case No. 3:16-cr-00432, Doc. No. 1 (D.N.D. Dec. 28, 2016); *Religious Sisters of Mercy*, 513 F. Supp. 3d at 1127–31 (explaining history).

In 2020, HHS issued a new rule that removed the 2016 Rule's gender identity language. ECF 68 ¶¶ 131–32. HHS stated in the 2020 Rule that it would not interpret Section 1557 (and Title IX as incorporated) as prohibiting discrimination on the basis of gender identity. ECF 68 ¶ 132. However, two district courts entered injunctions ordering HHS to reinstate the 2016 Rule's definition of "sex" to include gender identity, and they eliminated from the ACA the religious exemption protection from Title IX. *Walker v. Azar*, 480 F. Supp. 3d 417, 430 (E.D.N.Y. 2020), *modified by* 2020 WL 6363970 (E.D.N.Y. Oct. 29, 2020); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 64 (D.D.C. 2020); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. CV 20-1630 (JEB), 2021 WL 4033072 at *2 (D.D.C. Sept. 3, 2021); ECF 68 ¶¶ 133–34. Judge Welte enjoined applying this mandate to a group of Catholic employers under RFRA. *Religious Sisters of Mercy*, 513 F. Supp. 3d at 1127–31; ECF 68 ¶141.

Compounding the *Walker* and *Whitman-Walker Clinic* orders, and despite Judge Welte's RFRA ruling, President Biden signed an executive order on his first day in office requiring that Section 1557 and Title IX be interpreted nationwide to include gender identity as a protected trait. Executive Order No. 13,988, 86 Fed. Reg. 7023 (Jan. 20, 2021); ECF 68 ¶ 135. Effective May 10, 2021, HHS issued a Notification of Interpretation and Enforcement, stating that it would interpret and enforce Section 1557 as prohibiting discrimination on the basis of gender identity (as well as sexual orientation). ECF 68 ¶136. In effect, HHS's current interpretation and enforcement of Section 1557 is substantively the same as or more expansive than the 2016 Rule. ECF 68 ¶ 140. After this history, the Fifth and Eighth Circuits both affirmed permanent injunctions against the HHS Gender Identity Mandate on behalf of affected entities. ECF 68 ¶141; *Religious Sisters of Mercy*, 55 F.4th 583; *Franciscan All., Inc. v. Becerra*, 47 F.4th 368 (5th Cir. 2022).

The Gender Identity Mandate currently requires covered healthcare providers perform the following non-exclusive list:

a. Prescribe puberty blockers off-label from the FDA-approved indication to treat gender dysphoria and initiate or further transition in adults and children;

b. Prescribe hormone therapies off-label from the FDA-approved indication to treat gender dysphoria in all adults and children;

c. Provide other continuing interventions to further gender transitions ongoing in both adults and minors;

d. Perform hysterectomies or mastectomies on healthy women who believe themselves to be men;

e. Remove the non-diseased ovaries of healthy women who believe themselves to be men;

f. Remove the testicles of healthy men who believe themselves to be women;

g. Perform a process called "de-gloving" to remove the skin of a man's penis and use it to create a faux vaginal opening;

h. Remove vaginal tissue from women to facilitate the creation of a faux or cosmetic penis;

i. Perform or participate in any combination of the above mutilating cosmetic procedures to place a patient somewhere along the socially constructed gender identity spectrum;

j. Offer to perform, provide, or prescribe any and all such interventions, procedures, services, or drugs;

k. Refer patients for any and all such interventions, procedures, services, or drugs;

l. End or modify their policies, procedures, and practices of not offering to perform or prescribe these procedures, drugs, and interventions;

11

m. Say in their professional opinions that these gender intervention procedures are the standard of care, are safe, are beneficial, are not experimental, or should otherwise be recommended;

n. Treat patients according to gender identity and not sex;

o. Express views on gender interventions that they do not share;

p. Say that sex or gender is nonbinary or on a spectrum;

q. Use language affirming any self-professed gender identity;

r. Use patients' preferred pronouns according to gender identity, rather than using no pronouns or using pronouns based on biological sex;

s. Create medical records and coding patients and services according to gender identity, not biological sex;

t. Provide the government assurances of compliance, providing compliance reports, and posting notices of compliance in prominent physical locations, if the 2016 Rule's interpretation of the term sex governs these documents;

u. Refrain from expressing their medical, ethical, or religious views, options, and opinions to patients when those views disagree with gender identity theory or transitions;

v. Allow patients to access single-sex programs and facilities, such as mental health therapy groups, breastfeeding support groups, post-partum support groups, educational sessions, changing areas, restrooms, communal showers, and other single-sex programs and spaces, by gender identity and not by biological sex; and

w. Pay for or provide insurance coverage for any or all objectionable procedures, drugs, interventions, or speech.

ECF 68 ¶ 144.

The Healthcare Members are healthcare providers that receive Federal financial assistance and are thus under immediate threat of enforcement. ECF 68

12

¶ 145. The Healthcare Members would suffer by refusing Federal financial assistance because of the ubiquity of federally funded healthcare programs such as Medicaid and Medicare. ECF 68 ¶ 146. However, the Healthcare Members have religious, moral, ethical, conscientious, medical, and free speech objections to HHS Gender Identity Mandate. ECF 68 ¶ 149. The Healthcare Members currently do not have past or current policies or practices in their healthcare activities that comply with HHS Gender Identity Mandate and they wish to continue their current policies and practices in the future, rather than change their practices to conform to the government's mandate. ECF 68 ¶ 148. Further, HHS currently recognizes no RFRA exemptions under its interpretation of Section 1557 except those ordered by a court. ECF 68 ¶¶ 137–38, 157–58. The Healthcare Members are thus under an immediate threat of enforcement of HHS Gender Identity Mandate. ECF 68 ¶¶ 116, 143, 145. Failure to comply with the Gender Identity Mandate may result in loss of Federal funding, investigation by OCR or the Attorney General, private right of action civil liability, civil liability to the government, debarment from doing business with the federal government, attorney's fees, civil penalties, False Claims Act liability, and criminal penalties. ECF 68 ¶¶ 152–55, 159.

## PROCEDURAL HISTORY

This Court granted CEA preliminary relief. ECF 39. The government appealed, but eventually dismissed their appeal after losing and not seeking Supreme Court review in the *Religious Sisters* appeal. After good faith efforts to negotiate a settlement, the parties informed the Court they did not believe an

13

agreement was possible. ECF 67. Plaintiff filed its amended verified complaint on October 16, 2023. ECF 68.[1]

## STANDARD FOR GRANTING THE MOTION

"Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 804 (8th Cir. 2019) (citing Fed. R. Civ. P. 56(a)). The Court thus may grant a permanent injunction when "nothing remains … to resolve regarding the underlying facts" and the parties "disagree only on questions of law." *Bank One, Utah v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999). "The standard for granting a permanent injunction is essentially the same as for a preliminary injunction, except that to obtain a permanent injunction the movant must attain success on the merits." *Id.* A permanent injunction is thus appropriate when a party shows (1) actual success on the merits and when the equities favor relief, considering (2) a threat of irreparable harm to the movant, (3) the balance of harms between the parties, and (4) the public interest. *Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*, 801 F.3d 927, 936–37 (8th Cir. 2015), *vacated on other grounds*, *Dep't. of Health & Human Servs. v. CNS Int'l Ministries*, No. 15-775, 2016 WL 2842448 (U.S. May 16, 2016). In addition, declaratory relief is appropriate under the same circumstances to "clarify the relations between the parties and eliminate the legal uncertainties that gave rise to this litigation." *Levin v. Harleston*, 966 F.2d 85, 90 (2d Cir. 1992); *see also* 13C Wright, Miller & Cooper, Federal Prac. & Proc. Juris. § 3533.5 (3d ed.).

---

[1] Pursuant to the Court's order, the parties reached out to Magistrate Judge Hochhalter's chambers and submitted times for a scheduling conference on October 10, 2023, but as of the date of this filing no conference has been scheduled.

## ARGUMENT

Because CEA meets the requirements for permanent injunctive and declarator relief, it is appropriate to enter partial summary judgment. *Cf. Christian Emps. All. v. Azar*, No. 3:16-cv-309, 2019 WL 2130142 at *6 (D.N.D. May 15, 2019) (granting permanent injunctive and declaratory relief against HHS's abortifacient insurance coverage mandate).

## I.     CEA is entitled to final relief on the merits.

### A.     Both Mandates violate RFRA.

This Court has already ruled on the RFRA legal issues present in CEA's motion for a preliminary injunction, ECF 39, and Judge Welte ruled similarly in *Religious Sisters*, 513 F. Supp. 3d at 1153–54. There are no meaningful differences between those decisions and the issues raised here.

RFRA prohibits the EEOC and HHS from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability," unless the government proves that the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1.

The EEOC Coverage and HHS Gender Identity Mandates violate RFRA for three reasons: (1) CEA members exercise their religion by not performing gender transition services and by not providing health insurance covering those services; (2) both mandates substantially burden that exercise; and (3) the government lacks a compelling interest furthered by the least restrictive means.

#### 1.     CEA members' health insurance and medical care decisions are the exercise of religion, protected by RFRA.

The exercise of religion under RFRA "involves 'not only belief and profession but the performance of (or abstention from) physical acts.'" *Burwell v. Hobby Lobby*

*Stores, Inc.*, 573 U.S. 682, 710 (2014) (quoting *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990)). In *Hobby Lobby*, the Supreme Court held that employers exercised religion within the meaning of RFRA when they objected to covering certain items in their employee healthcare plans. 573 U.S. at 720.

Under this standard, CEA members exercise their religion when they seek to exclude coverage for gender transition services that conflict with their religious beliefs. And the CEA members that provide healthcare services—the Healthcare Members—exercise their religion when they provide healthcare services to individuals but exclude performing or referring for gender transition services. The Healthcare Members also exercise their religion by offering their full and frank medical opinions on sex and gender, by sharing their medical, ethical, and religious positions on gender transitions, and by not affirming false gender narratives, such as by using inaccurate pronouns or by mis-coding patients in charts and records.

CEA members believe that "[m]ale and female are immutable realities defined by biological sex" and that "[g]ender reassignment is contrary to Christian Values." ECF 68 ¶¶ 32–34; ECF 68-1, art. I, §§ 1.1.8, 1.3.5. Thus, performing (or referring for or affirming), and providing healthcare coverage for, gender transition services cuts directly against their religious beliefs. CEA members' provision of healthcare services and healthcare plans that reflect their own religious beliefs constitutes the exercise of religion protected by RFRA.

### 2.    Both Mandates substantially burden CEA members' exercise of religion.

The government's mandates burden CEA members' exercise of religion. The government substantially burdens the exercise of religion when: (1) non-compliance would have "substantial adverse practical consequences" on the party exercising its religion, or (2) compliance would "cause the objecting party to violate its religious beliefs, as it sincerely understands them." *Religious Sisters*, 513 F. Supp. 3d at 1147

(quoting *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2389 (2020) (Alito, J., concurring); *accord Hobby Lobby*, 573 U.S. at 720–26. CEA meets both factors here.

This Court correctly held the mandate burden CEA and its members. "It is completely undisputed that the Plaintiffs, compelled by fines and civil liability, must perform or provide coverage for gender transition procedures." ECF 39 at 16. The Court was correct, for several reasons.

First, if CEA members disregard the EEOC Coverage Mandate, they will face substantial adverse practical consequences. Noncompliance would likely lead to CEA members incurring civil liability under 42 U.S.C. § 2000e-5, including EEOC investigations, lawsuits brought by both the EEOC and private parties, attorney's fees and punitive damages, and potential orders to violate their beliefs. Likewise, if the Healthcare Members disregard the HHS Gender Identity Mandate, they may lose federal funding, would have to defend lawsuits brought by private citizens, would face investigations brought by the OCR or the Attorney General, may incur False Claims Act liability, and could even face criminal penalties. 20 U.S.C. § 1682; 31 U.S.C. § 3729; 18 U.S.C. § 1035. And even though CEA members face many adverse practical consequences for noncompliance, the mere possibility of having to pay significant monetary penalties—such as punitive damages and attorney's fees— by itself "indisputably qualifies as a substantial burden." *Religious Sisters*, 513 F. Supp. 3d at 1147 (quoting *Sharpe Holdings*, 801 F.3d at 937).

Second, CEA members cannot comply with the EEOC Coverage Mandate or the HHS Gender Identity Mandate without violating their sincerely-held religious beliefs. As detailed above, CEA members believe that God purposefully created persons either as a male or female, that one's God-given sex is immutable and unchangeable, and that they cannot pay for, provide, perform, refer for, offer, or facilitate access to gender transition services. ECF 68 ¶¶ 32–34; ECF 68-1, art. I, §§

17

1.1.8, 1.3.5. These beliefs are not for the government to second-guess. *See Hobby Lobby*, 573 U.S. at 724 (declining to decide whether a religious belief is "reasonable" and explaining that the Court will not address "important question[s] of religion and moral philosophy"); *Religious Sisters*, 513 F. Supp. 3d at 1147 (noting it is not the court's "domain" to question the "sincerity" of religious beliefs).

As Judge Welte held in *Religious Sisters*, "[b]ecause the interpretations of Section 1557 and Title VII threaten to penalize" CEA members "for adhering to their beliefs, a substantial burden weighs on the exercise of religion." 513 F. Supp. 3d at 1147–48; *see also Franciscan All., Inc. v. Becerra*, No. 553 F. Supp. 3d 361, 374 (N.D. Tex. 2021) (the government did not dispute "that the current Section 1557 regulatory scheme threatens to burden Christian Plaintiffs' religious exercise in the same way as the 2016 scheme").

**B.      Both Mandates fail strict scrutiny under RFRA.**

Because the government's mandates substantially burden CEA members' exercise of religion, they are valid under RFRA only if they satisfy strict scrutiny, but neither mandate furthers a compelling governmental interest by the least restrictive means. 42 U.S.C. § 2000bb-1(b); *Hobby Lobby*, 573 U.S. at 726.

**1.      Neither Mandate furthers a compelling governmental interest.**

The government bears the burden of establishing a compelling interest. Any purported "compelling interest" must be "of the highest order." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Moreover, "[b]roadly formulated" or "sweeping governmental interests are inadequate." *Sharpe Holdings*, 801 F.3d at 943 (citations omitted). Rather, Defendants must prove that they have a compelling interest in applying the mandates to CEA members—"the particular claimant[s] whose sincere exercise of religion is being substantially

burdened." *Hobby Lobby*, 573 U.S. at 726 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006)). This requires the government to prove not that they have a compelling interest in enforcing the EEOC Coverage and HHS Gender Identity Mandates generally, but that they have such an interest in denying an exemption to CEA members. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1882 (2021).

This Court held that the government cannot satisfy its burden. "Defendants must demonstrate a compelling interest to the Alliance's substantial burden and have failed to do so." ECF 39 at 17. The Court noted that the government's main defense was that it says it "will comply with RFRA but cannot predict ahead of time how RFRA will apply to the facts of a particular matter." *Id*. at 16. But the Court explained, "Religious freedom cannot be encumbered on a case-by-case basis." *Id*.

The Court was correct. The government has no valid interest—let alone a *compelling* one—in mandating that third parties perform, affirm, or pay for another person's gender transition surgeries and procedures. Indeed, Judge Welte suggested as much in *Religious Sisters*, expressing "serious doubts that a compelling interest exists." 513 F. Supp. 3d at 1148. To be sure, the Court acknowledged that the EEOC asserted a "compelling interest in combating discrimination in the workforce," and HHS asserted an interest "in ensuring nondiscriminatory access to healthcare." *Id*. (citations omitted). But it concluded that such broadly stated interests could not justify the mandates. *Id*. The Court instead "scrutinize[d] the asserted harm of granting specific exemptions to particular religious claimants and to look to the marginal interests in enforcing the challenged government action in that particular context." *Id*. (quoting *Holt v. Hobbs*, 574 U.S. 352, 363 (2015) (cleaned up)). But neither the EEOC nor HHS showed how exempting the *Religious Sisters* plaintiffs would harm the government's interests. *Id*.; *see also Franciscan All.*, 553 F. Supp. 3d at 376 (cleaned up) ("government asserts no harm in granting specific

19

exemptions to Christian Plaintiffs"). On appeal, the government did not claim in *Religious Sisters* that it had any arguments meeting strict scrutiny, raising only standing questions. 55 F.4th at 588. So too here. The government's "broadly formulated" and generic interests in preventing workplace discrimination and nondiscriminatory access to healthcare do not justify the infringement of CEA's and its members' beliefs. *O Centro*, 546 U.S. at 431.

The many exemptions to each mandate also undermine any governmental interest. A "law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Religious Sisters*, 513 F. Supp. 3d at 1148 (quoting *281 Care Comm. v. Arneson*, 766 F.3d 774, 787 (8th Cir. 2014)). The government's "creation of a system of exceptions" "undermines" the argument that its interest in nondiscrimination "can brook no departures." *Fulton*, 141 S. Ct. at 1882. The EEOC Coverage and HHS Gender Identity Mandates "leave gaps," *id*., for example by not applying to the government's own healthcare programs, such as the military's TRICARE health insurance. See TRICARE Policy Manual 6010.60-M, Chapter 7, § 1.2 at 4.1 (Issued: Sept. 6, 2016, revised Nov. 15, 2017), ECF 6-3 (excluding coverage for sex gender change surgery). Thus, the U.S. military—an employer to which Title VII applies, *see* 42 U.S.C. § 2000e-16—is exempt from having to provide health insurance that covers gender transition surgeries, but CEA members are not. The EEOC Coverage Mandate also exempts broad categories of employers, including: employers that employ fewer than 15 employees, 42 U.S.C. § 2000e(b); "an employer with respect to the employment of aliens outside any State," *id*. § 2000e-1(a); and employers "with respect to an employee in a workplace in a foreign country" if compliance would violate the law of that foreign country, *id*. § 2000e-1(b).

Likewise, the HHS Gender Identity Mandate exempts healthcare providers that are not principally engaged in providing healthcare and those that do not

receive Federal funds. 45 C.F.R. § 92.3(b). A religious healthcare provider that receives Federal funds is "comparable" to a healthcare provider (religious or not) that does not receive Federal funds because any government interest in "ensuring nondiscriminatory access to healthcare" would equally apply to private services. *Religious Sisters*, 513 F. Supp. 3d at 1148. But HHS treats the unfunded secular healthcare provider more favorably than the funded religious healthcare provider. It does not matter that it treats funded secular healthcare providers the same. *See Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) ("[i]t is no answer that [the government] treats some comparable secular businesses or activities as poorly as or even less favorably than the religious exercise at issue"). The HHS Gender Identity Mandate also incorporates multiple categorical statutory exemptions. *See id.* 45 C.F.R. § 92.6 (incorporating the exemptions listed in Title VI, VII, IX, and various other statutes). And notably, HHS's argument that it *might later* consider CEA members exempt under RFRA *itself* demonstrates that the government has no compelling interest to deny an exemption to plaintiffs. *Fulton*, 141 S. Ct. at 1882 ("The creation of a system of exceptions . . . undermines the City's contention that its non-discrimination policies can brook no departures.").

In addition, the government can claim no compelling interest in regulating speech, given that First Amendment speech protections extend to "professionals," such as healthcare providers. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371–72 (2018); *see also Conant v. Walters*, 309 F.3d 629, 636 (9th Cir. 2002) ("An integral component of the practice of medicine is the communication between a doctor and a patient. Physicians must be able to speak frankly and openly to patients."). But the mandate restricts the Healthcare Members from giving their sound medical opinions, judgment, and informed consent on gender transition services. *See* 2016 Rule, 81 Fed. Reg. at 31,435. HHS has explained that categorizing gender transition services as "experimental" "is outdated and not based

on current standards of care." *Id.* at 31,435. The mandate also requires the Healthcare Members to affirm transgender identities and to use a person's "preferred pronoun." *Id.* at 31,406. Not only is this unworkable from a practical perspective, but it is also unconstitutional. *See, e.g.*, *United States v. Varner*, 948 F.3d 250, 257 (5th Cir. 2020) (discussing the several pronouns created for gender-dysphoric persons and that requiring preferred pronoun usage would "hinder communication" and is a "quixotic undertaking"); *United States v. Thomason*, 991 F.3d 910, 915 (8th Cir. 2021) (acknowledging there is no precedent that courts and litigants must use preferred pronouns).

Simply put, the HHS Gender Identity Mandate "mandates orthodoxy, not anti-discrimination." *Ward v. Polite*, 667 F.3d 727, 735 (6th Cir. 2012). The government may not "force an individual to speak in ways that align with its views but defy her conscience about a matter of major significance." *303 Creative LLC v. Elenis*, 600 U.S. 570, 602–03 (2023). The "First Amendment interests are especially strong," especially on the use of pronouns, because the speech reflects core religious beliefs and protected exercise. *Meriwether v. Hartop*, 992 F.3d 492, 509 (6th Cir. 2021). No compelling interest can exist for such a mandate under RFRA.

### 2. Neither Mandate is the least restrictive means of furthering a compelling governmental interest.

The EEOC Coverage Mandate and HHS Gender Identity Mandate also fail strict scrutiny because there are many less restrictive ways to achieve any asserted interest. "To satisfy the least restrictive means test, the government must 'come forward with evidence' to show that its policies 'are the only feasible means . . . to achieve its compelling interest." *Religious Sisters of Mercy*, 513 F. Supp. 3d at 1148 (quoting *Sharpe Holdings*, 801 F.3d at 943). This test is "exceptionally demanding." *Hobby Lobby*, 573 U.S. at 728. The government meets it only "if no alternative forms of regulation would accomplish those interests without infringing on a

claimant's religious-exercise rights." *Religious Sisters*, 513 F. Supp. 3d at 1148 (internal quotation marks omitted) (quoting *Sharpe Holdings*, 801 F.3d at 943).

Here, several alternative forms of regulation could accomplish any claimed governmental interest while still respecting religious freedom. "'[T]he most straightforward way of doing this would be for the Government to assume the cost of providing gender-transition procedures for those 'unable to obtain them under their health-insurance policies due to their employers' religious objections.'" *Religious Sisters*, 513 F. Supp. 3d at 1149 (quoting *Hobby Lobby*, 573 U.S. at 728). The government could provide "subsidies, reimbursements, tax credits, or tax deductions to employees" for these procedures or could pay for them "at community health centers, public clinics, and hospitals with income-based support." *Sharpe Holdings*, 801 F.3d at 945. Finally, the government can offer insurance coverage for these services through its own healthcare exchanges, "treat[ing] employees whose employers do not provide complete coverage for religious reasons the same as it does employees whose employers provide no coverage at all." *Religious Sisters*, 513 F. Supp. 3d at 1149. (quoting *Sharpe Holdings*, 801 F.3d at 945).

If the government wishes to make obtaining gender transition services from healthcare providers easy, it can help individuals wanting those services find the many places that provide them. *Religious Sisters*, 513 F. Supp. 3d at 1149. After all, there is a "growing number of healthcare providers who offer and specialize in those services." *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 693 (N.D. Tex. 2016). And once the government locates a provider, it can then help pay for the costs of those procedures. *Id*. The government even could partner with these specialists, ensuring easy and affordable access, with no risk of provider objections.

## II.     CEA has standing and this case is ripe.

CEA's members need not sit back and wait for enforcement under Title VII or Section 1557 to suffer an Article III injury. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("*SBA List*"). Rather, a plaintiff can challenge a law's constitutionality before he faces prosecution or enforcement. *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 749 (8th Cir. 2019).

### A.     CEA faces a credible threat of injury.

Standing requires three elements: (1) an injury in fact, (2) that is traceable to defendants, and (3) that is redressable by judicial relief. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). The injury in fact element is satisfied—and a pre-enforcement suit proper—if "there is a substantial risk that the harm will occur." *SBA List*, 573 U.S. at 158. (citation and quotation marks omitted). Under *SBA List*, "a plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id.* at 159 (citation and quotation marks omitted). This standard is "forgiving" and "lenient" when a party brings First Amendment challenges. *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699–700 (8th Cir. 2021). CEA satisfies each *SBA List* factor.

#### 1.     CEA members engage in conduct affected with constitutional interests.

First, CEA members "inten[d] to"—and do—"engage in a course of conduct arguably affected with a constitutional interest." *SBA List*, 573 U.S. at 159. CEA members, as employers, offer health insurance coverage to employees that reflect their Christian faith and convictions. ECF 68 ¶¶ 44, 53, 58–61. And CEA's Healthcare Members perform medical services consistent with their faith and

24

convictions. ECF 68 ¶¶ 55, 58–61. These behaviors are affected with constitutional interests under the Free Exercise Clause and the Free Speech Clause of the First Amendment (and, notably, the religious exercise protections of RFRA, which are derivative of the Free Exercise Clause). Because CEA members' religious exercise and speech guide their current and future provision of health insurance and medical services, "it is certainly affected with [] constitutional interest[s]." *SBA List*, 573 U.S. at 162 (citation and quotation marks omitted). As a result, all of CEA's claims are affected with a constitutional interest, "regardless of the precise legal theory." *Telescope Media*, 936 F.3d at 750.

### 2. CEA's members' conduct is arguably proscribed by the government's Mandates.

Second, CEA members' religiously guided provision of health insurance coverage and medical services are "arguably proscribed" by the government's enforcement of Section 1557 and Title VII through the EEOC Coverage Mandate and HHS Gender Identity Mandate. Indeed, it is clear both from Judge Welte's order in *Religious Sisters*, and from the government's own pronouncements in May and June of 2021, that the government emphatically believes that both Title VII and Section 1557 require health insurance coverage of gender transition services, and that Section 1557 requires health care providers to perform gender transition interventions and to speak to and about patients consistent with their gender identity even where it conflicts with their biological sex.

Section 1557's regulation—and the Gender Identity Mandate contained therein—has been on the books since 2016. Indeed, Judge Welte resolved this question, noting that, "HHS tried to repeal the 2016 Rule's explicit prohibition on gender identity discrimination . . . [b]ut that repeal never took effect." *Religious Sisters*, 513 F. Supp. 3d at 1138 (quotation marks omitted) (discussing *Walker v. Azar*, 480 F. Supp. 3d 417, 430 (E.D.N.Y. 2020), as modified by 2020 WL 6363970

(E.D.N.Y. Oct. 29, 2020), and *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1 (D.D.C. 2020)). *Walker* and *Whitman-Walker* "reinstate[d] the prior definition of 'on the basis of sex' to include 'gender identity' and 'sex stereotyping.'" *Id*.

As if to affirm CEA's view, the government declared in May 2021 that it will "interpret and enforce Section 1557's prohibition on discrimination on the basis of sex to include: . . . discrimination on the basis of gender identity." HHS, Notice of Interpretation and Enforcement, 86 Fed. Reg. 27,984, 27,985 (May 25, 2021). This is consistent with what the government declared in the 2016 Rule, which candidly explains that because the rule prohibits gender identity discrimination, a healthcare provider cannot decline to perform gender transition services. See 2016 Rule, 81 Fed. Reg. at 31,455 (explaining a provider would have to perform a hysterectomy for a transgender man). The government's prior briefing in this case even maintains that *Bostock* requires it to impose this prohibition of CEA members' conduct. ECF 18 at 24. That insistence definitively resolves the question of whether CEA's Healthcare Members' categorical exclusion of gender transition services from their health practices is "arguably proscribed" by the government's Mandates. It is.

Thus, as the *Franciscan Alliance* court declared, "[t]he 2021 Interpretation effectuates a legal Penrose staircase to enforce Section 1557 in the near identical way as, if not an enhanced version of, how the 2016 Rule dictated." 553 F. Supp. 3d at 373. And, because Section 1557 applies to all operations of a healthcare entity, 45 C.F.R. § 92.3(b), by its plain text, it "arguably proscribes" CEA members' conduct. *See SBA List*, 573 U.S. at 162 (finding the text of the law at issue "swe[pt] broadly" and "arguably proscribed" petitioners' speech).

The same is true for Title VII. The EEOC has not wavered from its decade-old interpretation and enforcement of its Title VII coverage mandate, requiring gender transition services coverage in employer provided health insurance. Other courts have held that the kind of conduct described of CEA members here violates

Section 1557 and Title VII. *See Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 953 (D. Minn. 2018) ("Section 1557 also prohibits discrimination on the basis of gender identity"); *Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1030 (D. Alaska 2020) (health plan that excluded coverage of vaginoplasty and mammoplasty for transgender persons was "discriminatory on its face").

### 3.   There is a credible threat of enforcement.

CEA's members face a credible threat of enforcement. This Court already reached this conclusion. "Defendants admitted there have been complaints," and CEA's members "do not need to wait until enforcement has commenced for there to be an injury." ECF 39 at 10. "Government harassment of religious organizations requiring them to prove they are religious or evaluating whether their religious preferences can withstand a case-by-case analysis is a sufficient injury." *Id*.

The Court was correct for several reasons. First, "[w]hen a statute is challenged by a party who is a target or object of the statute's prohibitions, there is ordinarily little question that the statute has caused him injury." *St. Paul Area Chamber of Com. v. Gaertner*, 439 F.3d 481, 485 (8th Cir. 2006) (cleaned up). A credible threat of enforcement arises "when a course of action is within the plain text of a statute." *Religious Sisters*, 513 F. Supp. 3d at 1139 (citation omitted). *Religious Sisters* readily found healthcare plaintiffs to be the "objects of Section 1557 and its implementing regulations," and employers with more than 15 employees as falling "squarely within Title VII's reach." *Id*. at 1136, 1141. HHS requires the Healthcare Members at once to revise their written policies to affirm and offer gender transition services, irrespective of the provider's religious beliefs, medical judgment, or ethical concerns. See 2016 Rule, 81 Fed. Reg. at 31,455 ("A provider specializing in gynecological services that previously declined to provide a medically necessary hysterectomy for a transgender man would have to revise its

policy to provide the procedure for transgender individuals in the same manner it provides the procedure for other individuals.").

Second, the EEOC has long enforced its interpretation of Title VII. *See EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 585 (6th Cir. 2018). This includes specifically requiring gender transition health insurance coverage. *Fletcher*, 443 F. Supp. 3d at 1028 (concerning a categorical exclusion of gender transition services from a health insurance plan). As to HHS, in 2016 multiple complaints were filed against religious entities for refusing to provide gender transition services—and HHS investigated such claims. *See* Complaint, *Conforti v. St. Joseph's Healthcare System, Inc.*, No. 2:17-cv-00050, 2017 WL 67114 at ¶ 81 (D.N.J. Jan. 5, 2017) (showing HHS investigating claim against Catholic hospital for not performing gender transition surgery); Administrative Complaint, *ACLU v. Ascension Health*, U.S. Dep't of Health & Human Servs., Office for Civil Rights (Oct. 25, 2016), *available at* https://perma.cc/26A8-7G95.

Only a "[t]otal lack of enforcement . . . in extreme cases approaching desuetude" can undermine standing. *281 Care Comm. v. Arneson*, 638 F.3d 621, 628 (8th Cir. 2011). Even in-court assurances of non-enforcement by the government do not negate standing. *See Rodgers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019). But the opposite exists here: in May and June, 2021, the government insisted it will enforce and is enforcing these Mandates, and in this case the government refuses to disavow enforcement of these Mandates. The government's "general commitment to follow preexisting religious freedom and conscience protections [cannot] thwart standing." *Religious Sisters*, 513 F. Supp. 3d at 1140.

Third, the credible threat of enforcement is "bolstered" by the fact anyone can file a complaint against a CEA member, causing administrative investigations—which is itself "harm sufficient to justify pre-enforcement review." *SBA List*, 573 U.S. 164–65. Being subject to an HHS or EEOC investigative procedure "provides

28

substantial additional support for the conclusion" that this case is "justiciable." *Id*. at 166 (citation omitted). And the threat of those investigatory burdens imposes substantial pressure on entities to violate their religious beliefs under RFRA. Finally, as noted, the Section 1557 rule restricts the free speech of Healthcare Members, rendering the injury inquiry here "forgiving" and "lenient." *Turtle Island Foods*, 992 F.3d at 699–700.

### B.   RFRA authorizes this suit.

The government's earlier rebuttal, ECF 18, seemed to contend that because RFRA *might* shield a members' conduct (the government refuses to say RFRA will *actually* shield them), it is unclear whether Title VII or Section 1557 proscribe their conduct, or that there is a credible threat of enforcement.

The government's position is untenable. Initially, the injury in fact standard asks whether legal requirements "arguably" apply to CEA members, not whether they do apply if one considers RFRA. *SBA List*, 573 U.S. at 160. More fundamentally, the government's view would largely negate the RFRA statute. RFRA says a person whose religious exercise has been burdened "may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1. As "relief," a court may order an exemption, as happened in *Religious Sisters*. But the government reads the "relief" language out of RFRA and insists a plaintiff must wait to raise RFRA in response to specific enforcement, that is, only as a defense. That position cannot be reconciled with the circuit's *Religious Sisters* ruling, or the decade of litigation over the Affordable Care Act's contraceptive mandate. *See, e.g.*, *Christian Emps. All.*, 2019 WL 2130142; *Dordt College v. Burwell*, 801 F.3d 946 (8th Cir. 2015); *Hobby Lobby*, 573 U.S. 682. The Mandates here unequivocally prohibit any categorical exclusion or limitation on providing gender transition services as being "unlawful on its face."

2016 Rule, 81 Fed. Reg. at 31,429. CEA's members categorically exclude or limit the provision of or payment for gender transition interventions.

In both of these mandates, the government has imposed "a concrete application of a policy"—it cannot avoid judicial review by generically claiming it will respect RFRA and might exempt CEA members later. *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 865 (8th Cir. 2013). Such "hedging" of mandates "within a disclaimer about hypothetical future contingencies" is insufficient to defeat standing because it "does not insulate regulated entities from the binding nature of the obligations and similarly cannot serve to inoculate the agency from judicial review." *Id*. These bans on plaintiffs' behavior is not "somehow transformed into something less than a prohibition" merely because the government "couches an interdiction within a pro forma reference to state discretion." *Id*.

The government may also claim that this Court should not proceed to final judgment in this case because HHS may issue yet another rule that imposes this same Section 1557 mandate and that again provides no religious exemptions. *See* HHS, Nondiscrimination in Health Programs and Activities, 87 Fed. Reg. 47,824 (Aug. 4, 2022). First, that contingency has nothing to do with the EEOC's mandate. Second, the proposed rule proves the plaintiffs face the same injury because the rule proposes to impose a nationwide gender identity mandate—it backs away from that mandate not an inch. Third, nothing requires HHS to finalize a proposed rule, or to do it within any specific timeframe, so delay would be based on indefinite speculation. Fourth, the same rule was pending when the Eighth Circuit affirmed permanent RFRA relief in *Religious Sisters*, and the circuit did not delay. Fifth, this Court has already held that HHS does not sufficiently respect plaintiffs' RFRA rights merely by saying it will consider their religious objections on a case-by-case basis. "Religious freedom cannot be encumbered on a case-by-case basis.... Determining on a case-by-case basis if a religious exemption should apply is

certainly not the least restrictive means." ECF 39 at 16–17. A proposal to do so does not negate plaintiffs' entitlement to relief. Finally, plaintiffs' RFRA claim applies to any violation committed by the government's attempts to enforce Section 1557 and Title VII, and those statutes will not change. On the contrary, HHS's proposed rule proves that CEA and its members face exactly the same harm from Defendants that complaint identifies.

### C.   CEA members' injury is traceable to the government, and a favorable ruling from this Court will redress their harm.

CEA members' injury is traceable to the government because it "possess[es] authority to enforce the complained-of provision[s]." *Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017). In *Religious Sisters*, the Court held HHS had authority to enforce Section 1557, and the EEOC had authority to enforce Title VII, so the injury was caused by the government. 513 F. Supp. at 1139, 1142. So too here.

The government cannot avoid judicial review by blaming the injury on the underlying statutes and not on their agency action, for two reasons. *See* ECF 18 at 20. First, whether Title VII and Section 1557, or the agencies' rules and policies, prohibit CEA members from refusing gender transition coverage and services is a merits question—and therefore it is not appropriately considered in reviewing standing. *Turtle Island Foods*, 992 F.3d at 699; *Am. Farm Bureau Fed'n v. E.P.A.*, 836 F.3d 963, 968 (8th Cir. 2016). Second, whether the Mandates originate from the statutes or agency rules and policies does not change the fact that the government Defendants "possess authority to enforce the complained-of provision[s]" under *Calzone*, 866 F.3d at 869. The "relevant inquiry is whether" CEA's injury "can be traced to allegedly unlawful conduct of the defendant[s], not to the provision of law that is challenged." *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021). Here, the injury derives from the agencies' authority to enforce the Mandates.

Redressability is not lacking simply because CEA's requested injunction would not stop private persons from instituting complaints. Injunctive relief against the agencies' illegal rules and actions provides some relief—real relief—from "a discrete injury" traceable to the government. That establishes redressability. *281 Care,* 638 F.3d at 631 (citation omitted). CEA members "need not show that a favorable decision will relieve [their] *every* injury." *Id.* (emphasis in original).

### D.   CEA has associational standing on behalf of its members.

The government cannot evade relief by claiming that CEA does not have associational standing. This Court held that CEA met the standards for associational standing. ECF 39 at 8–9. "Plaintiff's members would have standing to sue as they have an injury with a causal connection to the conduct that is complained of, *i.e.,* they will be imminently injured by forcing to choose between complying with the requirements of the EEOC or HHS or choosing their sincerely held religious beliefs." In addition, "part of the Alliance's purpose is 'to support Christian employers and develop strategies for them, so that they, as part of their religious witness and exercise may provide health or other employment related benefits to their respective employees and engage in other employment practices in a manner that is consistent with Christian values.' " *Id.* at 9. It also held that members may be unnamed. *Id.* at 8–9 (citing *Disability Rights Wis., Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 802 (7th Cir. 2008); *Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999)). This Court noted that the case was ripe, as the mandates are in effect. ECF 39 at 9–10.

This Court's ruling was correct. In *Religious Sisters* the Eighth Circuit confirmed that identifying "at least one identified member" is sufficient. 55 F.4th at 601–02 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). CEA submitted this evidence. Its amended verified complaint and earlier submitted

affidavit name two members that are not plaintiffs in this case and that are injured by the mandates in this case. ECF 68 ¶¶ 62–75; *see also* ECF 31-1 ¶¶ 6–16. Both are employers subject to the EEOC, and HHS regulates insurance plans and TPAs of employer-sponsored healthcare coverage. One is also a healthcare provider subject to HHS's mandate in medical care. CEA has also identified a member in Arkansas with over 300 employees in another case in this circuit. *State of Mo. v. Biden*, No. 21-3494 (8th Cir. Motion, Exh. J. at 3. Decl. of Shannon O. Royce, filed Nov. 5, 2021). CEA's verified complaint pleads that all their members now, and any members admitted in the future, ascribe to CEA's beliefs concerning this case. ECF 68 ¶¶ 31–61.

CEA need not name additional members. In *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, the Eighth Circuit afforded relief to an organization of parents identified members anonymously. 83 F.4th 658, 664, 669 (8th Cir. 2023); *see also Am. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2390 (2021) (Thomas, J., concurring) ("the right to associate anonymously" protects First Amendment interests).

### E.    CEA's RFRA claims are ripe.

Article III standing and ripeness often "boil down to the same question." *SBA List*, 573 U.S. at 157, n. 5 (citation omitted). The government's ripeness arguments mirror its standing arguments. As in *Religious Sisters*, this case is fit for judicial resolution because no further factual development is needed to issue an injunction at this stage. 513 F. Supp. 3d at 1145–46. CEA has set forth the necessary facts under oath in both its complaint and in the motion, and this case "present[s] purely legal questions." *Id.* (citation omitted). Denying judicial review would inflict "significant practical harm" on CEA members by forcing them to either follow their religious beliefs or face serious and harsh penalties under the statutes. *Id.*

33

### III.    The other injunction factors also weigh in favor of CEA.

Because CEA members are likely to succeed on their RFRA claims, it meets the other injunction factors. "A[] RFRA violation is comparable to the deprivation of a First Amendment right." *Religious Sisters*, 513 F. Supp. 3d at 1152. Thus, "[w]hen a plaintiff has shown a likely violation of his or her First Amendment rights" or a violation of RFRA, "the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc) (internal quotation marks and citation omitted); *Religious Sisters*, 513 F. Supp. 3d at 1153. Because CEA members are likely to succeed on their RFRA and First Amendment claims, precedent deems the other preliminary injunction factors satisfied.

As this Court found in the preliminary injunction, CEA members will suffer "a very real irreparable harm" absent permanent injunctive relief. ECF 39 at 14. "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Here, the mandates compel CEA members to perform and cover gender transition services in violation of their religious beliefs, convictions, and practices. Because CEA's member's behavior is arguably proscribed and presents a credible threat of enforcement, and CEA is likely to succeed on its claims, irreparable harm is present. *See Marcus v. Iowa Pub. Television,* 97 F.3d 1137, 1140 (8th Cir. 1996).

The balance of the harms also favors CEA. Without injunctive relief, the government can and will enforce the mandates against CEA members, causing them to suffer irreparable injury by forcing them to perform and pay for gender transition services that contradict their religious beliefs and thus undermine their religious exercise. On the other hand, as this Court held, the potential harm to the government "is minimal at best." ECF 39 at 14. The injunction will only prevent

34

Defendants from enforcing the mandates against current and future CEA members. The government is not harmed by being prohibited from enforcing an unconstitutional law. *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (defendant is not "harmed by issuance of a preliminary injunction which prevents it from enforcing a regulation, which, on this record, is likely to be found unconstitutional.").

Likewise, a permanent injunction will advance the public interest. "[I]t is always in the public interest to protect constitutional rights." *Carson v. Simon*, 978 F.3d 1051, 1061 (8th Cir. 2020) (internal quotation marks and citation omitted); *see also Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("[I]njunctions protecting First Amendment freedoms are always in the public interest."). "Religious freedoms are at the heart of this case. It is in the public interest to ensure these rights are not violated. The public interest factor weighs in favor of Plaintiff." ECF 39 at 17.

Finally, relief should extend to CEA itself and to its current and future members. Judge Hovland held, in an earlier ruling for CEA, that there is "little rationale for limiting the injunction to current members" since it would "result in an endless cycle of litigation as new members and the Alliance seek to protect their rights." *Christian Emps. All.*, 2019 WL 2130142 at *4. It is appropriate for relief to extend to current and future members, assuming that (1) each member was not yet protected from the mandates by any other judicial order; (2) the member meets CEA's strict membership criteria, (3) CEA's membership criteria do not change, and (4) the member is not subject to an adverse ruling on the merits in another case involving the mandates. *Id.* at *6–7; *see also Catholic Benefits Ass'n v. Hargan*, No. CIV-14-240-R, ECF 184 at 2 (W.D. Okla. March 7, 2018) (permanent injunction against contraceptive mandate for present and future CBA members); *Reaching Souls Int'l, Inc. v. Azar*, No. CIV-13-1092-D, 2018 WL 1352186 at *2 (W.D. Okla.

Mar. 15, 2018) (permanent injunction against abortifacient mandate for "all current and future participating employers in the GuideStone Plan").

Relief also should extend to the government's coercive of health plans and insurers and third-party administrators (TPAs) to the extent they are offering services in connection with health plans of CEA and its members. This relief ensures that insurers and TPAs may lawfully offer coverage and services in connection with CEA health plans that exclude coverage of services that seek to alter a person's sex. *See Christian Emps. All.*, 2019 WL 2130142 at *6 (enjoining government from enforcing abortifacient mandate "against the Alliance and its members, their health plans, and their insurers and third-party administrators in connection with Alliance member health plans").

## CONCLUSION

In sum, this Court and the Eighth Circuit resolved all pertinent issues in CEA's favor entitling it to receive final judgment. *Religious Sisters* sustained RFRA relief against these mandates and confirmed that associational standing exists if the organization identifies an affected member. CEA identified at least two. The record supports issuing final judgment and a permanent injunction to protect CEA and its present and future members. No potential new HHS rule reiterating its mandate prevents final judgment—indeed, it shows CEA needs relief. Judgment on CEA's RFRA claims would avoid the need to rule on the other claims.

Therefore, the Court should certify that there is "no just reason for delay" to enter a partial final judgment for CEA under Fed. R. Civ. P. 54(b) on its two RFRA claims and to issue the permanent injunction. This Court may then stay CEA's remaining claims pending the outcome of any appeal by Defendants. If Defendants do not appeal, or if they appeal and the Court's order is fully-affirmed, the Court may dismiss CEA's other remaining claims without prejudice.

Respectfully Submitted,

*/s/ Matthew S. Bowman*

**Matthew S. Bowman**
DC Bar No. 993261
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622
mbowman@ADFlegal.org

**Julie Marie Blake**
VA Bar No. 97891
**Jacob Ethan Reed**
OH Bar No. 99020
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, Virginia 20176
Telephone: (571) 707-4655
Facsimile: (571) 707-4790
jblake@ADFlegal.org
jreed@ADFlegal.org

*Counsel for Plaintiff Christian Employers Alliance*

This 26th day of October, 2023.